IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| **Zachary Zurich**,<br><br>Plaintiff and<br>Counterclaim-Defendant<br><br>v.<br><br>**David Neiswenter**, individually, and David Neiswenter as member of all named nominal defendants.<br><br>Defendant and<br>Counterclaim-Plaintiff<br><br>**NEIS Acquisitions 5192, LLC**, a Georgia limited liability company<br><br>**NEIS Acquisitions AUXGA, LLC**, a Georgia limited liability company<br><br>Nominal Defendants,<br><br>**NEIS Acquisitions GA, LLC**, a Georgia limited liability company,<br><br>**NEIS Acquisitions PopGA1, LLC**, a Georgia limited liability company,<br><br>**NEIS Acquisitions 5192, LLC**, a Tennessee limited liability company,<br><br>**NEIS Acquisitions 5192, LLC**, an Illinois limited liability company,<br><br>**NEIS Acquisitions 6433 KY, LLC**, a Kentucky limited liability company, | Civil Action File No.<br>5:26-cv-00388-MTT |



112809826v6

**NEIS Acquisitions 6471, LLC**, a Kentucky limited liability company,

**NEIS Acquisitions 28232 PA, LLC**, a Pennsylvania limited liability company,

**NEIS Acquisitions 28382 PA, LLC**, a Pennsylvania limited liability company,

**NEIS Acquisitions 3502 IN, LLC**, an Illinois limited liability company,

**NEIS Acquisitions 22298, LLC**, a Texas limited liability company,

**NEIS Acquisitions 4651 SC, LLC**, a South Carolina limited liability company,

**FDSTLMO 26945, LLC**, a Missouri limited liability company, and

**National Property Management Services, LLC**, a Georgia limited liability company.

Additional Nominal Defendants Joined Pursuant to Rules 13(h), 19, and 20,

**The Law Office of Zachary Zurich, P.A.**, a Florida Professional Association and

**2364 TICZ, LLC**, a Georgia limited liability company

Additional Counterclaim )
Defendants Joined Pursuant to )
Rules 13(h) and 20. )
_______________________________ )

**DAVID NEISWENTER'S VERIFIED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

**RESPONSES TO NUMBERED ALLEGATIONS[1]**

**I. Nature of the Action**

1. Defendants admit that Plaintiff purports to assert claims for breach of fiduciary duty and judicial dissolution. Defendants deny that Plaintiff is entitled to money damages, judicial dissolution, or any other relief requested in the First Amended Complaint. Defendants deny the remaining allegations in Paragraph 1.

2. Defendants admit that Plaintiff and Defendant David Neiswenter each hold a fifty-percent membership interest in Neis Acquisitions AUXGA, LLC. Defendants further admit that Plaintiff and Neiswenter each hold a fifty-percent membership interest in the Illinois limited liability company identified in the First Amended Complaint as Neis Acquisitions 5192, LLC. Defendants admit that multiple entities hold interests in parcels comprising portions of Eisenhower

[1] The headings, titles, captions, and descriptive labels used throughout this Answer, Affirmative Defenses, and Counterclaims Complaint are included solely for convenience of reference and organizational purposes. No heading, caption, section title, paragraph title, count title, or descriptive label shall be construed as an admission of any fact, legal conclusion, characterization, allegation, claim, defense, relationship, status, authority, liability, or entitlement asserted by any party. To the extent any heading employed by Plaintiff contains a legal conclusion, factual characterization, or other allegation, Defendants expressly deny the same except as expressly admitted in the corresponding response.

Crossing and adjoining property. Defendants deny any remaining allegations in Paragraph 2 to the extent they inaccurately characterize the ownership, title, legal relationships, or respective interests of the referenced entities.

3. Denied.

4. Defendants admit that the City National Bank loan referenced in the First Amended Complaint matures on December 17, 2026. Defendants further admit that leasing, financing, and related business matters have been the subject of discussion and disagreement between Plaintiff and Neiswenter. Defendants deny that Neiswenter has improperly refused to lease, sell, permit action, or otherwise caused the Companies to be unable to address the loan maturity. Defendants deny the remaining allegations in Paragraph 4.

5. Defendants admit that Plaintiff seeks the relief described in Paragraph 5. Defendants deny that Plaintiff is entitled to that relief.

## II. Parties

6. Defendants lack knowledge or information sufficient to form a belief regarding Plaintiff's current domicile and therefore deny the allegations in Paragraph 6, except Defendants admit that Plaintiff has represented that Plaintiff is a citizen of Virginia.

7. Defendant Neiswenter admits that he is a natural person and a citizen of Florida domiciled in Broward County, Florida.

8. Defendants admit that Neis Acquisitions 5192, LLC is a Georgia limited liability company organized under the control number stated in Paragraph 8. Defendants admit that its operating agreement identifies an Illinois limited liability company bearing the same name as its member. The referenced operating agreement speaks for itself, and Defendants deny any characterization inconsistent with its terms.

9. Defendants admit that the Illinois limited liability company identified by Plaintiff is not presently named as a party and that its operating agreement identifies Plaintiff and Neiswenter as fifty-percent members. Defendants further admit that Plaintiff and Neiswenter executed certain organizational and operating documents in various capacities relating to the entities described in the Complaint. The referenced operating agreements and organizational documents speak for themselves and are the best evidence of their contents. Defendants deny the allegation that Plaintiff and Neiswenter managed the business and affairs of Neis Acquisitions 5192, LLC in the manner characterized by Plaintiff and deny any characterization inconsistent with the governing documents.

10. Defendants admit that Neis Acquisitions AUXGA, LLC is a Georgia limited liability company organized under the control number stated in Paragraph 10. Defendants admit that the referenced operating agreement identifies Plaintiff and Neiswenter as fifty-percent members. The operating agreement speaks for itself.

11. Defendants admit that 2364 TICZ, LLC and Neis Acquisitions GA, LLC are Georgia limited liability companies holding interests in certain property at issue. Defendants admit that 2364 TICZ, LLC is owned by Plaintiff and that Neis Acquisitions GA, LLC is owned by Neiswenter. Defendants lack knowledge sufficient to admit or deny Plaintiff's allegations concerning the citizenship attributed to 2364 TICZ, LLC and therefore deny those allegations. Defendants deny any remaining allegations or legal conclusions in Paragraph 11.

## III. Jurisdiction and Venue

12. Paragraph 12 states legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Plaintiff invokes diversity jurisdiction under 28 U.S.C. § 1332, but deny that the First Amended Complaint adequately establishes subject-matter jurisdiction and deny any allegation inconsistent with Defendants' jurisdictional defenses.

13. Defendants admit that Plaintiff alleges an amount in controversy exceeding $75,000 and purports to rely on Count I to satisfy the jurisdictional threshold. Defendants deny that Plaintiff has a valid claim for damages exceeding $75,000 or in any other amount.

14. Defendants admit that Plaintiff labels the entity Defendants as "nominal defendants" and states that Plaintiff seeks no damages from them. Defendants deny that merely labeling the entity Defendants as nominal controls their status for

jurisdictional purposes. Defendants further deny that the substantive controversy is limited to Plaintiff and Neiswenter as shown in Neiswenter's counterclaims.

15. Paragraph 15 contains legal argument and conclusions to which no response is required. To the extent a response is required, Defendants admit that the cited authorities speak for themselves but deny Plaintiff's interpretation or application of those authorities to the facts alleged here.

16. Defendants admit that Paragraph 16 identifies a potential jurisdictional issue arising from the citizenship of the entity Defendants and their members.

17. Paragraph 17 states legal argument and conclusions to which no response is required. To the extent a response is required, Defendants deny that Plaintiff has established that either entity Defendant is dispensable, that complete relief may be accorded without the entity Defendants, or that Count I may properly proceed if the entity Defendants are dropped. Defendants further deny that Count I states a valid direct claim against Neiswenter.

18. Defendant Neiswenter admits that he has transacted business relating to Georgia limited liability companies and Georgia real property. Defendants deny any remaining allegations or legal conclusions in Paragraph 18.

19. Defendants do not contest that the events and property alleged in the First Amended Complaint bear a relationship to Bibb County, Georgia. Defendants

otherwise deny the legal conclusions in Paragraph 19 and preserve all objections and defenses concerning jurisdiction and venue.

20. Defendants admit that Bibb County lies within the Macon Division of the Middle District of Georgia.

## IV. The Companies and the Property

21. Defendants admit that the referenced deed is recorded in the public records identified in Paragraph 21 and reflects the ownership percentages stated therein. The deed speaks for itself, and Defendants deny any characterization inconsistent with its terms.

22. Defendants admit that Neis Acquisitions 5192, LLC holds a 60.75% undivided interest in the property conveyed by the deed referenced in Paragraph 21; that Neis Acquisitions GA, LLC holds a 19.625% undivided interest; and that 2364 TICZ, LLC holds a 19.625% undivided interest. Defendants further admit that Neis Acquisitions GA, LLC is owned by Neiswenter and that 2364 TICZ, LLC is owned by Plaintiff. The deed and applicable governing documents speak for themselves regarding the authority necessary to convey, encumber, or lease the property. Defendants deny any inconsistent characterization.

23. Defendants admit that AUXGA is not identified as a grantee in the December 2021 deed referenced in Paragraph 21. Defendants admit that AUXGA has been involved in leasing matters relating to portions of Eisenhower Crossing.

Defendants deny Plaintiff's allegations to the extent they inaccurately characterize AUXGA's ownership, title, role, or authority. Defendants lack sufficient knowledge to admit or deny Plaintiff's allegation concerning every document in which AUXGA has been identified and therefore deny that allegation. Neiswenter asserts that the ownership of Eisenhower Crossing shopping center and encumbrances are more completely and accurately discussed in Neiswenter's counterclaims.

24. Defendants admit that the properties referenced in Paragraph 24 include a regional shopping center and that the shopping center has included multiple tenants, including certain tenants identified in Paragraph 24. Defendants deny any remaining allegations to the extent they mischaracterize the applicable property, ownership, tenancy, or title records.

25. Defendants admit that the referenced promissory note was executed, that it had an original principal amount of $8,967,915.00, and that it matures on December 17, 2026. The note speaks for itself regarding its terms, and Defendants deny any characterization inconsistent with the note.

26. Defendants admit that the loan is secured by certain recorded loan and security documents and that certain guaranties were executed. The referenced documents speak for themselves. Defendants deny any inaccurate or incomplete characterization of those documents.

27. Defendants lack knowledge sufficient to admit or deny that $8,369,190.47 is the current outstanding balance and therefore deny the allegation.

28. Defendants admit that City National Bank of Florida issued correspondence dated June 5, 2026 addressing a debt-service-coverage-ratio covenant. The correspondence speaks for itself. Defendants deny any characterization inconsistent with the complete correspondence and applicable loan documents.

29. Defendants admit that the loan matures on December 17, 2026. Defendants deny that the Companies are incapable of addressing the loan maturity or that Plaintiff's proposed liquidation or sale is the only available means of doing so.

## V. The Governing Agreements and the Alleged Deadlock

30. Defendants admit that the referenced entities are governed by written operating agreements and that Plaintiff attached documents purporting to be copies of those agreements. The agreements speak for themselves. Defendants deny any allegation inconsistent with their terms.

31. Defendants admit that Section 1.1 of the document attached as Exhibit C contains the language quoted by Plaintiff. Defendants lack knowledge sufficient to admit Plaintiff's allegations concerning the cause of the language, the parties'

alleged historical treatment of the document, or the existence of any other agreement, and therefore deny those allegations.

32. Defendants admit that Paragraph 32 quotes portions of the operating agreement attached as Exhibit A. The agreement speaks for itself, and Defendants deny any incomplete or inaccurate characterization of its terms.

33. Defendants admit that the operating agreements attached as Exhibits B and C contain language concerning contracts for sale or lease. The agreements speak for themselves, and Defendants deny Plaintiff's characterization to the extent it is incomplete or inconsistent with the agreements as a whole.

34. Defendants admit that the final sentence of Section 2.1(b) of the operating agreement attached as Exhibit A provides certain authority to Plaintiff concerning documents necessary for completing a purchase or sale of real property and borrowing money in connection therewith. Defendants deny Plaintiff's interpretation of the scope, effect, or enforceability of that provision and deny any suggestion that Plaintiff may exercise that authority in violation of fiduciary duties, contractual obligations, objections by other interested parties, ownership rights of other entities, or applicable law. Defendants admit that Neis Acquisitions 5192, LLC owns less than the entirety of the property described in Paragraph 21.

35. Defendants admit that Plaintiff and Neiswenter each hold fifty-percent interests in the entities identified in Paragraph 35. The governing agreements speak

for themselves regarding voting and approval requirements. Defendants deny that the Companies are categorically incapable of leasing or selling property or otherwise conducting business, and deny Plaintiff's characterization of every disagreement as a disabling deadlock.

36. Defendants admit that Section 6.1 of the referenced operating agreements contains the quoted language. Defendants deny that Plaintiff is indefinitely trapped in the Companies or that no lawful or commercially reasonable means exists to address the parties' relationship.

37. Defendants admit that the referenced operating agreements do not contain provisions expressly labeled as a "tiebreaking provision," "buy-sell provision," "put," "call," or "appraisal procedure." Defendants deny Plaintiff's remaining characterizations and legal conclusions.

38. Paragraph 38 states a legal conclusion and quotes or paraphrases Georgia law. The cited statute speaks for itself. Defendants deny any suggestion that Neiswenter violated any duty imposed by law or contract.

## VI. <u>Plaintiff's Allegations Concerning Neiswenter's Conduct</u>

39. Denied.

## I. <u>Rainbow; Suite 428 Expansion and Extension</u>

40. Defendant admit that Rainbow USA Inc. has occupied space at the shopping center pursuant to a written lease and amendments. The lease documents

speak for themselves regarding the tenant, premises, square footage, and terms. Defendants deny any inaccurate characterization.

41. Defendant admit that documents concerning a proposed Second Amendment to Lease were circulated and that the proposed amendment concerned an expansion into additional space. Defendants deny that the proposed document was complete, accurate, binding, or ready for execution by all required landlord parties, and deny any remaining allegations inconsistent with the complete communications and proposed amendment.

42. Defendants admit that the proposed Second Amendment included language identifying certain entities as "Landlord" and described certain property and space. The document speaks for itself. Defendants deny any allegation suggesting that Plaintiff possessed unilateral authority to bind all identified landlord entities.

43. Defendants admit that communications from the tenant or its counsel included deadlines and statements regarding further negotiations and the tenant's intentions. Those communications speak for themselves. Defendants lack sufficient information to admit or deny Plaintiff's allegations concerning every alleged co-tenancy consequence and therefore deny those allegations.

44. Defendants admit that Plaintiff transmitted and signed the proposed amendment in certain capacities. Defendants deny that Plaintiff's unilateral

signatures bound Neis Acquisitions GA, LLC or otherwise created a fully enforceable agreement against all required landlord parties.

45. Defendants admit that Neiswenter did not execute the proposed Second Amendment on behalf of Neis Acquisitions GA, LLC or in any other capacity. Defendants deny that the failure to execute that version of the proposed amendment was wrongful or contrary to the Companies' interests.

46. Defendants admit that Neiswenter communicated to Rainbow that the proposed Second Amendment was factually inaccurate and also communicated separately to Zurich that the proposed Second Amendment could not be executed in its then-current form. Defendants deny the remaining allegations in Paragraph 46, as stated.

## II. <u>Ross Dress For Less and dd's Discounts</u>

47. Defendants admit that a nonbinding letter of intent dated January 20, 2026 was circulated concerning a proposed lease transaction. The letter of intent speaks for itself regarding the proposed parties, premises, and terms. Defendants deny any allegation suggesting that an enforceable lease existed.

48. Defendants admit that Paragraph 48 recites certain proposed economic and delivery terms contained in the nonbinding letter of intent. The document speaks for itself. Defendants deny any incomplete or inaccurate characterization.

49. Defendants admit that Plaintiff signed an acknowledgment associated with the letter of intent without authorization of Mr. Neiswenter and that the tenant acknowledgment was not executed. Defendants deny that Plaintiff possessed unilateral authority to approve a binding lease transaction on behalf of all necessary parties.

50. Defendants admit that tenant-progress materials or construction materials were circulated and that certain materials identified "Andy Neiswenter" as a landlord representative. Defendants deny that circulation of preliminary construction documents established a binding lease, binding landlord obligation, or mutually approved transaction.

51. Defendants admit that Neiswenter sent communications seeking clarification concerning the absence of a mutually agreed lease and the circulation of construction materials. Defendants deny that Neiswenter "repudiated" an enforceable transaction, deny that any binding lease existed, and deny that Neiswenter wrongfully caused the proposed transaction not to proceed.

52. Defendants admit that Neiswenter sent a July 31, 2026 communication concerning review of lease restrictions, co-tenancy provisions, owner's easement agreement provisions (OEA), and proposed amendments. Defendants deny Plaintiff's incomplete characterization of that communication and deny that Neiswenter wrongfully failed to produce any document or approve any lease.

## III. **Five Below**

53. Defendants admit that a proposed letter of intent dated July 10, 2026 concerned a potential lease to Five Below. The letter of intent speaks for itself regarding its nonbinding terms, proposed parties, premises, and square footage.

54. Defendants admit that the proposed letter of intent included proposed rent, tenant-improvement, and exclusivity provisions. The document speaks for itself. Defendants deny any allegation treating the proposed terms as approved or binding.

55. Defendants admit that the proposed Five Below transaction included conditions relating to other tenants or transactions. The letter of intent speaks for itself. Defendants deny that Neiswenter caused any condition to fail or wrongfully prevented any transaction.

56. Defendants admit that the landlord acceptance block was not executed for the Five Below letter of intent by Neiswenter or Zurich. Defendants deny that Neiswenter wrongfully withheld authorization and deny that any alleged failure of the dd's transaction was wrongfully caused by Neiswenter. Defendants additionally assert that as of the filing of this response, both Five Below and dd's are in active negotiations neither of which have been brought to a resolution for final execution.

## IV. Electric Vehicle Charging Installation

57. Defendants admit that a proposed Electric Vehicle Charging Station Hosting Agreement was prepared or circulated. The document speaks for itself regarding its terms, proposed compensation, parties, and contingencies. Defendants deny that Plaintiff possessed unilateral authority to bind all necessary parties.

58. Defendants admit that the proposed agreement contained proposed compensation and contingencies. The agreement speaks for itself.

59. Defendants admit that Plaintiff signed the proposed agreement and that Neiswenter did not execute all documents requested in connection with the proposal. Defendants deny that Neiswenter wrongfully prevented the transaction or breached any legal or contractual duty.

## V. GameStop

60. Defendants lack knowledge sufficient to admit or deny Plaintiff's allegations concerning every communication with GameStop and therefore deny the allegations. Defendants specifically deny that Neiswenter wrongfully rejected any approved proposal or caused any rental stream to be lost.

## VI. Deferred Landlord Obligations

61. Defendants admit that quotations or proposals concerning roof work were obtained or discussed. Defendants deny that Neiswenter wrongfully refused to

approve required work and deny that any conduct by Neiswenter breached the governing agreements or any fiduciary duty.

## VII. Offers to Purchase and the Refusal to List

62. Defendants admit that certain broker opinions or valuation materials were obtained or circulated. Those materials speak for themselves. Defendants lack sufficient knowledge to admit that the listed range accurately reflects all opinions or the current value of the relevant property and therefore deny those allegations.

63. Defendants deny Plaintiff's characterization of Neiswenter's position regarding occupancy, leasing, net operating income, or property value. Defendants further deny that every broker unanimously rejected any position held by Neiswenter or that Plaintiff accurately characterizes the complete communications.

64. Defendants admit that materials concerning a potential purchase by Dhanani Private Equity Group were transmitted. Defendants deny that a binding or fully qualified offer existed, that the stated amount or terms reflected a transaction in the Companies' best interests, or that Neiswenter wrongfully failed to respond.

65. Defendants deny that Neiswenter wrongfully refused to engage or breached any legal, contractual, or fiduciary duty.

66. Defendants admit that an unsigned proposed listing agreement dated June 11, 2026 exists and identifies certain entities as owners. The proposed agreement speaks for itself. Defendants admit that Neiswenter did not approve or

execute the proposed listing agreement. Defendants deny that Neiswenter wrongfully refused to market or sell Company property and deny that Plaintiff may unilaterally market jointly owned property without the approvals required by the governing agreements and applicable ownership interests.

67. Defendants admit that Neis Acquisitions GA, LLC owns an undivided 19.625% interest in the property referenced in Paragraph 21 and is owned by Neiswenter. Defendants deny Plaintiff's pejorative characterization of the entity's ownership interest as "foreclosing" a sale. The deed and governing documents speak for themselves concerning the rights of each tenant in common.

## VIII. Written Demand and Refusal

68. Defendants admit that Plaintiff sent an email on or about August 3, 2026 making various assertions and demands concerning leasing, financing, distributions, and receivership. The email speaks for itself. Defendants deny the truth of Plaintiff's accusations and characterizations contained therein.

69. Defendants admit that Plaintiff's communication included the quoted statement concerning alleged deadlock. Defendants deny Plaintiff's characterization of the parties' disagreements and deny that the Companies were incapable of continued operation.

70. Defendants admit that Neiswenter did not sign the proposed Rainbow amendment by Plaintiff's unilateral deadline. Defendants deny the remaining

allegations, including that Neiswenter failed to respond substantively or wrongfully failed to take any action demanded by Plaintiff.

## IX. Alleged Purpose

71. Denied.

72. Defendants deny that Neiswenter communicated an improper intent to coerce Plaintiff into selling interests at a discount. Defendants admit only that the parties have discussed possible business resolutions, including potential transactions involving their respective interests. Defendants deny the remaining allegations.

## VII. Alleged Consequences

73. Denied.

74. Denied. Defendants further deny that the proposed transactions would necessarily have produced the alleged minimum rent, would have become binding leases, or would have continued for the alleged terms.

75. Paragraph 75 contains generalized valuation assertions and legal conclusions. Defendants deny that Plaintiff has established any loss, diminution in value, causation, or recoverable damages.

76. Denied.

77. Defendants admit that City National Bank issued correspondence regarding a debt-service-coverage-ratio covenant. Defendants deny that Neiswenter

caused any alleged default or that Plaintiff has established causation between any act by Neiswenter and the lender's position.

78. Defendants admit that the loan matures on December 17, 2026. Defendants deny that foreclosure, default interest, or enforcement costs are inevitable; deny that the Companies are incapable of refinancing or otherwise addressing the maturity; and deny that any alleged offer required acceptance.

79. Denied.

## COUNT I

### Alleged Breach of Fiduciary Duty – O.C.G.A. § 14-11-305 (Direct Claim Against Defendant Neiswenter)

80. Defendants incorporate their responses to Paragraphs 1 through 79 as though fully set forth herein.

81. Defendants admit that Neiswenter participates in management of certain entities and that Georgia law speaks for itself regarding applicable duties. Defendants deny that Neiswenter breached any duty owed to Plaintiff or any Company.

82. Defendants admit that Plaintiff labels Count I as a direct claim. Defendants deny that Plaintiff possesses a valid direct claim based on the alleged injuries.

83. Paragraph 83 contains legal argument and characterizations of case law to which no response is required. The cited authority speaks for itself. To the extent

a response is required, Defendants deny Plaintiff's interpretation and application of that authority.

84. Paragraph 84 contains legal argument and characterizations of case law to which no response is required. The cited authorities speak for themselves. Defendants deny that Plaintiff has established circumstances permitting the alleged direct claim.

85. Denied. Defendants specifically deny Plaintiff's subparagraphs (a) through (d) and deny that the asserted reasons for requiring a derivative action are absent or inapplicable.

86. Denied.

87. Denied.

88. Denied.

89. Denied.

90. Defendants admit that Plaintiff purports, in the alternative, to assert a derivative claim on behalf of AUXGA. Defendants deny that Plaintiff satisfied the statutory prerequisites for such a claim, deny that waiting the applicable statutory period would cause irreparable injury, deny that Plaintiff fairly and adequately represents AUXGA's interests, and deny that Neiswenter breached any duty or caused any recoverable injury.

Defendants deny that Plaintiff is entitled to any relief requested in the WHEREFORE clause following Paragraph 90.

**COUNT II**

**Alleged Judicial Dissolution – O.C.G.A. § 14-11-603**

91. Defendants incorporate their responses to Paragraphs 1 through 79 as though fully set forth herein.

92. Paragraph 92 states a legal conclusion and paraphrases O.C.G.A. § 14-11-603. The statute speaks for itself. Defendants deny that the statutory requirements for dissolution have been satisfied.

93. Defendants admit that Plaintiff is identified as a member of AUXGA. Defendants deny that Plaintiff is entitled to dissolution of AUXGA.

94. Defendants admit that the member of record of Neis Acquisitions 5192, LLC is the Illinois entity identified in the First Amended Complaint. Defendants lack sufficient knowledge to admit Plaintiff's allegation concerning the Illinois entity's current administrative status and therefore deny that allegation. Defendants deny that Plaintiff has standing or authority to seek dissolution of Neis Acquisitions 5192, LLC "for" its member, deny that the Illinois entity is incapable of acting, and deny Plaintiff's remaining legal conclusions.

95. Denied.

96. Denied.

97. Defendants admit that the parties have disagreed concerning certain leasing, financing, operational, and disposition issues. Defendants deny that continued operation is not reasonably practicable, deny that the alleged disagreements require dissolution, and deny Plaintiff's characterization of the Companies' financial condition and available alternatives.

98. Denied.

Defendants deny that Plaintiff is entitled to any relief requested in the WHEREFORE clause following Paragraph 98.

## **Response to Prayer for Relief**

Defendants deny that Plaintiff is entitled to any relief requested in Paragraphs (A) through (F) of the Prayer for Relief, including damages, dissolution, winding up, dismissal or dropping of parties under Federal Rule of Civil Procedure 21, interest, costs, attorney's fees, or any other relief.

## **Response to Jury Demand**

Defendants admit that Plaintiff has demanded a jury trial. Defendants likewise demand a trial by jury on all claims and issues so triable.

## **AFFIRMATIVE DEFENSES**

Without assuming any burden not otherwise imposed by law, Defendant David Neiswenter, individually and in all capacities asserted by Plaintiff, and the Nominal Defendants, assert the following affirmative and other defenses:

**First Defense**

The First Amended Complaint fails to state a claim upon which relief may be granted.

**Second Defense**

Plaintiff lacks standing to pursue some or all of the claims asserted individually and directly. Any injury alleged is derivative of an alleged injury to the entities and cannot be maintained as a direct claim.

**Third Defense**

To the extent any claim is derivative in nature, Plaintiff failed to satisfy all statutory and common-law prerequisites necessary to maintain such claims.

**Fourth Defense**

Plaintiff has failed to join persons and entities whose interests may be materially affected by the relief sought.

**Fifth Defense**

The conduct complained of was undertaken in good faith, for legitimate business reasons, and within the protections afforded by the business judgment rule and applicable law.

**Sixth Defense**

The claims asserted are barred, limited, or otherwise governed by the applicable Operating Agreements, deeds, guaranties, loan documents, leases, and other governing agreements, all of which speak for themselves.

**Seventh Defense**

At all relevant times, Defendant acted honestly, in good faith, and in what Defendant believed to be the best interests of the companies.

**Eighth Defense**

Plaintiff's claims are barred, in whole or in part, by waiver.

**Ninth Defense**

Plaintiff's claims are barred, in whole or in part, by estoppel.

**Tenth Defense**

Plaintiff's claims are barred, in whole or in part, by laches.

**Eleventh Defense**

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

**Twelfth Defense**

Plaintiff failed to mitigate the damages alleged in the First Amended Complaint.

**Thirteenth Defense**

The damages alleged by Plaintiff are speculative, uncertain, remote, contingent, and otherwise unrecoverable as a matter of law.

**Fourteenth Defense**

Any damages alleged by Plaintiff were caused, in whole or in part, by the acts, omissions, business decisions, economic conditions, market forces, lenders, tenants, third parties, or Plaintiff himself, constituting intervening and superseding causes.

**Fifteenth Defense**

Any recovery by Plaintiff must be reduced by offset, recoupment, set-off, unrecouped distributions, intercompany obligations, reimbursements, allocations, charges, liabilities, damages, and other amounts owed by Plaintiff.

**Sixteenth Defense**

The extraordinary remedy of judicial dissolution is unavailable because the companies are capable of operating in conformity with their governing documents and because adequate alternative remedies exist.

**Seventeenth Defense**

Plaintiff consented to, participated in, approved, ratified, acquiesced in, or benefited from some or all of the acts about which Plaintiff complains.

## Eighteenth Defense

Plaintiff's claims improperly disregard the separate legal existence of multiple entities and multiple ownership interests affecting the Property, including tenants-in-common and non-party entities whose ownership rights limit the ability of any single member to unilaterally lease, sell, finance, transfer, or otherwise dispose of Company property.

## Nineteenth Defense

Defendants presently lack sufficient information to determine whether additional affirmative defenses may exist. Defendants therefore expressly reserve the right to amend these defenses, assert additional defenses, and supplement this Answer as discovery and investigation proceed.

## DEFENDANT DAVID NEISWENTER’S COUNTERCLAIMS

Counterclaim-Plaintiff David Neiswenter (“Neiswenter”) asserts these Counterclaims against Counterclaim-Defendants Zachary Zurich (“Zurich”), The Law Office of Zachary Zurich, P.A. (the “Law Office”), and 2364 TICZ, LLC, arising from the unilateral control and transfer of Company funds, the exclusion of Neiswenter from Company accounts and financial information, the use of trust and other accounts outside the Companies’ ordinary operating structure, interference

with Company governance, and related breaches of fiduciary, contractual, statutory, and equitable obligations.

Each Counterclaim Defendant is referred to individually by name and collectively, where appropriate, as the "Counterclaim Defendants." The claims against each Counterclaim Defendant are asserted only to the extent supported by the allegations applicable to that Counterclaim Defendant.

## General Factual Allegations

### I. Parties

1. At all times relevant hereto, David Neiswenter ("Neiswenter") and Zachary Zurich ("Zurich") were equal owners of multiple limited liability companies and affiliated entities holding interests in commercial real estate, banking relationships, operating accounts, and related assets (collectively, the "Jointly Owned Companies").

2. The Jointly Owned Companies include:

(a) NEIS Acquisitions 5192, LLC, a Georgia limited liability company;

(b) NEIS Acquisitions AUXGA, LLC, a Georgia limited liability company;

(c) NEIS Acquisitions PopGA1, LLC, a Georgia limited liability company;

(d) NEIS Acquisitions 5192, LLC, a Tennessee limited liability company;

(e) NEIS Acquisitions 5192, LLC, an Illinois limited liability company;

(f) NEIS Acquisitions 6433 KY, LLC, a Kentucky limited liability company;

(g) NEIS Acquisitions 6471, LLC, a Kentucky limited liability company;

(h) NEIS Acquisitions 28232 PA, LLC, a Pennsylvania limited liability company;

(i) NEIS Acquisitions 28382 PA, LLC, a Pennsylvania limited liability company;

(j) NEIS Acquisitions 3502 IN, LLC, an Illinois limited liability company;

(k) NEIS Acquisitions 22298, LLC, a Texas limited liability company;

(l) NEIS Acquisitions 4651 SC, LLC, a South Carolina limited liability company;

(m) FDSTLMO 26945, LLC, a Missouri limited liability company; and

(n) National Property Management Services, LLC, a Georgia limited liability company.

3. Separate from the Jointly Owned Companies, NEIS Acquisitions GA, LLC is owned solely by Neiswenter and holds an ownership interest in portions of the real property that is the subject of this action. Additionally, separately from the Jointly Owned Companies, 2364 TICZ, LLC is owned solely by Zurich and likewise holds an ownership interest in portions of the real property that is the subject of this action. (hereinafter NEIS Acquisitions GA , LLC and 2364 TICZ, LLC may be referred to as the "Separately Owned Affiliate Entities" herein).

4. Unless otherwise specifically identified, references herein to the "Company" or "Companies" shall mean the Jointly Owned Companies collectively, together with their assets, bank accounts, money-market accounts, reserve accounts, treasury accounts, financial records, business operations, and property interests.

5. Additional Counterclaim Defendant The Law Office of Zachary Zurich, P.A. is, upon information and belief, a professional association organized under the laws of Florida.

6. At all relevant times, Zurich acted as an owner, officer, shareholder, employee, agent, or representative of the Law Office.

7. Upon information and belief, the Law Office maintained or administered one or more bank, trust, escrow, business, or financial accounts through which Company funds were received, held, transferred, administered, or retained, including an account ending in 642187.

8. To date, Counterclaim-Plaintiff has not been provided sufficient information to determine conclusively the legal title, precise account classification, authorized signatories, or complete account history for account ending in 642187. Zurich nevertheless described the account in writing as "my trust account," and available banking records reflect transfers of Company funds into and out of that account.

## II. Jurisdiction and Joinder

9. This Court possesses subject-matter jurisdiction over the claims asserted by Plaintiff pursuant to 28 U.S.C. § 1332. This Court further possesses supplemental jurisdiction over the counterclaims, claims against additional counterclaim defendants, and claims involving the affiliated entities pursuant to 28 U.S.C. § 1367 because such claims arise from the same transactions, occurrences, accounts, transfers, entities, property interests, financial relationships, and disputes that are the subject of the claims asserted in this action.

10. This Court also possesses original federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) over Counterclaim-Plaintiff's claim arising under 18 U.S.C. § 1962(c).

11. Venue is proper in this Court because a substantial portion of the events, transactions, property, conduct, and disputes giving rise to the claims and counterclaims occurred in Bibb County, Georgia, and because the real property that forms a substantial portion of the controversy is situated within this District.

12. Pursuant to Federal Rule of Civil Procedure 13(h), Counterclaim-Plaintiff joins additional parties necessary for the adjudication of the counterclaims asserted herein. Rules 19 and 20 govern such joinder.

13. Pursuant to Rule 19(a), the entities identified in the caption as Additional Nominal Defendants claim interests relating to the funds, bank accounts,

reserve accounts, distributions, investments, accounting records, intercompany transfers, real property interests, and governance matters that are the subject of the claims asserted herein, and complete relief cannot be accorded among the existing parties in their absence.

14. In the absence of the Additional Nominal Defendants, the Court may be unable to determine the ownership, source, destination, allocation, administration, accounting treatment, or disposition of Company funds and assets and may be unable to grant complete declaratory, accounting, injunctive, receivership, or equitable relief concerning the entities and property interests at issue.

15. In addition, the claims asserted in these Counterclaims concern numerous transfers, allocations, distributions, reimbursements, investments, reserve accounts, operating accounts, and other financial transactions involving the Jointly Owned Companies and affiliated entities.

16. The Additional Nominal Defendants are therefore joined pursuant to Rules 13(h) and 19 because they possess interests that may be impaired or affected by the adjudication of the claims asserted herein and because their presence is necessary to avoid inconsistent obligations and duplicative litigation.

17. Upon information and belief, the ownership, source, destination, allocation, accounting treatment, and present status of Company funds cannot be

determined without adjudicating the rights and obligations of the Additional Nominal Defendants and affiliated entities.

18. Pursuant to Federal Rules of Civil Procedure 13(h) and 20(a)(2), Counterclaim-Plaintiff joins The Law Office of Zachary Zurich, P.A. and 2364 TICZ, LLC as Additional Counterclaim Defendants because the claims asserted against them arise out of the same transactions, occurrences, conduct, transfers, accounts, property interests, and course of conduct that form the basis of the claims asserted against Zachary Zurich, and common questions of law and fact will arise in the action.

19. The claims against the Law Office concern the same approximately $1,941,000 transfer, account ending in 642187, subsequent transfers through Company operating accounts, Treasury Direct transactions, demands for disclosure and return, and disputed control of Company funds alleged against Zurich.

20. Upon information and belief, the Law Office received, administered, maintained, retained, controlled, supervised, or otherwise exercised authority over Company funds, trust-account funds, transfer proceeds, and related assets that form a substantial portion of the controversy described herein.

21. Upon information and belief, 2364 TICZ, LLC possesses ownership interests in property, funds, accounts, distributions, transfers, allocations,

reimbursements, reserves, and related assets that are directly implicated by the claims and counterclaims asserted herein.

22. Joinder of the Additional Counterclaim Defendants promotes judicial economy, prevents inconsistent judgments, avoids duplicative litigation, and permits complete adjudication of the ownership, control, administration, accounting, and disposition of Company assets and funds.

23. Counterclaim-Plaintiff reserves the right to seek joinder of additional persons or entities if discovery reveals additional parties possessing interests in the funds, accounts, transfers, assets, liabilities, distributions, reserves, investments, reimbursements, or property that are the subject of this action.

## III. Georgia Property and Ownership Structure

### A. *Eisenhower Crossing Tenant-in Common Property*

24. At all times relevant hereto, the parties held ownership interests in multiple Georgia limited liability companies and Georgia real estate assets.

25. One such asset consists of the commercial shopping-center property commonly known as 4628 and 4640 Presidential Parkway, Macon, Georgia 31206, consisting of approximately 99,963 square feet and commonly referred to by the parties as a grocery-anchored shopping center and located in the Eisenhower Crossing shopping area (the “Tenant-in-Common Property”).

26. The Tenant-in-Common Property consists of Bibb County tax parcels L0840167 and L0840168.

27. Title to the Tenant-in-Common Property is held through a tenancy-in-common ownership structure as follows:

i. NEIS Acquisitions 5192, LLC, a Georgia limited liability company jointly owned by Neiswenter and Zurich, owns a 60.75 percent tenancy-in-common interest in the Tenant-in-Common Property.

ii. Neis Acquisitions GA, LLC, a Georgia limited liability company wholly owned by Neiswenter, owns a 19.625 percent tenancy-in-common interest in the Tenant-in-Common Property.

iii. 2364 TICZ, LLC, a Georgia limited liability company wholly owned by Zurich, owns a 19.625 percent tenancy-in-common interest in the Tenant-in-Common Property.

28. As a result of the foregoing ownership structure, Neiswenter possesses, directly and indirectly, an aggregate fifty-percent ownership interest in the Tenant-in-Common Property and Zurich likewise possesses, directly and indirectly, an aggregate fifty-percent ownership interest in the Tenant-in-Common Property.

29. The Tenant-in-Common Property is improved with income-producing commercial real estate and is operated through a combination of the tenancy-in-common ownership structure and the Jointly Owned Companies described herein.

30. The Tenant-in-Common Property constitutes the only Georgia real property pledged as collateral securing the City National Bank of Florida loan maturing on December 17, 2026. A true and correct copy of the Deed to Secure Debt, Assignment of Rents and Security Agreement, dated December 16, 2021 and recorded on January 21, 2022 in the real-property records of the Superior Court of Bibb County, Georgia, at Deed Book 11126, Pages 348–377, is attached hereto as **Exhibit "A"** and incorporated herein by reference.

31. Only parcels L0840167 and L0840168 are encumbered by the deed to secure debt associated with the City National Bank financing relationship. *See* Ex. A.

32. No other Georgia property described herein is pledged as collateral for that loan.

### B. <u>Eisenhower Crossing Property Owned by NEIS Acquisitions AUXGA, LLC</u>

33. The parties also jointly own NEIS Acquisitions AUXGA, LLC, a Georgia limited liability company, with each party holding a fifty-percent membership interest.

34. NEIS Acquisitions AUXGA, LLC owns the retail and commercial property commonly known as 4657, 4658, 4659, and 4696 Presidential Parkway, Macon, Georgia 31206 (the "AUXGA Property").

35. The AUXGA Property consists of approximately 320,153 square feet of retail, commercial, parking, access, and ancillary real estate and includes Bibb County tax parcels L0840163, L0840169, L0840170, L0840160, L0910033, L0910051, and M0830285.

36. A true and correct copy of the Eisenhower Crossing Tax Parcel Map, depicting the parcels comprising the Tenant-in-Common Property and the AUXGA Property is attached hereto as **Exhibit "B"** and incorporated herein by reference.

37. Parcel L0840169 forms part of the AUXGA Property and is not owned through the tenancy-in-common ownership structure applicable to parcels L0840167 and L0840168.

38. Unlike the Tenant-in-Common Property, the AUXGA Property is owned solely by NEIS Acquisitions AUXGA, LLC and is not owned through the tenancy-in-common ownership structure described above.

39. The AUXGA Property is not encumbered by the City National Bank of Florida loan secured by parcels L0840167 and L0840168.

### C. Additional Affiliated Entities and Intercompany Relationships

40. The parties also possess ownership interests in additional affiliated entities, including NEIS Acquisitions 5192, LLC (a Tennessee limited liability company) and NEIS Acquisitions PopGa1, LLC (a Georgia limited liability company).

41. Upon information and belief, revenues, reserves, distributions, tenant income, reimbursements, transfers, Treasury Direct investments, trust-account funds, and other monies associated with the Tenant-in-Common Property, the AUXGA Property, NEIS Acquisitions 5192, LLC, the Tennessee entity bearing the same name, NEIS Acquisitions PopGa1, LLC, and other affiliated entities have been transferred among accounts controlled or administered by Zurich.

42. Upon information and belief, Company funds have been transferred among multiple affiliated entities and accounts without adequate disclosure and without a complete accounting concerning the ownership, source, destination, allocation, administration, and disposition of those funds.

43. The ownership, allocation, source, destination, accounting treatment, and present status of such funds cannot presently be determined without discovery, production of banking records, Treasury Direct records, trust-account records, accounting records, and a complete accounting.

44. The existence of multiple jointly and separately owned entities, multiple real-estate assets, multiple bank accounts, multiple investment accounts, and multiple intercompany transactions makes a complete accounting necessary to determine the ownership and disposition of Company funds and the rights and obligations among the affiliated entities.

45. Specifically, Neiswenter and Zurich each owned a fifty percent (50%) membership interest in NEIS Acquisitions AUXGA, LLC. Neiswenter and Zurich likewise each owned a fifty percent (50%) membership interest in NEIS Acquisitions 5192, LLC, an Illinois limited liability company, which serves as the sole member of NEIS Acquisitions 5192, LLC, a Georgia limited liability company.

46. As equal members of the Jointly Owned Companies, Zurich and Neiswenter each participated in the management and operation of the Companies and each owed fiduciary duties to the Companies and to one another. Those duties included duties of loyalty, honesty, fair dealing, full disclosure, proper accounting, preservation of Company assets, avoidance of self-dealing, and the obligation to act in a manner reasonably believed to be in the best interests of the Companies.

## IV. Neiswenter's Discovery of Undisclosed Company Bank Accounts and Denial of Access.

47. Around approximately the beginning of 2026, Neiswenter discovered that multiple Company bank accounts existed for entities in which he possessed ownership interests and management rights but to which he had not been granted

access, signatory authority, viewing authority, administrative rights, or other account privileges.

48. Upon information and belief, Zurich exercised exclusive control over the administration of the Company's banking relationships and account-access rights and maintained multiple Company accounts without affording Neiswenter equal access to those accounts.

49. After discovering the existence of the accounts, Neiswenter contacted representatives of City National Bank of Florida and requested access to the Company accounts and recognition as an authorized signer and account representative.

50. On or about August 6, 2026, representatives of City National Bank of Florida advised the parties that updated signature cards would be circulated to add David (Andy) Neiswenter as an authorized signer on multiple Company accounts maintained by the Companies.

51. The bank communication identified Company accounts maintained in the names of:

a. NEIS Acquisitions 6471, LLC (account ending in 6633);

b. NEIS Acquisitions AUXGA, LLC (account ending in 5063);

c. NEIS Acquisitions 4651 SC, LLC (account ending in 1582);

d. NEIS Acquisitions 22298, LLC (account ending in 1078);

e. NEIS Acquisitions 3502 IN, LLC (account ending in 2041); and

f. National Property Management Services, LLC (account ending in 8734).

52. Prior to receiving the communication from City National Bank, and for unknown reasons, Neiswenter had not been provided access to those accounts and had not been granted signatory authority, administrative authority, viewing authority, online access, or other account privileges with respect to those accounts.

53. The existence of the accounts and the need for City National Bank to circulate updated signature cards demonstrated that Company banking relationships existed for multiple entities without Neiswenter possessing the access ordinarily associated with an equal owner and manager.

54. Upon information and belief, Zurich had previously exercised unilateral authority concerning the administration of those accounts and the granting or withholding of account-access rights.

55. Shortly after City National Bank informed the parties that Neiswenter would be added as an authorized signer on the identified Company accounts, Zurich sent Neiswenter an email acknowledging Neiswenter's efforts to obtain access to the accounts and stating: “I see you intend to escalate.”

56. In the same communication, Zurich advised Neiswenter: “I will not consent to your request to be added to the various company bank accounts you requested” and instructed Neiswenter to withdraw the request submitted to City National Bank.

57. Zurich further advised that if Neiswenter refused to withdraw the request by the end of the day, Zurich intended to dissolve the remaining entities and initiate litigation in multiple jurisdictions, stating that Neiswenter would be required to retain counsel in each state and that Company assets would be turned over to receivers for management and sale.

58. Upon information and belief, Zurich's refusal to permit equal access to Company accounts, coupled with his demand that Neiswenter abandon his efforts to obtain access, and his threat to pursue dissolution and litigation if Neiswenter persisted, formed part of a broader effort to maintain exclusive control over Company funds, Company records, Company distributions, Company reserves, Company investments, and Company banking relationships.

59. Zurich's refusal to permit access to Company accounts and his opposition to Neiswenter being added as an authorized signer forms part of the conduct giving rise to the fiduciary-duty, contract, accounting, declaratory-relief, conversion, receivership, and Georgia RICO counter-claims asserted herein.

## V. Zurich's Pattern of Financial Control and Exclusion of Neiswenter from Management

60. At all times relevant hereto, Zachary Zurich and David Neiswenter participated in the management and operation of the Jointly Owned Companies and each owed fiduciary duties to the Companies and to one another.

61. Those duties included duties of loyalty, honesty, fair dealing, full disclosure, preservation of Company assets, proper accounting, avoidance of self-dealing, and the obligation to act in a manner reasonably believed to be in the best interests of the Companies.

62. Beginning no later than 2025 and continuing through the present, Zurich engaged in a pattern of conduct that interfered with the rights of Neiswenter and the Companies, including without limitation:

a. restricting access to Company bank accounts and financial information;

b. excluding Neiswenter from Company banking relationships and account administration;

c. denying Neiswenter signatory authority and account-access rights;

d. transferring Company funds without authorization;

e. commingling Company funds and accounts;

f. exercising unilateral authority over Company finances and investments;

g. interfering with Company governance; and

h. utilizing Company assets, personnel, and resources for purposes not jointly approved by the parties.

## VI. Unauthorized Treasury Direct and Trust-Account Transfers

63. One of the most significant disputes concerns Zurich's unilateral removal, transfer, administration, and retention of Company funds.

64. On or about May 12, 2026, approximately $1,994,384.44 was transferred from a Company account into a Treasury Direct account. Zurich unilaterally initiated the transaction, without authorization from Neiswenter.

65. Bank records subsequently reviewed by Neiswenter reflected a transaction identified as "TREASURY DIRECT TREAS DRCT" in the amount of $1,994,384.44. Upon information and belief, those funds were transferred into one or more Treasury Direct accounts under Zurich's control or administration.

66. Thereafter, on or about August 6, 2026, Zurich caused an additional $1,941,000.00 to be withdrawn from a Company money-market account ending in 547561.

67. The August 6, 2026 transaction was reflected in Company banking records as "WEBXFR TO COMM MMA 642187" in the amount of $1,941,000.00.

The transfer reduced the available balance of the account to approximately $1,000.30.

68. The August 6, 2026 transfer was undertaken by Zurich without the knowledge, authorization, approval, or consent of Neiswenter.

69. As a result of the May 12, 2026 and August 6, 2026 transactions alone, at least $3,935,384.44 in Company funds had been removed from Company accounts through transactions initiated by Zurich without authorization from Neiswenter.

70. Immediately after discovering the August 6, 2026 withdrawal, Neiswenter contacted Zurich and advised him that: “You have withdrawn $1,941,000 from our Company Bank Account today, without my consent. You need to send me evidence of where this money was moved to and the name of the Account Holder in which it is held, today.”

71. Zurich responded by admitting that the transferred funds had been placed into a trust account under his control and stated: “The funds are in my trust account and they'll stay there until further order of the court.”

72. At the time Zurich made that statement, no court order had authorized Zurich to remove the funds from the Company's account, place the funds into a trust account, exercise exclusive control over the funds, or to restrict Neiswenter’s access to those funds.

73. Zurich further stated that he was in the process of filing litigation in multiple jurisdictions and intended to keep the funds in the trust account.

74. Following Zurich's admission that Company funds had been placed into a trust account, Neiswenter advised Zurich that the Law Office was not a party to the Company's governance disputes, objected to the unilateral transfer of Company funds into a law-firm trust account, demanded the immediate return of the funds, and advised Zurich that complaints would be submitted to applicable bar authorities if the funds were not returned.

75. Rather than returning the funds or providing the requested information, Zurich responded: "go for it."

76. Zurich did not return the funds.

77. Instead of returning the funds or providing the requested information, Zurich continues to maintain, administer, transfer, control, or direct control over the disputed funds notwithstanding Neiswenter's objections, demands for disclosure, requests for an accounting, and demands for return of the funds.

78. Upon information and belief, all or substantial portions of the funds were thereafter placed into one or more trust accounts, Treasury Direct accounts, investment accounts, or other accounts outside the Companies' ordinary operating structure.

79. On or about August 11, 2026, approximately $997,168.89 was transferred from the trust account through the operating account of NEIS Acquisitions 5192, LLC (Tennessee) and thereafter transferred into one or more Treasury Direct accounts.

80. Upon further review of City National Bank records and online banking activity, Neiswenter discovered additional transactions occurring on or about August 18, 2026 involving the same group of funds previously transferred from Company accounts.

81. Bank records reflected that approximately $963,276.42 was transferred from Zurich's trust account into the operating account of NEIS Acquisitions 5192, LLC, a Tennessee limited liability company, account ending in 420508.

82. Upon information and belief, substantially all of those funds were immediately transferred out of the operating account and into one or more Treasury Direct accounts or Treasury investments.

83. Bank records further reflected that approximately $19,445.31 was transferred from the operating account of NEIS Acquisitions 5192, LLC, account ending in 420508, back into the trust account maintained by the Law Office, account ending in 642187.

84. Upon information and belief, the foregoing transactions constituted additional transfers of Company funds through the Law Office’s trust account and

through Company operating accounts without the authorization, approval, or consent of Neiswenter.

85. Upon information and belief, these transactions were undertaken as part of a continuing course of conduct through which Zurich exercised exclusive control over Company funds, restricted Neiswenter's access to those funds contrary to Neiswenter’s requests otherwise, and moved Company assets among trust accounts, operating accounts, Treasury Direct accounts, and other financial accounts outside the Companies' ordinary operating structure.

86. As a result of the transfers occurring on May 12, 2026, August 6, 2026, August 11, 2026, August 18, 2026, and related transactions, approximately $4 million in Company funds were removed from ordinary Company accounts and placed into accounts controlled or administered by Zurich, including trust accounts and Treasury Direct accounts.

87. Upon information and belief, the transfers rendered substantial Company funds unavailable for ordinary Company operations, distributions, management decisions, investment decisions, and other Company purposes absent Zurich's unilateral approval.

88. Zurich's conduct deprived, and is depriving, Neiswenter of equal access to, oversight of, and participation in the management of significant Company assets

and forms a substantial portion of the conduct giving rise to the claims asserted herein.

89. As a direct and proximate result of Zurich's actions, Neiswenter and the Companies have sustained damages in an amount to be proven at trial.

**COUNT I: BREACH OF FIDUCIARY DUTY**
(Against Zurich)

90. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

91. Zurich breached the fiduciary duties he owed to the Jointly Owned Companiesand to Neiswenter in numerous respects.

92. Among other things, Zurich unilaterally transferred Company funds without authorization and outside the ordinary course of business.

93. Zurich also restricted and, in some instances, denied Neiswenter access to Company bank accounts, financial records, administrative platforms, and other financial information necessary for Neiswenter to exercise his rights as a fifty-percent owner.

94. Upon information and belief, Zurich caused or permitted Company funds to be transferred into accounts outside the Companies' ordinary operating accounts, including trust accounts, Treasury Direct accounts, investment accounts, and other accounts over which Neiswenter lacked visibility and control.

95. Zurich further failed to provide a complete accounting concerning the location, ownership, disposition, and current status of those funds and failed to provide transparency concerning the movement of Company assets among accounts under his control.

96. Zurich further breached his duties by causing Company assets and Company funds to be commingled with funds belonging to affiliates, related entities, and third parties, thereby impairing transparency and making it more difficult to determine the ownership, source, and disposition of Company funds.

97. In addition, Zurich utilized or permitted the utilization of Company-paid personnel, contractors, and resources for the benefit of entities and assets that were not jointly owned by the parties and from which Neiswenter derived no corresponding benefit.

98. Zurich likewise permitted individuals possessing no ownership interest in the Companies, including third parties and family members, to possess administrative authority, management authority, access rights, or control over Company banking relationships and Company financial accounts while simultaneously restricting Neiswenter's access to those same accounts.

99. Zurich also repeatedly acted unilaterally concerning Company operations, financial relationships, leasing matters, banking relationships, and

management decisions despite the parties' equal ownership interests and despite governing documents requiring joint decision-making.

100. Zurich's conduct was designed to consolidate control over Company assets, restrict Neiswenter's participation in management, and interfere with the ordinary governance of the Companies.

101. Zurich further utilized litigation and receivership proceedings as leverage concerning jointly owned assets and entities.

102. Despite repeatedly representing to a court that emergency judicial intervention was required and that a receiver was necessary to protect Company assets, Zurich later abandoned those proceedings after obtaining a ruling appointing a receiver and immediately recommenced substantially similar litigation in another forum: this case presently before the Court.

103. Discovery will be commencing, and Counterclaim-Plaintiff expects additional breaches of fiduciary duty to be revealed through discovery, including additional unauthorized transfers, undisclosed transactions, account administration issues, intercompany transactions, and acts of self-dealing.

104. As a direct and proximate result of Zurich's conduct, Neiswenter has suffered damages and the Companies have suffered injury in an amount to be determined at trial.

**COUNT II: BREACH OF OPERATING AGREEMENTS**
(Against Zurich)

105. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

106. The Companies are governed by written Operating Agreements that constitute valid and enforceable contracts governing the rights, obligations, authority, management, governance, operations, finances, and affairs of the Companies and their members.

107. At all times relevant hereto, Zurich and Neiswenter were parties to, bound by, and entitled to enforce the Operating Agreements.

108. The Operating Agreements require compliance with the governance structure, approval procedures, member rights, information rights, management requirements, and financial-administration obligations established therein.

109. At all times relevant hereto, Counterclaim-Plaintiff performed his obligations under the Operating Agreements or was excused from further performance by Zurich's conduct.

110. Zurich breached the Operating Agreements in numerous respects.

111. Among other things, Zurich transferred Company funds without obtaining the approvals required by the governance structure established under the Operating Agreements.

112. Zurich further transferred Company funds into Treasury Direct accounts, trust accounts, investment accounts, and other accounts outside the Companies' ordinary operating accounts without authorization and without providing complete information concerning the ownership, control, location, administration, and disposition of those funds.

113. Zurich further restricted or denied Counterclaim-Plaintiff access to Company bank accounts, Company financial records, account-administration information, transfer records, and other Company information to which Counterclaim-Plaintiff was entitled under the Operating Agreements.

114. Zurich further exercised unilateral authority concerning Company finances, Company operations, Company banking relationships, Company accounts, account administration, financial transfers, financial reporting, and other Company matters despite the equal ownership structure of the Companies and despite governance requirements contained in the Operating Agreements.

115. Zurich further granted or permitted third parties to possess administrative authority, account authority, access authority, management authority, financial authority, signatory authority, or other control over Company affairs without the approvals required by the Operating Agreements.

116. Zurich further failed to administer the affairs of the Companies in a manner consistent with the contractual governance structure established by the

Operating Agreements and instead exercised unilateral authority over Company finances, Company records, Company accounts, and Company operations despite the parties' equal ownership interests and management rights.

117. Zurich further failed to provide information, records, account documentation, transfer documentation, financial information, and other Company records necessary for Counterclaim-Plaintiff to exercise his contractual rights under the Operating Agreements.

118. Zurich's conduct materially deprived Counterclaim-Plaintiff of the benefits of the Operating Agreements, including his rights to participate in Company management, monitor Company finances, access Company information, protect Company assets, oversee Company operations, and exercise the rights of an equal owner.

119. Zurich's breaches have caused damage to Counterclaim-Plaintiff and the Companies, including but not limited to costs associated with investigating disputed transfers, tracing Company funds, obtaining access to Company information, protecting Company assets, restoring transparency to Company finances, resolving governance disputes, and such further damages as may be established through discovery and at trial.

120. Zurich's breaches are continuing in nature unless restrained by this Court.

121. As a direct and proximate result of Zurich's breaches of the Operating Agreements, Counterclaim-Plaintiff and the Companies have sustained damages in an amount to be proven at trial.

**COUNT III: ACCOUNTING**
(Against all Counterclaim-Defendants)

122. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

123. Zurich has exercised substantial control over Company finances, Company banking relationships, Company records, Company distributions, and Company accounting functions, and upon information and belief, the Law Office has received, maintained, administered, transferred, retained, or exercised authority over Company funds and records relating thereto.

124. A substantial dispute exists concerning the receipt, transfer, investment, administration, allocation, ownership, and disposition of Company funds, including, without limitation:

a. Company distributions;

b. Company reserves;

c. Treasury Direct investments and accounts;

d. trust accounts and escrow accounts;

e. bank accounts and investment accounts;

f. administrative control of Company accounts;

g. intercompany transfers;

h. co-tenant allocations;

i. management-fee allocations;

j. reimbursements and expense allocations;

k. partner-debt balances;

l. transfers involving affiliated entities;

m. transfers involving accounts controlled by Zurich or persons acting at Zurich's direction;

n. account signatories, administrators, and persons possessing transfer authority;

o. account balances and historical account activity; and

p. other financial transactions relating to the Jointly Owned Companies.

125. Upon information and belief, Zurich possesses or controls financial information, banking records, accounting records, transfer documentation, communications, administrator records, and other information necessary to determine the nature, source, destination, ownership, and present status of Company funds.

126. Upon information and belief, the Law Office possesses or controls records concerning the receipt, custody, administration, transfer, investment, retention, and disposition of Company funds transferred into or through account

ending in 642187, including account records, trust-account records, wire information, transfer instructions, communications, and records identifying account signatories and authorized users.

127. Zurich and the Law Office have failed or refused to provide a complete accounting concerning the nature, ownership, location, transfer, investment, and disposition of Company funds transferred into or through account ending in 642187.

128. Zurich has failed or refused to provide complete information concerning numerous disputed transactions and account relationships, including transactions involving Treasury Direct investments, transfers among affiliated entities, account administration, and the location and disposition of Company funds.

129. Zurich has further failed to provide complete transparency concerning the identity of persons possessing administrative authority, transfer authority, signatory authority, approval authority, or other control over Company financial accounts.

130. Because Zurich and Neiswenter are equal owners of Jointly Owned Companies and because Zurich exercised substantial control over significant portions of the Companies' financial affairs, ordinary legal remedies are inadequate to determine the full extent of the transactions at issue.

131. A full accounting is necessary to determine: the location and ownership of Company funds; the propriety of transfers involving Company assets; the amount

of any distributions, allocations, reimbursements, or payments owed; the existence and extent of any commingling of Company funds; the identity of persons exercising authority over Company accounts; the amount of damages suffered by Neiswenter and the Companies; and such other matters as may be revealed through the accounting process.

132. Neiswenter has no adequate remedy at law to obtain the information necessary to fully determine these issues without an equitable accounting.

133. Equity therefore requires a complete accounting of all Company funds, financial records, account activity, transfers, allocations, reimbursements, account administration, investment activity, and related transactions.

**COUNT IV: DECLARATORY JUDGMENT**

(Against All Counterclaim Defendants)

134. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

135. An actual, present, and justiciable controversy exists between Counterclaim-Plaintiff and Counterclaim-Defendants concerning their respective rights, obligations, authority, and duties relating to the Jointly Owned Companies and the assets owned by those entities.

136. The parties dispute, among other things:

a. the scope of each member's management authority;

b. access to Company bank accounts, financial records, and administrative platforms;

c. the authority to distribute Company funds;

d. the ownership, control, location, and disposition of Company funds;

e. the propriety of prior transfers involving Company funds;

f. the authority to transfer Company funds into Treasury Direct accounts, trust accounts, investment accounts, or other financial accounts;

g. the authority to engage in leasing activity on behalf of the Companies;

h. the authority to negotiate, approve, reject, execute, amend, renew, or terminate leases;

i. the authority to market Company-owned property for sale;

j. the authority to negotiate, approve, reject, or execute purchase and sale transactions involving Company assets;

k. the authority to obtain financing, refinancing, or loan modifications;

l. the authority to grant account access, signatory authority, transfer authority, administrative authority, or viewing authority to third parties;

m. the identity of persons who are properly authorized to access or administer Company accounts;

n. the proper use of Company personnel, contractors, and other Company resources;

o. the parties' respective fiduciary obligations; and

p. the parties' respective rights and obligations under the governing operating agreements.

q. whether The Law Office of Zachary Zurich, P.A. possessed authority to receive, hold, administer, transfer, invest, or retain Company funds through account ending in 642187;

r. whether Company funds maintained in or through account ending in 642187 must be disclosed, accounted for, preserved, and returned.

137. Zurich has repeatedly asserted unilateral authority concerning Company funds, Company operations, leasing activity, banking relationships, account administration, and other Company matters. Neiswenter disputes those assertions and contends that Zurich lacks the authority to take such actions unilaterally.

138. Zurich has further asserted positions concerning the operation of the Companies that are inconsistent with Neiswenter's interpretation of the governing agreements, the ownership structure of the entities, and the parties' historical course of conduct.

139. Unless the Court determines the parties' respective rights and obligations, uncertainty will continue concerning the operation, management, and governance of the Companies.

140. Neiswenter is entitled to a declaration defining the parties' respective rights, authority, duties, obligations, and limitations under the governing agreements and applicable law.

**COUNT V: INJUNCTIVE RELIEF**
(Against All Counterclaim Defendants)

141. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

142. Zurich and the Law Office have engaged in, and upon information and belief continues to engage in, unilateral conduct affecting the Jointly Owned Companies, including their finances, banking relationships, leasing activities, governance, records, personnel, and confidential business information.

143. Specifically, Zurich has exercised unilateral control over Company funds, restricted Neiswenter's access to Company accounts and financial information, caused or permitted Company funds to be transferred into accounts outside the ordinary operating accounts of the Companies, utilized the Law Office trust accounts, Treasury Direct accounts, and other investment accounts without authorization, and failed to provide complete transparency concerning the location, ownership, and disposition of Company funds.

144. Zurich has also acted unilaterally concerning leasing opportunities, tenant negotiations, broker communications, prospective sale opportunities, and related business activities despite the parties' equal ownership interests and despite

governing agreements requiring joint participation and approval in connection with significant Company decisions.

145. Upon information and belief, Zurich has further utilized Company-paid personnel, contractors, and resources for entities, properties, and business activities not jointly owned by the parties while simultaneously restricting Neiswenter's participation in Company operations and management.

146. Zurich's conduct has created a substantial risk of continuing and irreparable harm to the Companies and to Neiswenter, including the loss of Company opportunities, interference with Company governance, impairment of transparency, loss of access to financial information, diminution of Company value, and potential dissipation or concealment of Company assets.

147. Upon information and belief, the Law Office has received, maintained, transferred, retained, administered, possessed, or exercised authority over Company funds or records relating thereto. Unless restrained by this Court, Zurich and the Law Office may continue transferring, investing, retaining, dissipating, concealing, or otherwise impairing the traceability and availability of Company funds.

148. Monetary damages alone are insufficient to protect Neiswenter and the Companies from the continuing effects of Zurich's conduct.

149. Unless restrained by this Court, Zurich and The Law Office of Zachary Zurich, P.A. are likely to continue engaging in unilateral actions affecting Company

finances, Company operations, Company records, leasing opportunities, tenant relations, and Company assets.

150. Counterclaim-Plaintiff has no adequate remedy at law to prevent such continuing harm.

**COUNT VI: CONVERSION**
(Against Zurich and Law Office)

151. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

152. At all relevant times, the jointly owned Companies owned and possessed funds, cash equivalents, bank-account balances, money-market balances, Treasury Direct investments, investment-account balances, reserves, rents, and other monetary assets.

153. As a fifty-percent owner of the jointly owned Companies, Counterclaim-Plaintiff possessed ownership rights and legally protected interests in Company funds and Company assets.

154. Zurich exercised custody, possession, management authority, signatory authority, access authority, administrative authority, and control over Company funds and Company financial accounts.

155. Beginning no later than May 2026, Zurich transferred, controlled, redirected, invested, administered, retained, and exercised dominion over substantial

sums of Company money without authorization and outside the ordinary course of Company business.

156. Those transfers included, without limitation:

a. the transfer of approximately $1,994,384.44 into a Treasury Direct account;

b. the transfer of approximately $1,941,000.00 from a Company money-market account into account ending in 642187;

c. the subsequent transfer of approximately $997,168.89 into Treasury Direct accounts;

d. the subsequent transfer of approximately $963,276.42 into Treasury Direct accounts; and

e. additional transfers and related transactions that will be identified through discovery and a complete accounting.

157. Zurich further exercised dominion and control over Company funds by:

a. restricting Neiswenter's access to Company bank accounts and financial information;

b. refusing to provide complete information regarding the location and disposition of Company funds;

c. failing to provide complete account records and transfer documentation;

d. transferring Company funds into accounts outside the Companies' ordinary operating accounts;

e. transferring Company funds into trust accounts, Treasury Direct accounts, investment accounts, and other accounts under his control; and

f. retaining possession, custody, or control over Company funds after demand for disclosure, accounting, and return.

158. Upon information and belief, Zurich's conduct deprived Counterclaim-Plaintiff and the Companies of possession, control, use, access, transparency, and administration of Company funds.

159. Counterclaim-Plaintiff demanded return of Company funds, disclosure concerning the location of Company assets, identification of receiving accounts, account records, and restoration of access to Company financial information.

160. Zurich failed and refused to return the funds, provide the requested information, or restore access to Company accounts.

161. Zurich exercised dominion and control over Company funds in a manner inconsistent with the rights of Counterclaim-Plaintiff and the Companies by asserting exclusive authority over the disposition, investment, administration,

location, and return of Company funds and by refusing to restore such funds and information after demand.

162. Upon information and belief, the Law Office knowingly received, possessed, administered, retained, transferred, controlled, or otherwise exercised dominion over Company funds transferred into or through account ending in 642187.

163. Upon information and belief, the Law Office exercised dominion and control over Company funds after receiving notice that ownership and control of those funds were disputed and after demands were made for disclosure, tracing, accounting, and return.

164. Upon information and belief, the Law Office lacked authorization from the Companies, Counterclaim-Plaintiff, any Company resolution, escrow arrangement, trust agreement, governing document, or court order authorizing continued possession, administration, retention, or transfer of Company funds.

165. Upon information and belief, the Law Office retained possession, custody, administration, or control of Company funds after receiving notice that ownership and control of the funds were disputed and after demands were made for disclosure, tracing, accounting, preservation, and return.

166. Upon information and belief, the Law Office received and retained the disputed funds despite knowing that the funds originated from Company accounts

and despite being informed that Counterclaim-Plaintiff disputed Zurich's authority to transfer, retain, or exclusively control those funds.

167. As a direct and proximate result of the conduct of Zurich and the Law Office including the unauthorized transfer, receipt, retention, administration, and control of Company funds, Counterclaim-Plaintiff and the Companies have sustained damages in an amount to be determined at trial.

168. The conduct of Zurich and, upon information and belief, the Law Office, constituted an unauthorized assumption and exercise of ownership, dominion, possession, and control over Company property inconsistent with the rights of Counterclaim-Plaintiff and the jointly owned Companies.

169. The conduct of Zurich and, upon information and belief, the Law Office, was intentional, willful, and undertaken in conscious disregard of the rights of Counterclaim-Plaintiff and the Companies.

170. Zurich and, upon information and belief, the Law Office, remain in possession of information, records, accounts, proceeds, investments, funds, or other property necessary to identify the full extent of the converted property.

## **COUNT VII: APPOINTMENT OF RECEIVER**

(Against All Counterclaim Defendants)[2]

171. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

172. The Jointly Owned Companies own, operate, manage, and lease substantial commercial real property and maintain significant financial accounts, investment accounts, banking relationships, tenant relationships, and other assets requiring ongoing management and oversight.

173. The parties each possess a fifty-percent ownership interest in the Companies and possess equal management rights under the governing agreements.

174. A substantial dispute exists concerning the management and operation of the Companies, including disputes concerning:

a. Company bank accounts;

b. Company distributions;

c. control of Company funds;

d. Treasury Direct investments and accounts;

e. trust-account transfers;

[2] Counterclaim-Plaintiff David Neiswenter is the sole member and 100% owner of NEIS Acquisitions GA, LLC, which owns a 19.625% tenancy-in-common interest in the Tenant-in-Common Property. In his capacity as the sole member authorized to act for NEIS Acquisitions GA, LLC, Neiswenter has authorized and consents on its behalf to the appointment of the requested receiver and to the receiver's management, preservation, leasing, operation, maintenance, refinancing, marketing, and administration of the Tenant-in-Common Property, subject to further order of the Court.

f. leasing decisions;

g. tenant negotiations;

h. refinancing efforts;

i. Company records;

j. account administration;

k. signatory authority;

l. management authority; and

m. the overall governance and operation of the Companies.

175. Zurich has exercised unilateral control over substantial Company funds and has transferred Company funds into Treasury Direct accounts, trust accounts, investment accounts, and other financial arrangements outside the Companies' ordinary operating accounts.

176. Zurich has further restricted or impaired Neiswenter's ability to exercise equal oversight concerning Company finances, account administration, and Company operations.

177. The parties' disputes have reached a point where continued management of the Companies through ordinary cooperation is no longer reasonably achievable.

178. As first raised by Zurich’s prior lawsuit and pursuant to Mr. Zurich's own sworn testimony and representations to the court in prior litigation, the

Companies are presently facing significant financial and operational issues, including the maturity of the City National Bank loan scheduled for December 17, 2026, ongoing leasing issues affecting property performance, disputes concerning Company reserves and financial management, and the need for coordinated lender communications and refinancing efforts.

179. Resolution of lender issues, refinancing efforts, leasing opportunities, tenant negotiations, preservation of Company assets, administration of Company funds, and operation of the Companies require neutral oversight.

180. The need for receivership is further demonstrated by the parties' disputes concerning the transfer, administration, investment, location, and control of millions of dollars in Company funds, including disputed transfers involving Treasury Direct accounts, trust accounts, and other financial accounts outside the Companies' ordinary operating structure.

181. Less restrictive remedies are presently inadequate because substantial disputes exist concerning control of Company funds, disputed transfers, account administration, leasing authority, refinancing authority, access to Company records, and day-to-day management of the Companies. The parties' equal ownership interests and inability to resolve these disputes have materially impaired the Companies' ability to operate efficiently and address upcoming lender, leasing, and operational issues.

182. Zurich has previously initiated legal proceedings wherein he requested a receiver and asserted under oath and to the court that the appointment of a receiver was necessary to protect Company assets, preserve Company operations, address management disputes, and safeguard the interests of the Companies and their stakeholders, and obtained the appointment of a receiver in prior litigation involving these same assets and substantially similar allegations.

183. Counterclaim-Plaintiff believes that John F. Kennedy of James Bates Brannan Groover LLP possesses substantial experience in commercial real-estate matters, financial administration, business disputes, receiverships, and court-supervised fiduciary appointments and is well qualified to serve as receiver.

184. Counterclaim-Plaintiff requests that the receiver be vested with all powers necessary to:

a. preserve and protect Company assets;

b. receive, collect, hold, and administer Company funds;

c. obtain and maintain access to all Company accounts, financial records, and financial information;

d. supervise leasing activity and tenant communications;

e. supervise refinancing efforts and lender communications;

f. preserve Company records and electronically stored information;

g. investigate disputed transfers of Company funds;

h. provide accountings and reports to the Court and the parties; and

i. take such other actions as may be necessary to preserve and administer the Companies pending final resolution of this action.

185. Appointment of a receiver is in the best interests of the Companies, their owners, their creditors, and other stakeholders.

**COUNT VIII: GEORGIA RICO VIOLATIONS**
O.C.G.A. § 16-14-1, *et seq*
(Against Zurich and the Law Office)

186. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

187. The Georgia RICO Act prohibits any person, through a pattern of racketeering activity or proceeds derived therefrom, from directly or indirectly acquiring or maintaining any interest in or control of an enterprise or property of any nature, including money. O.C.G.A. § 16-14-4(a). The Act further prohibits a person employed by or associated with an enterprise from directly or indirectly conducting or participating in the enterprise through a pattern of racketeering activity. O.C.G.A. § 16-14-4(b).

188. At all relevant times, the Jointly Owned Companies were legal entities and therefore constituted one or more "enterprises" within the meaning of O.C.G.A. § 16-14-3(3).

189. Counterclaim-Defendant Zurich was associated with and participated in the affairs of the Companies through his ownership interests, participation in management, access to Company funds, control of Company banking relationships, and administration of Company financial accounts.

190. As a member, manager, fiduciary, and person entrusted with access to Company funds, Zurich initially obtained possession of and authority over Company funds subject to the operating agreements, his fiduciary obligations, the rights of his equal co-owner, and the obligation to use, apply, administer, and preserve those funds solely for authorized Company purposes.

191. Upon information and belief, the Law Office was associated with and participated in the affairs of the enterprise through its banking, trust-account, financial-administration, transfer, and custodial activities relating to Company funds.

192. Upon information and belief, Company funds were transferred into, through, or from accounts maintained by or associated with the Law Office, including account ending in 642187.

193. Upon information and belief, the Law Office knowingly participated in or facilitated the receipt, transfer, retention, administration, investment, or control of Company funds after receiving notice that ownership and control of those funds were disputed.

194. Beginning no later than May 2026, Zurich engaged in multiple related acts involving the unauthorized transfer, appropriation, retention, concealment, investment, and control of Company funds.

**The Predicate Acts**

195. On or about May 12, 2026, Zurich transferred or caused the transfer of approximately $1,994,384.44 in Company funds from a Company account into a Treasury Direct account without Counterclaim-Plaintiff's knowledge, consent, or approval and without producing any Company resolution or other authorization supporting that transfer.

196. On or about August 6, 2026, Zurich transferred or caused the transfer of approximately $1,941,000 in Company funds from the Neis Acquisitions 5192, LLC money-market account ending in 547561 to an account ending in 642187. When asked to identify where the funds had been placed, Zurich stated: "The funds are in my trust account and they'll stay there until further order of the court."

197. No court order authorized Zurich to remove the funds from the Company account, place the funds in an account identified as his trust account, or exercise exclusive control over the timing and conditions of their return.

198. On or about August 11, 2026, Zurich transferred or caused the transfer of approximately $997,168.89 from the account ending in 642187, through a Company operating account, and into one or more Treasury Direct accounts.

199. On or about August 18, 2026, Zurich transferred or caused the transfer of approximately $963,276.42 from the account ending in 642187, through a Company operating account, and into one or more Treasury Direct accounts.

200. Additional transactions involving the account ending in 642187 included a transaction of approximately $19,445.31 and may include other transactions to be identified through discovery and a complete accounting.

201. Each transfer constituted a separate exercise of dominion and control over Company property and a separate appropriation or disposition of Company funds.

202. The foregoing transfers were undertaken without Counterclaim-Plaintiff's knowledge or consent, outside the Companies' ordinary operating accounts, and without the joint authorization required by the Companies' equal ownership and governance structure.

203. After the transfers occurred, Neiswenter demanded, return of the funds, a complete tracing and accounting, identification of the receiving accounts and their owners, disclosure of all signatories and authorized users, restoration of financial access, and cessation of further unilateral financial activity, among other things. Neiswenter further demanded that the funds remain intact, segregated, and traceable pending their return.

204. Zurich failed and refused to provide the demanded authorization, accounting, tracing information, account documentation, and return of the disputed funds.

**Theft-Based Racketeering Activity**

205. O.C.G.A. § 16-14-3 includes theft offenses under Article 1 of Chapter 8 among the criminal offenses capable of constituting racketeering activity.

206. Under O.C.G.A. § 16-8-2, theft by taking includes not only the initial unlawful taking of another's property, but also the unlawful appropriation of property by a person who initially possessed the property lawfully, when undertaken with the intent to deprive another of that property.

207. Under O.C.G.A. § 16-8-4, theft by conversion occurs when a person lawfully obtains funds or other property of another subject to an agreement or other known legal obligation requiring a specified application or disposition and knowingly converts the funds or property to that person's own use in violation of the agreement or legal obligation.

208. Zurich initially obtained access to the Company funds through his position as a member, manager, fiduciary, and person entrusted with administration of Company financial accounts.

209. Zurich was subject to and bound by known legal, fiduciary, contractual, and governance obligations requiring him to administer Company funds for

authorized Company purposes, preserve the property and rights of the Companies and their members, provide an accounting of Company assets, refrain from misappropriating Company property, and refrain from exercising unauthorized exclusive control over jointly owned Company funds.

210. Zurich's obligation to administer Company funds arose from the Operating Agreements, his status as an equal member and manager, his fiduciary duties owed to the Companies and to Neiswenter, and the parties' longstanding course of dealing. Zurich therefore possessed Company funds pursuant to known legal obligations concerning their administration, use, preservation, and disposition.

211. By transferring Company funds into Treasury Direct accounts, the disputed account ending in 642187, and an account he described as “my trust account,” and by retaining control of those funds without joint authorization and after demand for return and accounting, Zurich knowingly appropriated and converted Company property in violation of those obligations.

212. Upon information and belief, each transfer alleged above constitutes a separate predicate act of theft by taking, theft by conversion, or both, within the meaning of O.C.G.A. § 16-14-3.

**<u>Wire-Fraud Based Racketeering Activity</u>**

213. Upon information and belief, Zurich utilized interstate wire communications, including electronic banking systems, internet-based financial

platforms, online banking portals, Treasury Direct systems, electronic communications, emails, and other interstate wire transmissions to effectuate, conceal, and further the scheme described herein.

214. Upon information and belief, Zurich knowingly transmitted, or caused to be transmitted, electronic instructions, authorizations, communications, records, representations, and other wire communications relating to the transfer, administration, control, custody, disposition, and investment of Company funds.

215. Upon information and belief, such wire communications were transmitted for the purpose of executing and furthering a scheme to obtain, retain, exercise control over, conceal, administer, and dispose of Company funds through materially false, misleading, incomplete, or fraudulent representations and omissions concerning the ownership, administration, authorization, location, custody, and disposition of Company funds.

216. Upon information and belief, Zurich represented, directly or indirectly, that he possessed authority to transfer, administer, invest, retain, restrict access to, and control Company funds when, in fact, such authority was disputed, limited, subject to the governing Operating Agreements, subject to Counterclaim-Plaintiff's equal ownership and management rights, and otherwise not authorized in the manner represented.

217. Upon information and belief, each electronic transfer authorization, electronic banking instruction, electronic communication, online transaction, and related interstate wire communication transmitted in furtherance of the scheme constitutes a separate predicate act of wire fraud under 18 U.S.C. § 1343 and O.C.G.A. § 16-14-3.

**Pattern of Racketeering Activity**

218. The alleged predicate acts occurred within four years of one another and were not isolated incidents.

219. The predicate acts described herein, including theft by taking, theft by conversion, wire fraud, and related racketeering activity, shared the same or similar intent, purpose, result, victim, participant, property, and method of commission.

220. Each predicate act involved Zurich's use of financial-account access and Company banking relationships to acquire or maintain disproportionate or exclusive control over Company money without Counterclaim-Plaintiff's knowledge or consent.

221. The predicate acts were interrelated and undertaken in furtherance of a common scheme to consolidate control of Company funds, restrict Counterclaim-Plaintiff's access to those funds, and prevent Counterclaim-Plaintiff from exercising equal management and oversight rights.

222. The alleged predicate acts therefore constitute a "pattern of racketeering activity" under O.C.G.A. § 16-14-3(4).

**Violations of O.C.G.A. § 16-14-4**

223. Through the pattern of racketeering activity described above, Zurich directly or indirectly acquired or maintained an interest in or control over Company money, Company investments, Company financial accounts, and other Company property in violation of O.C.G.A. § 16-14-4(a).

224. Through the same pattern of racketeering activity, Zurich, while associated with the Companies, conducted or participated directly or indirectly in the affairs of the Companies in violation of O.C.G.A. § 16-14-4(b).

225. The pattern of racketeering activity enabled Zurich to remove substantial funds from accounts subject to ordinary Company oversight, transfer them through an account outside Counterclaim-Plaintiff's control, place them into investments and accounts lacking equal access and transparency, and maintain control over the funds notwithstanding Counterclaim-Plaintiff's objections and demands.

**Direct and Proximate Injury**

226. The injuries alleged in this Count flow directly from the alleged theft-based predicate acts. Civil Georgia RICO requires a direct connection between at

least one predicate act and the claimed injury, rather than an attenuated or merely consequential relationship.

227. As the direct and proximate result of the transfers and conversions, Counterclaim-Plaintiff was deprived of access to and oversight of Company funds, deprived of the ability to participate equally in their administration and disposition, and forced to incur expenses to trace, protect, recover, and obtain an accounting of the funds.

228. The Companies were likewise deprived of possession and control of funds held in their ordinary operating accounts and incurred losses, expenses, administrative burdens, and risks associated with the unauthorized transfers, disputed custody, and lack of transparency.

229. Counterclaim-Plaintiff has therefore suffered injury to business and property by reason of the violations of O.C.G.A. § 16-14-4.

230. Under O.C.G.A. § 16-14-6(c), a person injured by a violation of O.C.G.A. § 16-14-4 may recover three times the actual damages sustained, appropriate punitive damages, attorney's fees in the trial and appellate courts, and reasonably incurred costs of investigation and litigation.

**<u>COUNT IX: FEDERAL RICO VIOLATIONS</u>**
(Against Zurich and The Law Office)

231. Counterclaim-Plaintiff incorporates by reference Paragraphs 1 through 89 as though fully set forth herein.

**The RICO "Persons"**

232. Counterclaim-Defendant Zurich is a natural person and a "person" within the meaning of 18 U.S.C. § 1961(3).

233. Counterclaim-Defendant the Law Office is a legal entity capable of holding a legal or beneficial interest in property and is therefore a "person" within the meaning of 18 U.S.C. § 1961(3).

234. At all relevant times, Zurich owned, controlled, operated, acted through, or acted on behalf of the Law Office.

235. Zurich and the Law Office each participated in the conduct alleged in this Count to the extent specified herein, including through the use of account ending in 642187, which Zurich described in writing as "my trust account."

**The Enterprises**

236. The Jointly Owned Companies are legal entities engaged in owning, operating, leasing, financing, and managing commercial real estate and related assets in Georgia and multiple other states.

237. Each Jointly Owned Company constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

238. Alternatively, the Jointly Owned Companies, together with their affiliated financial and property-management operations, constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4).

239. The enterprise possessed a structure and purpose separate from the alleged racketeering activity. Its legitimate purposes included owning and operating commercial real estate; collecting and administering rents and other revenues; maintaining banking and investment accounts; paying Company expenses; preserving Company reserves; administering Company assets; and managing the Companies' financial affairs.

240. The affiliated entities comprising the Company enterprise maintained continuing relationships through common ownership, common management, shared banking relationships, intercompany transactions, real-estate operations, property-management activities, and the administration of Company revenues and reserves.

241. The enterprise existed before the predicate acts alleged herein and would have continued to exist and conduct legitimate business activities in the absence of those predicate acts.

242. The enterprise engaged in and affected interstate commerce by, among other things:

a. owning, operating, or managing commercial real estate in multiple states;

b. maintaining banking and financial relationships involving financial institutions and accounts located or administered across state lines;

c. receiving and making interstate electronic payments;

d. conducting transactions through interstate electronic banking systems;

e. conducting transactions through Treasury Direct, an internet-based federal financial platform;

f. transacting with tenants, vendors, lenders, property managers, and other parties located in multiple states; and

g. transmitting business and financial communications through interstate wires.

**Defendants' Association with and Participation in the Enterprises**

243. At all relevant times, Zurich was associated with the enterprise through his ownership interests, management responsibilities, fiduciary status, access to Company accounts, control over Company banking relationships, and administration of Company funds.

244. Zurich participated in the operation or management of the enterprise by exercising authority over Company financial accounts, Company banking relationships, Company investments, Company records, intercompany transfers, and the disposition of Company funds.

245. Upon information and belief, the Law Office was associated with the enterprise by receiving, holding, administering, transferring, investing, retaining, or

exercising control over Company funds through account ending in 642187 and related financial accounts.

246. The Law Office's alleged receipt, custody, administration, and transfer of Company funds were not part of the ordinary real-estate operations or authorized financial structure of the enterprise.

**Scheme to Defraud**

247. Beginning no later than May 2026 and continuing thereafter, Defendants devised and participated in a scheme to obtain and maintain unilateral and undisclosed control over substantial Company funds and to deprive the Companies and Neiswenter of access to, use of, control over, and material information concerning those funds.

248. The objects of the scheme included:

a. removing Company funds from accounts maintained within the Companies' ordinary financial structure;

b. placing Company funds into accounts over which Zurich exercised unilateral control or administration;

c. transferring Company funds through an account maintained by or associated with the Law Office;

d. transferring Company funds into Treasury Direct accounts or investments that were not equally accessible to Neiswenter;

e. preventing Neiswenter from monitoring, administering, or participating in decisions concerning Company funds;

f. concealing or withholding material information concerning the title, ownership, custody, administration, location, disposition, and investment of Company funds; and

g. maintaining control over the funds after demands for their return, preservation, tracing, and accounting.

249. Zurich knew that Neiswenter was a fifty-percent owner with corresponding management and oversight rights in the Jointly Owned Companies.

250. Zurich knew that the governing ownership structure, Operating Agreements, fiduciary obligations, and parties' course of dealing limited Zurich's authority to remove substantial Company funds from their ordinary accounts and place those funds under Zurich's unilateral control.

251. Notwithstanding those limitations, Zurich caused interstate electronic transfer instructions to be transmitted that, expressly or implicitly, represented to the financial institutions and financial platforms processing the transactions that:

a. Zurich possessed the authority necessary to initiate and direct the transactions;

b. the transactions were authorized transactions of the Companies;

c. the destination accounts were proper and authorized recipients of Company funds; and

d. Zurich was authorized to exercise the resulting control over the transferred funds.

252. Upon information and belief, those express or implied representations were false or misleading because the transfers had not received the approval required by the Companies' ownership and governance structure and Zurich lacked authority to obtain or exercise exclusive control over the transferred Company funds.

253. Zurich knew that the electronic transfer instructions and the representations of authority accompanying them were false or misleading when transmitted.

254. Zurich intended the financial institutions and platforms processing the transactions to treat the instructions as valid and authorized instructions concerning Company property.

255. The representations concerning Zurich's authority were material because the financial institutions and platforms would not have processed the transfers in the manner alleged without instructions appearing to originate from a person possessing authority to direct the disposition of the account holders' funds.

256. The scheme further included Zurich's failure to disclose to the Companies, Neiswenter, and the institutions processing or maintaining the transactions that:

a. Zurich's authority to transfer the funds was limited or disputed;
b. Neiswenter had not authorized the transfers;
c. the Companies had not adopted resolutions authorizing the transfers;
d. Company funds would be placed into or transferred through an account associated with the Law Office;
e. Neiswenter would not possess equal access to or control over the destination accounts;
f. Zurich intended to retain unilateral control over the funds; and
g. Zurich intended to condition the return or release of Company funds on future judicial action even though no court order authorized the removal or retention of the funds.

257. After obtaining control over the funds, Zurich used interstate electronic communications and financial systems to transfer, administer, invest, retain, and further conceal or obscure the location and disposition of Company property.

258. When Neiswenter demanded disclosure of the location and ownership of the account receiving the August 6, 2026 transfer, Zurich stated that the funds were in “my trust account” and would remain there “until further order of the court.”

259. No court order authorized Zurich or the Law Office to remove the funds from the Company account, place them in an account associated with the Law Office, restrict the Companies’ or Neiswenter’s access to the funds, or condition their return on further judicial action.

260. After receiving demands for disclosure, tracing, preservation, accounting, and return of the funds, Defendants continued to exercise control over the funds and caused additional interstate electronic transfers involving account ending in 642187, Company operating accounts, and Treasury Direct accounts.

**Predicate Acts of Wire Fraud**

261. The federal wire-fraud statute, 18 U.S.C. § 1343, prohibits the use of interstate wire communications to execute a scheme or artifice to defraud or to obtain money or property by materially false or fraudulent pretenses, representations, or promises.

262. Defendants knowingly used, or caused the use of, interstate wire communications for the purpose of executing and furthering the scheme alleged herein.

263. The interstate wires included electronic banking instructions, online account-access communications, electronic fund-transfer requests, internet-based Treasury Direct transactions, emails, and related electronic transmissions crossing state lines or passing through interstate banking and communications systems.

264. Each of the following transactions constituted a separate use of interstate wires in furtherance of the alleged scheme:

**May 12, 2026 Wire**

265. On or about May 12, 2026, Zurich caused approximately $1,994,384.44 in Company funds to be electronically transferred from a Company financial account into one or more Treasury Direct accounts or investments.

266. Upon information and belief, Zurich initiated or caused the May 12, 2026 transaction through an online banking portal, electronic banking instruction, Treasury Direct platform, or related interstate wire communication.

267. The electronic instructions associated with that transaction expressly or implicitly represented that Zurich possessed authority to transfer and exercise control over the Company funds.

268. Zurich knew that the transaction had not been approved by Neiswenter and that Zurich's authority to transfer and exercise unilateral control over the funds was limited by the Companies' governance structure and Neiswenter's equal ownership and management rights.

**August 6, 2026 Wire**

269. On or about August 6, 2026, Zurich caused approximately $1,941,000.00 to be electronically transferred from the Company money-market account ending in 547561 into account ending in 642187.

270. The transaction appeared in Company banking records as "WEBXFR TO COMM MMA 642187," reflecting that the transaction was accomplished through an electronic web transfer.

271. The transaction reduced the available balance in the originating Company account to approximately $1,000.30.

272. Upon information and belief, Zurich initiated or caused the August 6, 2026 transaction through an online banking portal or other electronic system that transmitted instructions through interstate wires.

273. The electronic instructions associated with the transaction expressly or implicitly represented that Zurich possessed authority to transfer the Company funds to the destination account and to exercise control over the transferred funds.

274. Zurich subsequently identified the destination account as "my trust account," even though the transferred money belonged to one or more of the Companies and no court order, Company resolution, trust agreement, escrow agreement, or authorization from Neiswenter permitted Zurich or the Law Office to hold the money under Zurich's exclusive control.

**August 11, 2026 Wire**

275. On or about August 11, 2026, Zurich and the Law Office caused approximately $997,168.89 to be transferred electronically from account ending in 642187, through a Company operating account, and into one or more Treasury Direct accounts or investments.

276. Upon information and belief, the August 11, 2026 transaction was initiated or completed through online banking systems, electronic transfer instructions, Treasury Direct systems, or related interstate wire communications.

277. The transaction furthered the scheme by transferring Company funds from an account outside the Companies' ordinary financial structure, through a Company account, and into accounts or investments controlled or administered by Zurich without equal access, disclosure, or authorization.

**August 18, 2026 Wires**

278. On or about August 18, 2026, Zurich and the Law Office caused approximately $963,276.42 to be transferred electronically from account ending in 642187 into the operating account of NEIS Acquisitions 5192, LLC, a Tennessee limited liability company, ending in 420508.

279. Upon information and belief, substantially all of the approximately $963,276.42 was then transferred electronically from the Company operating

account into one or more Treasury Direct accounts or investments controlled or administered by Zurich.

280. On or about the same date, approximately $19,445.31 was transferred electronically from the operating account ending in 420508 back into the account ending in 642187.

281. Upon information and belief, the August 18, 2026 transactions were initiated or completed through online banking systems, electronic transfer instructions, Treasury Direct systems, or related interstate wire communications.

282. The August 18, 2026 transactions furthered the scheme by moving Company funds repeatedly between an account associated with the Law Office, a Company operating account, and one or more Treasury Direct accounts while withholding complete information concerning the ownership, custody, administration, and disposition of the funds.

**Defendants' Intent and Knowledge**

283. Zurich acted knowingly and with the intent to obtain and maintain unilateral control over Company money and to deprive the Companies and Neiswenter of access to, use of, control over, and material information concerning that money.

284. Zurich's fraudulent intent is evidenced by, among other facts:

a. Zurich’s exclusion of Neiswenter from Company accounts and banking relationships;

b. Zurich’s refusal to consent to Neiswenter being added as a signer to accounts belonging to jointly owned Companies;

c. Zurich’s demand that Neiswenter withdraw the request for access submitted to City National Bank of Florida;

d. Zurich’s threat to dissolve entities and initiate litigation if Neiswenter continued seeking access to Company accounts;

e. Zurich’s transfer of nearly all funds from the money-market account ending in 547561;

f. Zurich’s transfer of Company money to an account Zurich described as “my trust account”;

g. Zurich’s assertion that the Company funds would remain there pending a future court order when no existing order authorized the transfer or retention;

h. Zurich’s refusal to return the funds after demand;

i. Zurich’s refusal to provide a complete accounting and tracing of the funds;

j. the repeated movement of the funds among the Law Office account, Company operating accounts, and Treasury Direct accounts; and

k. Zurich's continued exercise of control over the funds after receiving notice that his authority was disputed.

285. Upon information and belief, the Law Office knowingly received, held, administered, transferred, invested, or retained Company funds after learning that Neiswenter disputed Zurich's authority to transfer and control those funds and after demands were made for disclosure, tracing, preservation, accounting, and return.

286. Upon information and belief, the Law Office knowingly permitted its account ending in 642187 to be used to receive, hold, transfer, administer, or conceal the disposition of Company money in furtherance of the scheme.

**<u>Pattern of Racketeering Activity</u>**

287. The wire-fraud predicates alleged above were related and constituted a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

288. The predicate acts shared the same or similar purposes, participants, victims, property, methods of commission, and results.

289. Each predicate act involved one or more of the following common methods:

a. use of Zurich's access to Company financial accounts;

b. electronic representations of authority to financial institutions or financial platforms;

c. transfer of Company money through interstate electronic banking systems;

d. placement of Company money into accounts not equally accessible to Neiswenter;

e. transfer of Company money through an account associated with the Law Office;

f. placement of Company funds into Treasury Direct accounts or investments;

g. withholding of material account and transfer information; and

h. continued control over Company funds after demands for disclosure, accounting, and return.

290. The predicate acts were not isolated transactions. They formed successive parts of a coordinated course of conduct through which Defendants obtained, preserved, transferred, and exercised control over Company funds.

291. The predicate acts occurred on separate dates, involved separate electronic instructions, involved multiple originating and destination accounts, and required multiple decisions to transfer or retain the funds.

292. The predicate acts furthered the common purpose of obtaining and maintaining unilateral control over Company money, preventing equal access and oversight, and concealing or withholding material information concerning the funds' custody, administration, and disposition.

293. The scheme affected multiple Jointly Owned Companies, multiple financial accounts, multiple interstate transactions, and Company funds associated with business operations and properties in multiple states.

294. The pattern was open-ended because, unless restrained, Defendants possessed the means and opportunity to continue transferring, investing, administering, retaining, or exercising control over Company funds through the same accounts, electronic systems, and methods.

295. Zurich's refusal to provide equal account access, his assertion of continuing unilateral control over the funds, his refusal to return the funds, and the continued movement of funds after Neiswenter's demands demonstrated a threat that the alleged racketeering activity would continue.

**Conduct of the Enterprises Through Racketeering Activity**

296. Through the pattern of wire fraud alleged herein, Zurich knowingly conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs in violation of 18 U.S.C. § 1962(c).

297. Zurich participated in the operation or management of the enterprise by directing the transfer, custody, administration, investment, and disposition of Company funds.

298. Zurich used management authority and account access derived from his association with the enterprise to initiate or direct the alleged predicate acts.

299. Upon information and belief, the Law Office participated in the operation or management of the enterprise's financial affairs by receiving, holding, administering, transferring, investing, or retaining Company funds through account ending in 642187 and related accounts.

300. Upon information and belief, the Law Office's participation was knowing and material because the alleged scheme depended upon the availability and use of account ending in 642187 as an intermediary account for receiving, holding, and transferring Company funds.

**Direct Injury to Business or Property**

301. The Companies owned the funds removed from their ordinary financial accounts and transferred through the interstate wires alleged herein.

302. Neiswenter possessed direct contractual, managerial, and ownership rights relating to the Company funds, including rights of access, oversight, participation, information, administration, and control arising from the Operating Agreements and the equal ownership and management structure.

303. The intended and actual result of the predicate acts was the removal of identifiable Company funds from accounts subject to the Companies' ordinary financial controls and the placement of those funds into accounts and investments controlled or administered by Zurich and the Law Office.

304. The predicate acts directly deprived the Companies of possession, use, availability, and ordinary control of their money.

305. The predicate acts directly deprived Neiswenter of his contractual and property-based rights to access, oversee, administer, protect, and participate in decisions concerning Company money.

306. The injuries did not arise merely because Defendants engaged in wrongdoing. The injuries resulted directly from the electronic transactions constituting the alleged wire-fraud predicates because each transaction removed, transferred, or retained identifiable Company funds and placed those funds beyond the Companies' ordinary joint control.

307. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Counterclaim-Plaintiff suffered injury to business or property, including:

a. loss of contractual and property-based management rights;

b. loss of access to and control over Company funds;

c. loss of the use and availability of Company funds;

d. costs reasonably incurred tracing and protecting Company assets;

e. accounting and forensic expenses incurred to determine the location and disposition of Company funds;

f. expenses incurred seeking restoration of account access and financial transparency; and

g. other direct business and property damages to be established through discovery and at trial.

308. The Companies likewise sustained direct injury to business and property, including the loss of possession, availability, use, and control of funds removed from their ordinary accounts and the expenses required to trace, protect, account for, and recover those funds.

309. No more directly injured party exists with respect to the deprivation of Neiswenter's individual contractual and property-based management rights and the costs Neiswenter personally incurred to investigate, trace, protect, and recover the Company funds.

310. To the extent any portion of the injuries alleged herein belongs derivatively to one or more of the Companies, Neiswenter asserts those injuries derivatively and for the benefit of the affected Companies, subject to the requirements of applicable law and Federal Rule of Civil Procedure 23.1.

311. Demand upon Zurich to cause the affected Companies to pursue claims arising from Zurich's own conduct would have been futile because Zurich is the alleged wrongdoer, possesses a fifty-percent ownership interest and management authority, disputes any wrongdoing, and has refused to return or fully account for the funds.

312. Counterclaim-Plaintiff fairly and adequately represents the interests of the affected Companies in seeking recovery and preservation of Company property.

**Relief Under 18 U.S.C. § 1964(c)**

313. Under 18 U.S.C. § 1964(c), a person injured in business or property by reason of a violation of 18 U.S.C. § 1962 may recover threefold the damages sustained, together with the cost of suit and reasonable attorney's fees.

314. Counterclaim-Plaintiff is entitled to recover the relief authorized by 18 U.S.C. § 1964(c), together with all other relief available at law or in equity.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant and Counterclaim-Plaintiff David Neiswenter, individually and derivatively on behalf of the Jointly Owned Companies to the extent applicable, respectfully requests that the Court enter judgment in his favor and against the appropriate Counterclaim Defendants and grant the following relief:

A. Award compensatory damages in an amount to be determined at trial;

B. Award consequential damages, special damages, and all other damages recoverable under applicable law;

C. Award treble damages pursuant to the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-6(c);

D. Award treble damages pursuant to 18 U.S.C. § 1964(c) for Defendants' violations of 18 U.S.C. § 1962(c);

E. Award punitive damages to the extent authorized by Georgia law and otherwise permitted by law;

F. Award all attorney's fees, litigation expenses, expert fees, investigative costs, accounting expenses, forensic expenses, and other recoverable costs authorized by contract, statute, equity, or common law, including but not limited to O.C.G.A. § 16-14-6(c) and 18 U.S.C. § 1964(c);

G. Order a full accounting, tracing, and identification of all Company funds, reserves, investments, Treasury Direct accounts, trust accounts, bank accounts, transfers, distributions, reimbursements, allocations, revenues, and other Company assets;

H. Enter appropriate declaratory relief defining and adjudicating the parties' respective rights, duties, authority, management rights, account-access rights, ownership interests, fiduciary obligations, and governance authority;

I. Enter preliminary, interlocutory, and permanent injunctive relief as necessary to preserve Company assets, prevent further unauthorized transfers, maintain the status quo, compel disclosure of financial information, and protect the rights of Counterclaim-Plaintiff and the Companies;

J. Appoint a receiver with the powers requested in Count VII, including authority over Company assets, Company finances, lender communications, leasing activity, records, and operations, together with such additional authority as the Court deems appropriate;

K. Impose a constructive trust upon all Company funds, accounts, investments, Treasury Direct accounts, trust accounts, proceeds, and assets traceable to the transfers and conduct alleged in these Counterclaims;

L. Impose an equitable lien upon all assets, accounts, investments, proceeds, funds, or property traceable to the Company monies transferred, administered, retained, invested, or controlled by Counterclaim Defendants;

M. Award prejudgment interest and post-judgment interest as authorized by law;

N. Award taxable costs of court;

O. Award such derivative relief as may be necessary to restore Company assets and property to the affected Companies;

P. Grant such other, further, legal, equitable, and just relief as the Court deems proper.

**DEMAND FOR JURY TRIAL**

Defendant and Counterclaim-Plaintiff David Neiswenter hereby demands a trial by jury on all claims, counterclaims, defenses, and issues so triable.

Respectfully submitted this 8th day of October, 2026.

BUCHALTER LLP

/s/ Brian S. Goldberg
Brian S. Goldberg
Georgia Bar No. 128007

3475 Piedmont Road NE
Suite 1100
Atlanta, Georgia 30305
Telephone: (404) 832-7667
Email: bgoldberg@buchalter.com
*Counsel for Defendant, Counterclaim-Plaintiff*
*David Neiswenter*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of October, 2026, I electronically filed the foregoing David Neiswenter's Answer, Affirmative Defenses, and Counterclaims with the Clerk of Court using the CM/ECF system, which will automatically send notice of such filing to all counsel of record.

Respectfully submitted,

BUCHALTER LLP

/s/ Brian S. Goldberg
Brian S. Goldberg
Georgia Bar No. 128007

3475 Piedmont Road NE
Suite 1100
Atlanta, Georgia 30305
Telephone: (404) 832-7667
Email: bgoldberg@buchalter.com
*Counsel for Defendant, Counterclaim-Plaintiff*
*David Neiswenter*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

**Zachary Zurich**,

Plaintiff and
Counterclaim-Defendant

v.

**David Neiswenter**, et al.

Defendant and
Counterclaim-Plaintiff

Civil Action File No.
5:26-cv-00388-MTT

**VERIFICATION OF DAVID NEISWENTER**

I, David Neiswenter, declare as follows:

1. I am the Defendant and Counterclaim-Plaintiff in the above-captioned action, and I have read the foregoing Answer, Affirmative Defenses, and Counterclaims.

2. I have personal knowledge of the facts set forth therein.

3. As to those matters stated upon information and belief, I believe them to be true and correct.

4. The factual allegations contained in the foregoing Answer, Affirmative Defenses, and Counterclaims are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2026.

David Neiswenter

**EXHIBIT "A"**

Security Deed

Type: GEORGIA LAND RECORDS
Recorded: 1/21/2022 9:06:00 AM
Fee Amt: $25,025.00 Page 1 of 30
Intangible Tax: $25,000.00
Bibb County Superior Court
Erica Woodford Clerk

Participant ID(s): 3760043500,
7067927936

BK 11126 PG 348 - 377

After recording return to:
Chicago Title Insurance Company
711 Third Avenue, 8th Floor
New York, NY 10017

State of: Georgia
County of: Bibb

**DEED TO SECURE DEBT, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT**

THIS DEED TO SECURE DEBT, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT (the "Deed"), made on **December 16, 2021** from NEIS ACQUISITIONS 5192, LLC, a Georgia Limited Liability Company and 2364 TICZ, LLC, a Georgia Limited Liability Company, and NEIS ACQUISITIONS GA, LLC, a Georgia Limited Liability Company (the "Grantor"), whose address is 2885 Sandford Ave. SW 25343, Grandville, Michigan 49418 in favor CITY NATIONAL BANK OF FLORIDA (the "Grantee"), whose address is 100 S.E. 2nd Street, 13th Floor, Miami, FL 33131.

In consideration of Grantee's extension of new financial accommodations or continuation of existing financial accommodations to Grantor (such other person(s) or entity(ies), individually and collectively, "Borrower"), whose obligations to Grantee are being supported by Grantor, and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, Grantor agrees as follows:

**ARTICLE I**

**DEFINITIONS, HEADINGS, RULES OF CONSTRUCTION AND SECURITY AGREEMENT**

1.1 Definitions. As used in this Deed and in the exhibits attached hereto, the following terms shall have the following meanings herein specified, such definition to be applicable equally to the singular and plural forms of such terms:

(a) Default Rate: The Default Rate as defined in the Note.

(b) Environmental Agreement: That certain Environmental Compliance and Indemnity Agreement dated as of even date herewith from Grantor and Guarantor in favor of Grantee.

(c) Environmental Law: Any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, franchise, permit, certificate, license, authorization, or

**Return To:**
Fidelity National Title Group
3301 Windy Ridge Parkway, Suite 300
Atlanta, GA 30339
Attn: Kim Hogan- **212720GA**

other direction or requirement of any Governmental Authority, as same may be amended from time to time, whether now in existence or established or hereafter enacted, promulgated, adopted, entered or issued, both within and outside the present contemplation of the parties hereto, relating to pollution or protection of the environment.

(d) Events of Default: Those events described in **Article VII** hereof.

(e) Fixtures: All property and equipment now owned or hereafter acquired by Grantor and now or hereafter located under, on, or above the Land, whether or not permanently affixed, which, to the fullest extent permitted by applicable law in effect from time to time, shall be deemed fixtures and a part of the Land.

(g) Future Advances: Any loan of money from Grantee to Grantor made within twenty (20) years from the date hereof. The total amount of such loan or loans may decrease or increase from time to time, but the total unpaid aggregate balance secured by this Deed at any one time shall not exceed double the loan amount plus interest thereon, and any disbursements made for the payment of the Impositions (whether taxes, levies or otherwise), insurance, or other liens on the Deed Property, with interest on such disbursements. The Grantee has no obligation, whatsoever, to make a Future Advance.

(h) Governmental Authority: Any (domestic or foreign) federal, state, county, municipal or other governmental department, entity, authority, commission, board, bureau, court, agency or any instrumentality of any of them.

(i) Governmental Requirement: Any law, enactment, statute, code, ordinance, order, rule, regulation, judgment, decree, writ, injunction, franchise, permit, certificate, license, authorization, or other direction or requirement of any Governmental Authority now existing or hereafter enacted, adopted, promulgated, entered, or issued applicable to the Grantee, Grantor, the Land, the Improvements, or any of the Deed Property, including, without limitation, any Environmental Law.

(j) Guarantor(s): means, individually and/or collectively, ZACHARY ZURICH and DAVID NEISWENTER and their respective heirs, personal representatives, successors and assigns.

(k) Guaranty: means (i) that certain Guaranty of Payment and Performance dated as of even date herewith from Guarantor in favor of Grantee, and (ii) that certain Guaranty of Payment and Performance dated as of even date herewith from Guarantor in favor of Grantee, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

(l) Hazardous Substances: Any hazardous, toxic or dangerous waste, substance or material including, but not limited to, any elements or compounds which are now or hereafter (i) identified in Section 101(14) of the CERCLA, 42 U.S.C. Section 9601(14), and as set forth in 40 C.F.R. Section 302, as the same may be amended from time to time, (ii) determined to be toxic, a pollutant or contaminant, under any Environmental Law, (iii) contained in the list of hazardous substances adopted by the United States Environmental Protection Agency, (iv) defined as "petroleum" and "petroleum products" as defined in Fla. Stat. Section 376.301, as same may be amended from time to time, and (v) asbestos, radon, polychlorinated biphenyls and such other elements, compounds, materials, substances or waste which are otherwise dangerous, hazardous, harmful or deleterious to human or animal health or safety, or the environment.

(m) Impositions: All (i) real estate and personal property taxes and other taxes and assessments, public or private; utility rates and charges including those for water and sewer; all other governmental and non-governmental charges and any interest or costs or penalties with respect to any of the foregoing; and charges for any public improvement, easement or agreement maintained for the benefit of or involving the Deed Property, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever that at any time prior to or after the execution of this Deed may be assessed,

levied or imposed upon the Deed Property or the Rent or income received therefrom, or any use or occupancy thereof, (ii) other taxes, assessments, fees and governmental and non-governmental charges levied, imposed or assessed upon or against Grantor or any of its properties and (iii) taxes levied or assessed upon this Deed, the Note, and the other Obligations, or any of them.

(n) Improvements: All buildings, structures, appurtenances and improvements, including all additions thereto and replacements and extensions thereof, now constructed or hereafter to be constructed under, on or above the Land, which term includes any part thereof. Together with the fixtures, attachments, appliances, equipment, machinery, furnishings and other articles affixed or attached to said buildings and improvements or used or intended to be used with or in connection with the use, operation or enjoyment of the Property, including, without limitation, all building materials, electrical, plumbing, heating and air conditioning systems (including window units), all built-in appliances, cabinets and lighting fixtures, including all extensions, additions, improvements, betterments, after-acquired property, renewals, replacements and substitutions, or proceeds from a permitted sale of, any of the foregoing (all of the foregoing is hereinafter collectively referred to as the "Improvements and Personal Property"); and all minerals, shrubs, trees or other emblements now or hereafter on said Property or under or above the same or any part or parcel thereof.

(o) Land: The real property described in **Exhibit "A"** attached hereto and made a part hereof, together with all rights, privileges, tenements, hereditaments, rights-of-way, easements, appendages, projections, appurtenances, water rights including riparian and littoral rights, streets, ways, alleys, and strips and gores of land now or hereafter in anyway belonging, adjoining, crossing or pertaining to the Land. Grantor is the owner in fee simple of the Land more particularly described in **Exhibit "A"** attached hereto.

(p) Leases: Any and all leases, usufructuary interests, and rights of Grantor in the Property, and all rights of Grantor as lessor or landlord under any lease or sublease letting or demising all or any portion of the Property or the Improvements as the same may be amended or modified from time to time, together with the security therefor, now or hereafter in force, oral or written, covering or affecting the Deed Property or any part thereof.

(q) Loan: That certain loan in the amount EIGHT MILLION NINE HUNDRED SIXTY-SEVEN THOUSAND NINE HUNDRED FIFTEEN AND 00/100 DOLLARS ($8,967,915.00), as evidenced by the Note and secured by this Deed.

(r) Loan Agreement: That certain Loan Agreement dated as of even date herewith, by and among the Grantor and Grantee, as the same may be amended, restated, modified or replaced from time to time.

(s) Loan Documents: Any document or instrument executed, submitted, or to be submitted by Grantor or others in connection with the Loan, including but not limited to: (i) the Note, (ii) this Deed, (iii) the financing statements, (iv) the Guaranty, (v) the Loan Agreement, (vi) the Environmental Agreement, and (vii) any other document or instrument executed by Grantor in connection with the Loan.

(t) Deed Property: The Land, the Improvements, the Fixtures, the Leases, the Rents and the Personal Property together with:

(i) all judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of the Deed Property or any part thereof under the power of eminent domain, or by agreement in lieu thereof, or for any damage thereto caused by any

governmental action (whether by such taking or otherwise), such as without limitation, any award for change of grade of streets;

(ii) all judgments, awards and settlements hereafter made, and all insurance proceeds hereafter paid for any damage to the Deed Property, and all unearned insurance premiums on any insurance policies maintained by the Grantor pursuant to this Deed;

(iii) all awards and refunds hereafter made with respect to any Imposition; and

(iv) the estate, right, title, interest, privilege, claim or demand whatsoever of Grantor, now or hereafter, either at law or in equity, in and to the Deed Property.

The term Deed Property includes any part of the foregoing property described as Deed Property, and all proceeds, products, replacements, improvements, betterments, extensions, additions, substitutions, renewals, accessories, and appurtenances thereto and thereof.

(u) Grantee: CITY NATIONAL BANK OF FLORIDA, its successors and/or assigns.

(v) Grantor: NEIS ACQUISITIONS 5192, LLC, a Georgia Limited Liability Company and 2364 TICZ, LLC, a Georgia Limited Liability Company, and NEIS ACQUISITIONS GA, LLC, a Georgia Limited Liability Company.

(w) Note: that certain Promissory Note dated as of even date herewith from Grantor in favor of Grantee in the principal amount of EIGHT MILLION NINE HUNDRED SIXTY-SEVEN THOUSAND NINE HUNDRED FIFTEEN AND 00/100 DOLLARS ($8,967,915.00)by this reference made a part hereof to the same extent as though set out in full herein, and any other note given to Grantee evidencing a Future Advance as any of said notes may from time to time hereafter be modified, amended, extended or renewed. The maturity date of the Note is December 17, 2026.

(x) Obligations:

(i) Any and all of the indebtedness, liabilities, covenants, promises, agreements, terms, conditions, and other obligations of every nature whatsoever, whether joint or several, direct or indirect, absolute or contingent, liquidated or unliquidated, of Grantor and Guarantor, or any of them, to Grantee, evidenced by, secured by, under and as set forth in the Note, this Deed, the Guaranty or any of the other Loan Documents;

(ii) Any and all other indebtedness, liabilities and obligations of every nature whatsoever (whether or not otherwise secured or to be secured) of Grantor (whether as maker, endorser, surety, guarantor or otherwise) to Grantee or any of Grantee's affiliates, whether now existing or hereafter created or arising or now owned or howsoever hereafter acquired by Grantee or any of the Grantee's affiliates, whether such indebtedness, liabilities and obligations are or will be joint or several, direct or indirect, absolute or contingent, liquidated or unliquidated, matured or unmatured, including, but not limited to, any letter of credit issued by Grantee for the account of; together with all expenses, attorneys' fees, paralegals' fees and legal assistants' fees incurred by Grantee in the preparation, execution, perfection or enforcement of any document relating to any of the foregoing; and

(iii) Any and all Future Advances.

(y) Permitted Title Exceptions: Those matters, if any, described in Schedule B to the title insurance policy insuring Grantee's interest in this Deed.

(z) Person: Any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government, or agency or political subdivision thereof, or any other form of entity.

(aa) Personal Property: All of the following property of Grantor whether now owned or existing, or hereafter acquired or arising, whether located in, on, pertaining to, used or intended to be used in connection with or resulting or created from the ownership, development, management, or operation of the Land:

(1) all Improvements (to the extent same are not deemed to be real property) and landscaping;

(2) all Fixtures (to the extent same are not deemed to be real property) and goods to become Fixtures;

(3) all accounts, accounts receivable, other receivables, contract rights, chattel paper, instruments and documents; any other obligations or indebtedness owed to Grantor from whatever source arising; all rights of Grantor to receive any performance or any payments in money or kind; all guaranties of the foregoing and security thereof; all of the right, title and interest of Grantor in and with respect to the goods, services, or other property that gave rise to or that secure any of the foregoing, and all rights of Grantor as an unpaid seller of goods and services, including, but not limited to, the rights to stoppage in transit, replevin, reclamation, and resale;

(4) all goods, including without limitation, all machinery, equipment, furniture, furnishings, building supplies and materials, appliances, business machines, tools, aircraft and motor vehicles of every kind and description, and all warranties and guaranties for any of the foregoing;

(5) all inventory, merchandise, raw materials, parts, supplies, work-in-process and finished products intended for sale, of every kind and description, in the custody or possession, actual or constructive, of Grantor including such inventory as is temporarily out of the custody or possession of Grantor, any returns upon any accounts and other proceeds resulting from the sale or disposition of any of the foregoing, including, without limitation, raw materials, work-in-process, and finished goods;

(6) all general intangibles, including, without limitation, corporate or other business records and books, computer records whether on tape disc or otherwise stored, blueprints, surveys, architectural or engineering drawings, plans and specifications, trademarks, tradenames, goodwill, telephone numbers, licenses, governmental approvals, franchises, permits, payment and performance bonds, tax refund claims, and agreements with utility companies, together with any deposits, prepaid fees and charges paid thereon;

(7) all Leases and Rents (to the extent same are not deemed to be real property);

(8) all judgments, awards of damages and settlements from any condemnation or eminent domain proceedings regarding the Land, the Improvements or any of the Deed Property;

(9) all insurance policies required by this Deed, the unearned premiums therefor and all loss proceeds thereof;

(10) all other personal property, including without limitation, management contracts, construction contracts, architectural contracts, service contracts, advertising contracts, contracts for purchase and sale of any of the Deed Property, purchase orders, equipment leases, monies in escrow accounts, reservation agreements, prepaid expenses, deposits and down payments with respect to the sale or rental of any of the Deed Property, options and agreements with respect to additional real property for use or development of the Deed Property, end-loan commitments, surveys, abstracts of title, all brochures, advertising materials, condominium documents and prospectuses; and

(11) all proceeds, products, replacements, additions, betterments, extensions, improvements, substitutions, renewals and accessions of any and all of the foregoing.

(aa) Rents: All of the rents, royalties, issues, revenues, income, profits, receipts, reserves, security deposits and other benefits, whether past due or now or hereafter arising from the Deed Property and the occupancy, use and enjoyment thereof, and any insurance proceeds and condemnation awards now or hereafter accruing or owing from any Leases or otherwise derived from the Deed Property, including, without limitation, all amounts payable by any party thereto on account of maintenance, repairs, taxes, insurance and common area or other charges and all amounts paid in cancellation of any Leases, whether accruing before or after the foreclosure of this Deed or during any appeal period after a final judgment of foreclosure, minimum rents, additional rents, percentage rents, parking, maintenance and deficiency rents.

1.2 Rules of Construction. The use of any gender shall include all other genders. The singular shall include the plural and the plural shall include the singular. The word "or" is not exclusive and the use of the word "and" may be conjunctive or disjunctive in the sole and absolute discretion of Grantee. The captions of Articles, Sections and Subsections of this Deed are for convenient reference only, and shall not affect the construction or interpretation of any of the terms and provisions set forth herein.

1.3 Security Agreement. This Deed constitutes a "Security Agreement" within the meaning of and shall create a security interest under the Uniform Commercial Code-Secured Transactions as adopted by the State of Florida, with respect to the Fixtures, Leases, Rents and Personal Property. The debtor's principal place of business and the secured party's address is set forth in the introduction to this Deed.

## ARTICLE II

## GRANT

2.1 Grant. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and to secure the payment, observance, performance and discharge of the Obligations, Grantor does by these presents, give, transfer, grant, bargain, sell, alien, remise, release, assign, secure by Deed, hypothecate, deposit, pledge, set over, confirm, convey and warrant unto Grantee all estate, right, title and interest of Grantor in and to the Deed Property, whether now owned or held or hereafter acquired by Grantor, subject, however, to the Permitted Title Exceptions, to have and to hold the Deed Property unto Grantee, its successors and assigns forever.

2.2 Condition of Grant.

2.2.1 Subject to the provisions of this Deed, the condition of these presents is such that if Grantor shall pay, observe, perform and discharge the Obligations, or cause same to be paid, observed, performed and discharged in strict accordance with the terms thereof, then this Deed and the estates, interests, rights and assignments granted hereby shall be null and void, but otherwise shall remain in full force and effect.

2.2.2 This instrument is a deed passing legal title to the Premises pursuant to the laws of the State of Georgia governing loan or security deeds and security agreements and is not a mortgage, as "mortgage" is defined for the purpose of the real property law of the State of Georgia and is made and intended to secure (i) the payment of the indebtedness evidenced by the Note and any modifications, extensions, renewals or consolidations thereof and substitutions therefor, either in whole or in part; (ii) any and all additional advances made by Grantee to protect or preserve the Premises or the security interest created hereby on the Premises, or for taxes, assessments or insurance premiums as hereinafter provided or for performance of any of Grantor's obligations hereunder or for any other purpose provided herein (whether or not the original Grantor remains the owner of the Premises at the time of such advance); (iii) the performance of all obligations of Grantor under this Deed; (iv) the performance of all obligations of Grantor under any loan agreement (including, without limitation, any construction loan agreement), guaranty and other agreements, documents or instruments evidencing, securing or otherwise relating to the indebtedness evidenced or guaranteed by the Note); and (v) any and all other indebtedness now owing or which may hereafter be owing by Grantor to Grantee, now existing or hereafter coming into existence, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due to become due, and all renewals, modifications, consolidations and extensions thereof and substitutions therefor, either in whole or in part. All of the foregoing secured hereby are collectively described herein as the "Secured Indebtedness."

2.3 Subrogation. The Grantee is hereby subrogated to the claims and liens of all parties whose claims or liens are fully or partially discharged or paid with the proceeds of the indebtedness secured by this Deed notwithstanding that such claims or liens may have been cancelled and satisfied of record.

## ARTICLE III

## ASSIGNMENT OF LEASES AND RENTS

3.1 Assignment. The Grantor does hereby absolutely and unconditionally assign and transfer to Grantee all of Grantor's estate, right, title and interest in and to the Leases and Rents, to have and to hold the Leases and Rents unto Grantee, its successors and assigns forever. From time to time, upon request of Grantee, Grantor shall give further evidence of this assignment to Grantee by executing and delivering to Grantee specific assignments of the Leases and Rents, in form and content approved by Grantee. All such specific assignments shall be of the same dignity and priority as this Deed. From time to time, upon request of Grantee, Grantor shall also execute and deliver to Grantee any notification to tenants or other document reasonably required by Grantee.

3.2 Payment of Rents to Grantor, as Licensee, Until Default. So long as no Event of Default has occurred, Grantee confers a license for the use and benefit of Grantee, as licensee, to collect, receive and accept the Rents as they become due and payable (but in no event for more than two (2) months in advance); provided, however, that if the Rents exceed the payments due under the Note, Grantor may use such excess, first, for the operation and benefit of the Deed Property and, second, for the general benefit of the Grantor. Upon the occurrence of an Event of Default, Grantee may, at its option, remove the Grantor as licensee for the collection of the Rents and appoint any other person including, but not limited to, itself as a substitute licensee to collect, receive, accept and use all such Rents in payment of the Obligations, in such order as Grantee shall elect in its sole and absolute discretion, whether or not Grantee takes possession of the Deed Property. Grantor hereby directs each of the respective tenants under the Leases, and any rental agent, to

pay to Grantee all such Rents, as may now be due or shall hereafter become due, upon demand for payment thereof by Grantee without any obligation on the part of any such tenant or rental agent to determine whether or not an Event of Default has in fact occurred. Upon an Event of Default, the permission hereby given to Grantor to collect, receive and accept such Rents as licensee shall terminate and such permission shall not be reinstated upon a cure of the Event of Default without Grantee's specific written consent. Exercise of Grantee's rights under this **Section**, and the application of any such Rents to the Obligations, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant hereto, but shall be cumulative and in addition to all other rights and remedies of Grantee.

3.3 Performance Under Leases. Grantor covenants that it shall, at its sole cost and expense, (a) duly and punctually perform and discharge, or cause to be performed and discharged, all of the obligations and undertakings of Grantor or its agents under the Leases, (b) use its best efforts to enforce or secure, or cause to be enforced or secured, the performance of each and every obligation and undertaking of the respective tenants under the Leases, (c) promptly notify Grantee if Grantor receives any notice from a tenant claiming that Grantor is in default under a Lease and (d) appear in and defend any action or proceeding arising under or in any manner connected with the Leases. In the event any tenant of the Deed Property should be the subject of any proceeding under any state of local law which provides for the possible termination or rejection of any of Lease assigned hereby, Grantor covenants and agrees that if any such Lease is so terminated and/or rejected, no settlement for damages shall be made without the prior written consent of Grantee, except in the ordinary course of business, and any amounts received as payment for such damages for termination and/or rejection of any such Lease shall be made payable to Grantor.

3.4 Leases in Good Standing. All Leases are in full force and effect, and to the best of Grantor's knowledge, there are no defaults thereunder or any defenses or offsets thereto on the part of any tenant or subtenant.

3.5 Provisions of Leases and Approval of Tenants and Subtenants. All Leases shall be inferior and subordinate to the lien of this Deed and the terms of each Lease shall so expressly provide. Grantor covenants that all Leases hereafter entered into by Grantor shall be in form and substance satisfactory to Grantee. Further, if an Event of Default exists, the Grantee specifically reserves the right to approve all proposed tenants and subtenants, and any assignee or sublessee of any existing tenant or subtenant.

3.6 Termination or Modification. If an Event of Default exists, Grantor covenants that it shall not, without the prior express written consent of Grantee, enter into a Lease, or modify, terminate, extend, amend, or consent to the cancellation or surrender of any Lease, or permit any subtenant under any Lease to assign or sublet its rights thereunder.

3.7 Delivery of Executed Leases and Annual Rent Roll. Grantor covenants that it shall furnish Grantee promptly after request, with executed copies of all Leases, and an annual rent roll, together with such other related information as may be reasonably required by Grantee.

3.8 No Obligation of Grantee. This Assignment shall not be deemed or construed to constitute Grantee as a Grantee in possession of the Deed Property nor shall it obligate Grantee to take any action or to incur expenses or perform or discharge any obligation, duty or liability of Grantor under any Lease.

3.9 Cumulative Remedies. Each and every right, remedy and power granted to Grantee by this **Article** shall be cumulative and in addition to every other right, remedy and power given by the Loan Documents and now or hereafter existing in equity, at law, or by virtue of statute or otherwise. The failure of Grantee to avail itself of any of its rights, remedies and powers shall not be construed or deemed to be a waiver thereof.

3.10 Notification of Grantee's Rights. Grantee shall have the right, but not the obligation, at any time and from time to time, to notify any tenant under any Lease of the rights of Grantee as provided in this **Article** and Grantor, upon demand from Grantee, shall confirm to such tenant the existence of such rights.

3.11 Other Assignments. Grantor shall not further assign or transfer the Leases or Rents except in favor of Grantee as provided in this **Article**, and shall not create or permit to be created or to remain, any Deed, pledge, lien, encumbrance, claim, or charge on the Leases or Rents. Any transaction prohibited under this **Section** shall be null and void.

3.12 Grantee's Right to Assign. Grantee shall have the right to assign to any subsequent holder of this Deed, or to any person acquiring title to the Deed Property, the Grantor's rights, title and interest in any Leases hereby or hereafter assigned, subject, however, to the provisions of this Deed. After the Grantor shall have been barred and foreclosed of all right, title and interest and equity of redemption in said Deed Property, no assignee of the Grantor's interest in said Leases shall be liable to account to the Grantor for any Rents or other payments.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

4.1 Representations and Warranties. Grantor hereby represents and warrants to Grantee that:

(a) Organization, Corporate Power, Partnership Power, Etc. Grantor is a limited liability company and such entity (A) is duly organized, validly existing and in good standing under the laws of the State of Delaware, (B) has the power and authority to own its properties and to carry on its business as now being conducted, and all of its issued and outstanding membership interests are fully paid and nonassessable, there are no outstanding rights or options to acquire any additional membership interests, and its membership interests have not been pledged or encumbered in any manner whatsoever, (C) is qualified to do business in the State of Florida, (D) is in compliance with all Governmental Requirements, and (E) has not amended or modified its operating agreement except as previously disclosed in writing to Grantee prior to the execution hereof.

(b) Validity of Loan Documents. (i) the execution, delivery and performance by Grantor of the Loan Documents, and the borrowing evidenced by the Note (A) are within the powers and purposes of Grantor, (B) have been duly authorized by all requisite action of Grantor, (C) do not require the approval of any Governmental Authority, and (D) will not violate any Governmental Requirement, the articles of organization or the operating agreement of Grantor, or any indenture, agreement or other instrument to which Grantor is a party or by which it or any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of its property or assets, except as contemplated by the provisions of the Loan Documents; and (ii) the Loan Documents constitute the legal, valid and binding obligations of Grantor and other obligors named therein, if any, in accordance with their respective terms.

(c) Financial Statements. All balance sheets, statements of profit and loss, and other financial data that have been given to Grantee with respect to Grantor and other parties from which financial statements will be submitted to Grantee (the "Other Parties"), (i) are complete and correct in all

material respects, (ii) accurately present the financial condition of said parties as of the dates, and the results of its or their operations, for the periods for which the same have been furnished and (iii) have been prepared in accordance with generally accepted accounting principles consistently followed throughout the periods covered thereby; all balance sheets disclose all known liabilities, direct and contingent, as of their respective dates; and there has been no change in the condition of the Grantor's financial or otherwise, since the date of the most recent financial statements given to Grantee with respect to said parties, other than changes in the ordinary course of business, none of which changes has been materially adverse.

(d) Other Agreements. Grantor is not a party to any agreement or instrument materially and adversely affecting any of the Deed Property, Grantor, or Grantor's present or proposed businesses, properties or assets, operation or condition, financial or otherwise, and Grantor is not in default in the performance, observance or fulfillment of any of the material obligations, covenants or conditions set forth in any agreement or instrument to which it is a party.

(e) Other Information. All other information, including reports, financial statements, certificates, papers, data and otherwise, given and to be given to Grantee with respect (i) to Grantor (ii) to the Loan and (iii) to others obligated under the terms of the Loan Documents, are true, accurate and correct in all material respects and complete.

(f) Title. Grantor is indefeasibly seized of and has and will have fee simple title to the Land and Improvements free and clear of any and all Deeds, liens, encumbrances, claims, charges, equities, covenants, conditions, restrictions, easements, rights-of-way and all other matters affecting the Land and Improvements, whether or not of record, except for the Permitted Title Exceptions. Grantor has and will have good, absolute and marketable title to the Fixtures and Personal Property all free and clear of any and all liens, charges, encumbrances, security interests and adverse claims whatsoever, except those in favor of Grantee. Grantor will preserve its title to the Deed Property and will forever warrant and defend the same to Grantee and will forever warrant and defend the validity and priority of the lien of this Deed against the claims of all persons and parties whomsoever.

(g) No Violations. No Governmental Requirement (including, but not limited to, 21 U.S.C. Section 811 and 881, and 18 U.S.C. Section 1961), and no covenant, condition, restriction, easement or similar matter affecting the Land or Improvements or any of the Deed Property has, to the best of Grantor's knowledge, been violated, and Grantor has not received any notice of violation from any Governmental Authority or any other person with respect to any of the foregoing matters.

(h) Taxes. Grantor has filed all federal, state, county and municipal income tax returns required to have been filed by it, and has paid all taxes that have become due pursuant to such returns, pursuant to any assessments received by it or pursuant to law, and Grantor does not know of any basis for additional assessment with respect to such taxes or additional taxes. The Land is assessed separately from all other adjacent land for the purposes of real estate taxes and there is no intended public improvement, which may involve any charge being levied or assessed, or which may result in the creation of any lien upon the Deed Property.

(i) Litigation. There are no judgments outstanding against Grantor and there is no action, suit, proceeding, or investigation now pending (or to the best of Grantor's knowledge, after diligent inquiry threatened) against, involving or affecting Grantor or the Deed Property, or any part thereof, at law, in equity or before any Governmental Authority that if adversely determined as to the Deed Property or as to Grantor would result in a material adverse change in the business or financial condition of the Grantor or Grantor's operation and ownership of the Deed Property, nor is there any basis for such action, suit, proceeding or investigation.

(j) Utilities. There is available to the Land and Improvements through public or private easements or rights-of-way abutting or crossing the Land (which would inure to the benefit of Grantee in case of enforcement of this Deed) a water supply and a sanitary sewer service approved by all health and other authorities having jurisdiction, and electric, gas (if applicable) and telephone service, all of sufficient capacity to serve the needs of the Land and Improvements according to their intended purpose.

(k) Condition of Deed Property. Neither the Land, the Improvements nor any of the Deed Property or any part thereof, now existing, is damaged or injured as a result of any fire, explosion, accident, flood or other casualty. The Improvements, as of the date of this Deed, are free of any defects in material, structure and construction and to the best of Grantor's knowledge do not violate any Governmental Requirements. There is no known existing, proposed or contemplated plan to modify or realign any street or highway or any existing, proposed or contemplated eminent domain proceeding that would result in the taking of all or any part of the Land, the Improvements, or any part of the Deed Property, or that would adversely affect the use or the operation of the Land, the Improvements or any part of the Deed Property.

(l) Zoning. The Land is zoned so as to permit the Land and Improvements to be used for their intended purpose.

(m) No Default. No default or Event of Default exists under any of the Loan Documents; and no event has occurred and is continuing which, with notice or the lapse of time, or both, would constitute a default under any provision thereof.

(n) Environmental Contamination/Hazardous Substances. Grantor and the Deed Property are to the best of Grantor's knowledge in full compliance with all Environmental Laws, and there are no civil, criminal or administrative actions, suits, demands, claims, hearings, notices or demand letters, notices of violation, investigations, or proceedings pending or threatened against the Grantor or the Deed Property relating in any way to any Environmental Law or any agreement, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved under any Environmental Law. To the best of Grantor's knowledge there have never been nor are there currently any Hazardous Substances in violation of law located on, in, or under the Deed Property or used in connection therewith, and neither Grantor nor any other person has ever used the Deed Property for the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, emission, discharge or release of any Hazardous Substance in violation of law. No notice or advice has been received by Grantor of any condition or state of facts that would be contributing to a claim of pollution or any other damage to the environment by reason of the conduct of any business on the Deed Property or the operation thereof, whether past or present.

(o) Rents. Grantor has not sold, assigned, transferred, Deed or pledged any of the Rents or other payments from any Leases or any part thereof, whether now due or hereafter to become due.

(p) Representations and Warranties in Other Loan Documents. All of the representations and warranties contained in the other Loan Documents are true and correct.

4.2 Reliance on Representations. The Grantor acknowledges that the Grantee has relied upon the Grantor's representations, has made no independent investigation of the truth thereof, is not charged with any knowledge contrary thereto that may be received by an examination of the public records in the County in which the Land is located, or that may have been received by any officer, director, agent, employee or shareholder of Grantee.

## ARTICLE V

## AFFIRMATIVE COVENANTS

5.1 Payment and Performance. Grantor shall promptly pay and punctually perform, or shall cause to be promptly paid and punctually performed, all of the Obligations as and when due and payable.

5.2 Existence. Grantor shall preserve and keep in full force and effect its existence, rights, franchises, trade names and qualification to transact business in the State of Florida.

5.3 Compliance With Laws. Grantor shall promptly and faithfully comply with, conform to and obey all Governmental Requirements and the rules and regulations now existing or hereafter adopted by every Board of Fire Underwriters having jurisdiction, or similar body exercising similar functions, that may be applicable to Grantor, the Land, the Improvements, or any of the Deed Property or to the use or manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Deed Property, whether or not such Governmental Requirement or rule or regulation shall necessitate structural changes or improvements or interfere with the use or enjoyment of the Deed Property.

5.4 Impositions.

(a) Grantor shall pay all Impositions on the Land, the Improvements and the other Deed Property and all taxes levied or assessed upon this Deed, the Note and the Obligations, or any of them. In the event of the passage, after the date of this Deed, of any law (i) making it illegal for the Grantor to pay the whole or any part of the Impositions, or charges or liens herein required to be paid by Grantor, or (ii) rendering the payment by Grantor of any and all taxes levied or assessed upon this Deed, the Note, or the Obligations or the interest in the Deed Property represented by this Deed unlawful, or (iii) rendering the covenants for the payment of the matters set forth in Subparts (i) and (ii) of this **Subsection** by Grantor legally inoperative, the Grantor shall pay, upon demand, the entire unpaid Obligations notwithstanding anything in the Note, this Deed, or the other Loan Documents to the contrary.

(b) Grantor shall pay all ad valorem taxes on the Deed Property on or before the date same become delinquent and shall deliver to Grantee tax receipts evidencing said payment within ten (10) days thereof. Grantor shall also deliver to Grantee receipts evidencing the payment of all other Impositions within thirty (30) days after same become due and payable or before same shall become delinquent, whichever is sooner.

5.5 Insurance.

(a) The Grantor shall obtain, maintain and keep in full force and effect during the term of the Loan, or cause Grantor's lessees to obtain, maintain and keep adequate insurance coverage, with all premiums paid thereon and without notice or demand, with respect to its properties and business against loss or damage of the kinds and in the amounts customarily insured against by companies of established reputation engaged in the same or similar businesses including, without limitation:

(i) Hazard/Windstorm/Hail Insurance reflecting coverage to be lesser of 80% replacement cost value (RCV) or loan amount, but not less than 80% of RCV and a deductible of five percent (5%) of policy face amount. With a deductible of the lesser of 5% of policy face amount or $50,000. Such policy shall include an additional insured endorsement naming the Lender as additional insured and loss payee;

(ii) Commercial general liability insurance insuring against all claims for personal or bodily injury, death, or property damage occurring upon, in or about the Land in an amount of not less than $1,000,000.00 single limit and $2,000,000.00 aggregate coverage for the Land. With a deductible of the lesser of 5% of policy face amount or $50,000. Such policy shall include an additional insured endorsement naming the Lender as additional insured and loss payee;

(iii) Insurance in such amounts and against such other casualties and contingencies as may from time to time be reasonably required by Lender, including, without limitation, flood hazard insurance to the extent, if any, required by law;

(iv) If the Land is located in an area designated by the Director of Federal Emergency Management Agency as a special flood hazard area, Borrower shall provide evidence for such parcel of flood insurance which shall be in the maximum amount of coverage available under the National Flood Insurance Program (NFIP) with a maximum deductible of $5,000.00. Such policy shall include an additional insured endorsement naming the Lender as additional insured and loss payee.

(b) All policies of insurance required hereunder shall: (i) be written by carriers which are licensed or authorized to transact business in the State of Florida, and are rated **[*"A"*]** or higher, Class XII or higher, according to the latest published Best's Key Rating Guide and which shall be otherwise acceptable to Grantee in all other respects, (ii) provide that the Grantee shall receive thirty (30) days' prior written notice from the insurer before a cancellation, modification, material change or non-renewal of the policy becomes effective, and (iii) be otherwise reasonably satisfactory to Grantee.

(c) Grantor shall not, without the prior written consent of Grantee, take out separate insurance concurrent in form or contributing with regard to any insurance coverage required by Grantee.

(d) At all times during the term of this Deed, Grantor shall have delivered to Grantee the original (or a certified copy) of all policies of insurance required hereby, together with receipts or other evidence that the premiums therefor have been paid.

(e) Not less than thirty (30) days prior to the expiration date of any insurance policy, Grantor shall deliver to Grantee the original (or certified copy), or the original certificate, as applicable, of each renewal policy, together with receipts or other evidence that the premiums therefor have been paid.

(f) The delivery of any insurance policy and any renewals thereof shall constitute an assignment thereof to Grantee, and Grantor hereby grants to Grantee a security interest in all such policies, in all proceeds thereof and in all unearned premiums therefor.

5.6 Tax and Insurance Escrow. Supplementing the provisions of **Sections 5.4** and **5.5** hereof, upon the occurrence of an Event of Default, at Grantee's option, Grantor shall pay to Grantee on the payment date of installments of interest as provided in the Note, together with and in addition to such installments of interest, an installment of the Impositions and insurance premiums for such insurance as is required hereunder, next due on the Deed Property in an amount sufficient, as estimated by Grantee, to accumulate the sum required to pay such Impositions and insurance, as applicable, thirty (30) days prior to the due date thereof. Amounts held hereunder shall not be, nor be deemed to be, trust funds, but may be commingled with the general funds of Grantee, and no interest shall be payable with respect thereto. Upon

demand of Grantee, Grantor shall deliver to Grantee, within ten (10) days after such demand, such additional money as is necessary to make up any deficiencies in the amounts necessary to enable Grantee to pay such Impositions and insurance premiums when due. In case of an Event of Default, Grantee may apply any amount under this **Section** remaining to Grantor's credit to the reduction of the Obligations, at such times and in such manner as Grantee shall determine.

5.7 Repair. Grantor shall keep the Land, the Improvements and the other Deed Property in good order and condition and make all necessary or appropriate repairs and replacements thereof and betterments and improvements thereto, ordinary and extraordinary, foreseen and unforeseen, and use its best efforts to prevent any act that might impair the value or usefulness of the Deed Property.

5.8 Restoration Following Casualty.

(a) If all or any part of the Improvements or any of the Deed Property shall be damaged or destroyed by a casualty covered by insurance under **Section 5.5**, Grantor shall immediately give written notice thereof to Grantee and the appropriate insurer, and Grantee is authorized and empowered (but not obligated or required) to make proof of loss and to settle, adjust or compromise any claims for loss, damage or destruction under any policies of insurance required under this Deed. All proceeds of insurance, as provided in **Section 5.5,** shall be paid to Grantee and shall be applied first to the payment of all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred by Grantee in obtaining such proceeds; and second, at the option of Grantee, either to the payment of the Obligations whether or not due in such order as Grantee may elect, or to the restoration, repair or replacement of the Improvements and the other Deed Property damaged or destroyed. Such proceeds shall be disbursed to Grantor as work progresses pursuant to a construction and disbursing agreement in form and content satisfactory to Grantee, in its sole discretion, and Grantor shall promptly and diligently, regardless of whether there shall be sufficient insurance proceeds therefor, restore, repair and rebuild the Improvements and the other Deed Property to the equivalent of its condition immediately prior to the casualty. During the period of restoration and repair, Grantor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations. The election by Grantee to apply the insurance proceeds to the restoration, repair or replacement of the Deed Property shall not affect the lien of this Deed or affect or reduce the Obligations.

(b) If all or any of the Improvements or the other Deed Property shall be damaged or destroyed by a casualty not covered by insurance under **Section 5.5**, or, if so covered, the insurer fails or refuses to pay the claim within thirty (30) days following the filing thereof, Grantor shall immediately give written notice thereof to Grantee, and Grantor shall promptly and diligently, at Grantor's sole cost and expense, restore, repair and rebuild the Improvements and the other Deed Property to the equivalent of its condition immediately prior to the casualty. During the period of restoration and repair, Grantor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations.

(c) If any work required to be performed under **Subsections (a)** or **(b)** above, or both, shall involve an estimated expenditure of more than $50,000.00, no such work shall be undertaken until plans and specifications therefor, prepared by an architect satisfactory to Grantee, have been submitted to and approved by Grantee.

5.9 Condemnation.

(a) Grantor shall immediately notify Grantee upon obtaining any knowledge of the institution of any proceedings for the condemnation of the Deed Property or any part thereof.

(b) If all or any part of the Deed Property shall be damaged or taken through condemnation (which term when used in this Deed shall include any damage or taking by any Governmental Authority and any transfer by private sale in lieu thereof, either temporarily or permanently), Grantee at its option may declare all of the unpaid Obligations to be immediately due and payable, and upon ten (10) days written notice from Grantee to Grantor all such Obligations shall immediately become due and payable as fully and to the same effect as if such date were the date originally specified for the final payment or maturity thereof. Grantee shall be entitled to all compensation, awards and other payments resulting from such condemnation and is hereby authorized, at its option, to commence, appear in and prosecute, in its own or in Grantor's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith. All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by Grantor to Grantee and shall, be applied first to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Grantee in connection with any action or proceeding under this **Section**, and second, at the option of Grantee, either to the payment of the Obligations whether or not due in such order as Grantee may elect, or to the restoration, repair or alteration of the Deed Property. If Grantee elects to apply the condemnation awards to the restoration, repair or alteration of the Deed Property, such awards shall be disbursed to Grantor as work progresses pursuant to a construction and disbursing agreement in form and content satisfactory to Grantee, in its sole discretion, and Grantor shall promptly and diligently, regardless of whether there shall be sufficient condemnation awards therefor, restore, repair and alter the Deed Property in a manner satisfactory to Grantee. During the period of restoration, repair and alteration, the Grantor shall continue to duly and promptly pay, perform, observe and comply with all of the Obligations. The election by Grantee to apply the condemnation awards to the restoration, repair or alteration of the Deed Property shall not affect the lien of this Deed or affect or reduce the Obligations. If any restoration, repair or alteration of the Deed Property shall involve an estimated expenditure of more than $50,000.00, same shall not be commenced until plans and specifications therefor, prepared by an architect satisfactory to Grantee, have been submitted to and approved by Grantee.

5.10 Inspection. Grantor shall permit Grantee and its agents to inspect the Land, Improvements and the other Deed Property at any time during normal business hours and at all other reasonable times.

5.11 Contest of Tax Assessments, Etc. After prior written notice to Grantee, Grantor, at its own expense, may contest by appropriate legal proceedings, promptly initiated and conducted in good faith and with due diligence, the amount, validity or application, in whole or in part, of (a) any of the Governmental Requirements referred to in **Section 5.3**, or (b) any Imposition; provided that: (i) in the case of any unpaid Imposition, such proceedings shall suspend the collection thereof from Grantor, the lessor, the Land, the Improvements and the other Deed Property, (ii) the Land, the Improvements and the other Deed Property or any part thereof will not be in danger of being sold, forfeited, terminated, cancelled or lost, (iii) the use of the Land, the Improvements and the other Deed Property or any part thereof for its present or future intended purpose or purposes will not be interrupted, lost or terminated, (iv) Grantor shall have set aside adequate reserves with respect thereto, and (v) Grantor shall have furnished such security as may be required in the proceedings or as may be reasonably requested by Grantee.

5.12 Expenses.

(a) Grantor shall pay all reasonable costs and expenses in connection with the Loan and the preparation, execution, and delivery of the Loan Documents including, but not limited to, reasonable fees and disbursements of counsel appointed by Grantee, and all recording costs and expenses, documentary stamp tax and intangible tax on the entire amount of funds disbursed under the Loan, and other

taxes, surveys, appraisals, premiums for policies of title and other insurance and all other fees, costs and expenses, if any, or otherwise connected with the Loan transaction.

(b) Grantor shall pay or reimburse Grantee for all reasonable costs, charges, expenses, and reasonable attorneys' fees paid or incurred by Grantee pursuant to this Deed or the other Loan Documents including but not limited to those costs, charges, expenses and fees paid or incurred for the payment of the Impositions, insurance, completion of construction, repairs, appraisal fees, recording charges title insurance, search fees, premiums, documentary stamps and intangible taxes, environmental assessment fees, or any other fees or in any action, proceeding or dispute of any kind in which Grantee is a party because of any Obligation not being duly and promptly performed or being violated, including, but not limited to, the foreclosure or other enforcement of this Deed, any condemnation or eminent domain action involving the Land, the Improvements or any part of the Deed Property or any part thereof, any action to protect the security hereof, or any proceeding in probate, reorganization, bankruptcy, arbitration, or forfeiture in rem. All such amounts paid or incurred by Grantee, together with interest thereon at the Default Rate from the date incurred by Grantee, shall be secured by this Deed and shall be due and payable by Grantor immediately, whether or not there be notice or demand therefor.

(c) Any reference in this Deed to attorneys' or counsels' fees paid or incurred by Grantee shall be deemed to include paralegals' fees and legal assistants' fees. Moreover, wherever provision is made herein for payment of attorneys' or counsels' fees or expenses incurred by the Grantee, said provision shall include, but not be limited to, such fees or expenses incurred in any and all judicial, bankruptcy, reorganization, administrative, or other proceedings, including appellate proceedings, whether such fees or expenses arise before proceedings are commenced or after entry of a final judgment.

(d) Grantor shall pay Grantee all fees, costs, charges, and expenses required by the Note.

5.13 <u>Preservation of Agreements</u>. Grantor shall preserve and keep in full force and effect all agreements, approvals, permits and licenses necessary for the development, use and operation of the Deed Property for its intended purpose or purposes.

5.14 <u>Books and Records</u>. The Grantor shall keep and maintain, at all times, full, true and accurate books of accounts and records, adequate to correctly reflect the results of the operation of the Deed Property. The Grantee shall have the right to examine such books and records and to make such copies or extracts therefrom as the Grantee shall require.

5.15 <u>Indemnification</u>.

(a) Grantor shall at its own expense, and does hereby agree to, protect, indemnify, reimburse, defend and hold harmless Grantee and its directors, officers, agents, employees attorneys, successors and assigns from and against any and all liabilities (including strict liability), losses, suits, proceedings, settlements, judgments, orders, penalties, fines, liens, assessments, claims, demands, damages, injuries, obligations, costs, disbursements, expenses or fees, of any kind or nature (including attorneys' fees and expenses paid or incurred in connection therewith) arising out of or by reason of (i) an incorrect legal description of the Land; (ii) any action, or inaction of Grantee in connection with the Note, this Deed, the other Loan Documents or the Deed Property; (iii) the construction of any Improvements; (iv) the Improvements; (v) the use and operation of the Deed Property; (vi) any acts or omissions of Grantor or any other Person at, on or about the Deed Property regarding the contamination of air, soil, surface waters or groundwaters over, on or under the Land; (vii) the presence, whether past, present or future, of any Hazardous

Substances on, in or under the Land; or (viii) any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans involving the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, cleanup, emission, discharge, seepage, spillage, leakage, release or threatened release of any Hazardous Substance on, in, under or from the Land, in connection with Grantor's operations on the Land, the Improvements of the other Deed Property, or otherwise; all of the foregoing regardless of whether within the control of the Grantee.

(b) The indemnifications of this **Section** shall survive the full payment and performance of the Obligations and the satisfaction of this Deed.

5.16 Further Assurances. Grantor, at its sole expense, upon the request of Grantee, shall execute, acknowledge and deliver such further instruments and do such further acts as may, in the opinion of the Grantee, be necessary, desirable, or proper to carry out more effectively the purpose of this Deed and to subject to the lien hereof any property intended by the terms hereof to be covered hereby, including, without limitation, any proceeds, renewals, additions, substitutions, replacements, products, betterments, accessions and appurtenances thereto and thereof.

5.17 Financing Statements. Grantor shall execute and deliver to Grantee, in form and substance satisfactory to Grantee, such financing statements, continuation statements, and such further assurances as Grantee may from time to time consider reasonably necessary to create, perfect, preserve and maintain in full force and effect Grantee's lien upon the Fixtures, Leases, Rents and Personal Property; and, Grantee, at the expense of Grantor, may cause such statements and assurances to be recorded and rerecorded, filed and re-filed, in the name of Grantor, and Grantor hereby irrevocably appoints Grantee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Grantor, but at the option of said attorney-in-fact, to execute and file any and all financing statements.

5.18 Hazardous Substances.

(a) Grantor shall immediately notify Grantee orally and in writing if Grantor (i) becomes aware of the presence of any Hazardous Substance or other environmental problem or liability on, in, under, released from or associated with the Deed Property, or (ii) receives any complaint, order, citation, notice or other written or oral communication (collectively an "Environmental Complaint") regarding air emissions, water discharges or any other environmental, health or safety matter affecting the Land, the Improvements, or the other Deed Property or any part thereof, or the presence of any Hazardous Substance on, in, under, released from or associated with the Deed Property, or any past, present or future events, conditions, circumstances, activities, practices, incidents, actions or plans involving the manufacture, processing, distribution, use, transport, handling, treatment, storage, disposal, cleanup, emission, discharge, seepage, spillage, leakage, release or threatened release of any Hazardous Substance on, under or from the Deed Property. Grantor shall forthwith transmit to Grantee copies of any Environmental Complaint.

(b) Grantor shall, at its own cost and expense, take any action necessary or advisable for the cleanup of any Hazardous Substance on, in, under, released from or associated with the Deed Property, including any removal, containment or remedial actions in accordance with all applicable Environmental Laws, and shall pay or cause to be paid all cleanup, administrative, enforcement and other costs, expenses or fines which may be asserted against Grantor, Grantee, the Deed Property, or any other Person in connection therewith. Grantee shall have the right but not the obligation, and without any limitation of Grantee's other rights under this Deed, to enter onto the Land and the Improvements or to take any action as it deems necessary or advisable to cleanup, remove, resolve or minimize the impact of, or otherwise deal

with, any Hazardous Substance or any Environmental Complaint following receipt of any notice from any Person or Governmental Authority asserting the existence of any Hazardous Substance or an Environmental Complaint pertaining to the Deed Property or any part thereof which, if true, could result in an order, suit or other action against Grantor or Grantee which, in the sole opinion of Grantee, could jeopardize Grantee's security under this Deed. All costs and expenses incurred by Grantee in the exercise of any such rights shall be secured by this Deed and shall be payable by Grantor upon demand if the excise results from Grantor's failure to comply with Environmental Laws or this Deed and such failure persists after written notice of the failure and a reasonable opportunity to cure it.

(c) In the event that Grantee has reasonable cause to believe that the Deed Property is not in compliance with any applicable Environmental Law, Grantee shall have the right, in its sole discretion, to require Grantor to periodically perform an environmental audit of the Land, the Improvements and the other Deed Property (but not more frequently than annually unless an Environmental Complaint is then outstanding) and, if deemed necessary by Grantee, an environmental risk assessment of the Land, the Improvements and the other Deed Property including Hazardous Substances waste management practices and Hazardous Substances waste disposal sites thereon. All environmental audits and environmental risk assessments shall be at Grantor's expense, shall be performed and prepared by an environmental consultant satisfactory to Grantee, and shall otherwise be in form and substance satisfactory to Grantee. Should Grantor fail to provide such environmental audit or environmental risk assessment within thirty (30) days of the Grantee's written request, Grantee shall have the right, but not the obligation, to retain an environmental consultant to perform and prepare same. All costs and expenses incurred by Grantee in the exercise of such rights shall be secured by this Deed and shall be payable by Grantor upon demand or charged to Grantor's loan balance at the discretion of Grantee.

5.19 Appraisal. Grantee may obtain a new or updated appraisal (the "Appraisal") of the Deed Property at Grantor's expense. Appraisals shall not be required more than once annually unless an Event of Default exists or if required by a governmental or banking agency or authority. Each Appraisal shall be performed and prepared by an appraiser certified or licensed under the State of Florida and acceptable to Grantee, which Appraisal shall meet all appraisal standards prescribed by all Governmental Authorities regulating Grantee, and shall otherwise be in form and substance satisfactory to Grantee.

5.20 Performance of Loan Documents. Grantor shall duly and punctually perform all covenants, terms and agreements expressed as binding upon it under all of the Loan Documents.

5.21 Performance of Other Agreements. Grantor shall duly and punctually perform all covenants, terms and agreements expressed as binding upon it under any Permitted Title Exception, or any other agreement of any nature whatsoever binding upon it with respect to the Deed Property.

**ARTICLE VI**

**NEGATIVE COVENANTS**

6.1 Use Violations, Etc. Grantor shall not use the Deed Property or allow the same to be used or occupied for any unlawful purpose or in violation of any Governmental Requirement or restrictive covenant covering, affecting or applying to the ownership, use or occupancy thereof, commit or permit or suffer any act to be done or any condition to exist on the Deed Property or any article to be brought thereon that may be dangerous, or that may in any way increase any ordinary fire or other hazard, unless safeguarded as required by law, or that may, in law, constitute a nuisance, public or private.

6.2 Care of the Deed Property.

(a) Grantor shall not commit or permit any waste, impairment, or deterioration of the Deed Property, or perform any clearing, grading, filling or excavation of the Deed Property, or make or permit to be made to the Deed Property any alterations or additions that would have the effect of materially diminishing the value thereof (in Grantee's sole opinion) or take or permit any action that will in any way increase any ordinary fire or other hazard arising out of the construction or operation thereof.

(b) Grantor shall not, without the prior written consent of Grantee, remove, demolish or substantially alter, or permit the removal, demolishment or substantial alteration of, any structural Improvements on the Land that would materially decrease the value of the Improvements excluding demolition, removal, installation and alteration of interior improvements for space leased or to be leased to tenants, which may be accomplished without Grantee consent. In the event such consent is required and given and if any work to be performed shall involve an estimated expenditure of more than $50,000.00, no such work shall be undertaken until plans and specifications therefor, prepared by an architect satisfactory to Grantee, shall have been submitted to and approved by Grantee.

(c) Grantor shall not permit any of the Fixtures or Personal Property to be demolished or to be removed from the Land, without the prior written consent of Grantee. In the event such consent is given, the Grantee may require that said Fixture or Personal Property be replaced by an article of equal suitability and value, owned by Grantor free and clear of any vendor's lien, chattel Deed, or security interest of any kind, except such as may be approved in writing by Grantee, and that such replacement article be encumbered by the lien of this Deed.

6.3 Other Liens and Deeds. Grantor shall not, without the prior written consent of Grantee, create or permit to be created or to remain, any Deed, pledge, construction lien or other lien, conditional sale or other title retention agreement, encumbrance, claim, or charge on (whether prior or subordinate to the lien of this Deed or the other Loan Documents) the Deed Property or income therefrom, other than this Deed, the other Loan Documents and the Permitted Title Exceptions. Any transaction prohibited under this **Section** shall be null and void.

6.4 Transfer of Deed Property. Except for Leases entered into in the ordinary course of business, which shall not require Grantee's consent so long as no Event of Default exists, Grantor shall not sell, convey, or transfer or permit to be sold, conveyed or transferred any interest in the Deed Property or any part thereof. A contract to deed or agreement for deed, or an assignment, pledge, or encumbrance of a beneficial interest in any land trust, or a lease for all or substantially all of the Land or Improvements shall constitute a transfer prohibited by the provisions of this **Section** and shall be null and void.

6.5 Transfer of Other Assets. Grantor shall not, directly or indirectly, sell, convey, or transfer or permit to be sold, conveyed, or transferred any of its assets to any Person to which Grantor is related or connected. The term "assets" as used in this **Section** does not include the Deed Property, the sale, conveyance, or transfer of which is prohibited as provided in **Section 6.4** hereof.

6.6 Environmental Contamination/Hazardous Substances. Grantor and the Deed Property shall at all times remain in full compliance with all Environmental Laws. Grantor shall not, nor permit any other person to manufacture, process, distribute, use, transport, handle, treat, store, dispose, emit, discharge, leak, spill or release any Hazardous Substance on, in, under or from the Deed Property in violation of Environmental Laws.

## ARTICLE VII

## EVENTS OF DEFAULT

7.1 Events of Default. An "Event of Default", as used in this Deed, shall occur at any time or from time to time:

(a) Failure to Pay. If any Obligation or any installment thereof is not paid when due; or

(b) Failure to Perform. If any Obligation other than an Obligation requiring the payment of money or the occurrence of an event described in Subsections (c) through (n), MUST CONFORM TO ALWAYS INCLUDE ALL SUBECTIONS OF 7.1 after (c) inclusive, below is not duly and promptly performed or is violated, and the same continues for more than fifteen (15) days after written notice; or

(c) False Representation. If any representation or warranty made in any Loan Document by or on behalf of Grantor or any Guarantor or if any financial statement or operating statement or any schedule attached thereto furnished by Grantor or any Guarantor is at any time false, misleading, or breached; or

(d) Judgment. If a final judgment for the payment of money is rendered against Grantor and the same remains unsatisfied except for such period of time as execution on the judgment is effectively stayed; or

(e) Voluntary Bankruptcy, Etc. If Grantor or any Guarantor (i) is voluntarily adjudicated bankrupt or insolvent, (ii) seeks or consents to the appointment of a receiver or trustee for itself or for all or any part of its property, (iii) files a petition seeking relief, including reorganization, arrangement or similar relief, under the present Bankruptcy Code or other similar present or future applicable laws of the United States or any state or any other competent jurisdiction, (iv) makes a general assignment for the benefit of creditors or (v) admits in writing its inability to pay its debts as they mature; or

(f) Involuntary Bankruptcy, Etc. If a receiver or trustee is appointed for Grantor or any Guarantor or for all or any part of their respective properties without their respective consents and such appointment is not vacated within sixty (60) days, or if a petition is filed against Grantor seeking relief, including reorganization, arrangement or similar relief, under the present Bankruptcy Code or other similar present or future applicable laws of the United States or any state or other competent jurisdiction, and such petition is not dismissed within sixty (60) days after the filing thereof; or

(g) Default Under Loan Documents. If any Event of Default occurs under the Loan Agreement or any of the other Loan Documents, or if any obligation of Grantor under any of the other Loan Documents is not fully performed and the same continues beyond any applicable notice and cure period set forth therein; or

(h) Cross Default. If Grantor or any affiliate of Grantor or any Guarantor defaults under any loan, contract or agreement extended by Grantee or any of its affiliates; or

(i) Foreclosure of Other Liens. If the holder of any Deed or other lien on the Deed Property, whether a Permitted Title Exception or not (without hereby implying Grantee's consent to any

such Deed or other lien) institutes foreclosure or other proceedings for the enforcement of any of its remedies thereunder; or

(j) Notice Limiting Future Advances. If Grantor, pursuant to Florida Statutes Section 697.04(1)(b) as amended from time to time, files for record a notice limiting the maximum amount which may be secured by this Deed; or

(k) Death or Incapacity of Guarantor. The death of, appointment of a guardian for, or legal incapacity of any Guarantor.

(l) Liens. If any federal, state or local tax lien or any claim of lien for labor or materials or any other lien or encumbrance of any nature whatsoever is recorded against Grantor or the Deed Property and is not removed by payment or transferred to substitute security in the manner provided by law within fifteen (15) days after it is recorded in accordance with applicable law.

(m) Dissolution, Termination of Existence, Etc. The dissolution of, termination of existence of or loss of good standing status by Grantor, its subsidiaries or affiliates, if any, or any other party to the Loan Documents.

## ARTICLE VIII

## RIGHTS AND REMEDIES

8.1 Remedies. If an Event of Default shall have occurred, Grantee may, at its option, exercise any, some or all of the following remedies, concurrently or consecutively.

(a) Acceleration. Grantee may declare all of the unpaid Obligations, together with all accrued interest thereon, to be due and payable without notice or demand which are hereby expressly waived, and upon such declaration all such Obligations shall immediately become due and payable as fully and to the same effect as if the date of such declaration were the date originally specified for the full payment or maturity thereof.

(b) Grantee's Right to Enter and Take Possession, Operate and Apply Income.

(i) Grantee may demand that Grantor surrender the actual possession of the Deed Property and upon such demand, Grantor shall forthwith surrender same to Grantee and, to the extent permitted by law, Grantee itself, or by such officers or agents as it may appoint, may enter and take possession of all of the Deed Property and may exclude Grantor and its agents and employees wholly therefrom.

(ii) If Grantor shall for any reason fail to surrender or deliver the Deed Property or any part thereof after Grantee's demand, Grantee may obtain a judgment or order conferring on Grantee the right to immediate possession or requiring the Grantor to deliver immediate possession to Grantee, to the entry of which judgment or decree the Grantor hereby specifically consents.

(iii) Grantee may from time to time: (A) continue and complete construction of, hold, store, use, operate, manage and control the Deed Property and conduct the business thereof; (B) make all reasonably necessary maintenance, repairs, renewals, replacements, additions, betterments and

improvements thereto and thereon and purchase or otherwise acquire additional Fixtures and Personal Property; (C) insure or keep the Deed Property insured; (D) exercise all the rights and powers of the Grantor in its name or otherwise with respect to the same; and (E) enter into agreements with others (including, without limitation, new Leases or amendments, extensions, or cancellations to existing Leases) all as Grantee from time to time may determine in its sole discretion. Grantor hereby irrevocably appoints Grantee its true and lawful attorney-in-fact, which appointment is coupled with an interest, with full power of substitution, and empowers said attorney or attorneys in the name of Grantor, but at the option of said attorney-in-fact, to do any and all acts and execute any and all agreements that Grantee may deem necessary or proper to implement and perform any and all of the foregoing.

(iv) The Grantee may, with or without taking possession of the Deed Property as hereinabove provided, collect and receive all the Rents therefrom, including those past due as well as those accruing thereafter, and shall apply the monies so received first, to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Grantee and its agents in connection with the collection of same, whether or not in possession of the Deed Property, and second, in such order as Grantee may elect, to the payment of the Obligations.

(c) <u>Proceedings To Recover Sums Due</u>.

(i) If any installment or part of any Obligation shall fail to be paid when due, Grantee shall be entitled to sue for and to recover judgment against the Grantor for the amount so due and unpaid together with all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Grantee in connection with such proceeding, together with interest thereon at the Default Rate from the date incurred by Grantee. All such costs and expenses shall be secured by this Deed and shall be due and payable by Grantor immediately.

(ii) If Grantor shall fail to pay upon the Grantee's demand, after acceleration as provided in **Subsection 8.1(a)**, all of the unpaid Obligations, together with all accrued interest thereon, Grantee shall be entitled to sue for and to recover judgment against the Grantor for the entire amount so due and unpaid together with all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Grantee in connection with such proceeding, together with interest thereon at the Default Rate from the date incurred by Grantee. All such costs and expenses shall be secured by this Deed and shall be payable by Grantor immediately. Grantee's right under this **Subsection** may be exercised by Grantee either before, after or during the pendency of any proceedings for the enforcement of this Deed, including appellate proceedings.

(iii) No recovery of any judgment as provided in **Subsections (i)** and **(ii)** above and no attachment or levy of any execution upon any of the Deed Property or any other property shall in any way affect the lien of this Deed upon the Deed Property or any part thereof, or any lien, rights, powers, or remedies of Grantee hereunder, but such lien, rights, powers and remedies shall continue unimpaired as before.

(d) <u>Foreclosure</u>.

(i) Grantee may institute proceedings for the partial or complete foreclosure of this Deed and Grantee may, pursuant to any final judgment of foreclosure, sell the Deed Property as an entirety or in separate lots, units, or parcels.

(ii) In case of a foreclosure sale of all or any part of the Deed Property, the proceeds of sale shall be applied in accordance with **Section 8.8** below hereof, and the Grantee shall be entitled to seek a deficiency judgment against the Grantor to enforce payment of any and all Obligations then remaining due and unpaid, together with interest thereon, and to recover a judgment against the Grantor therefor.

(iii) The Grantee is authorized to foreclose this Deed subject to the rights of any tenants of the Deed Property, or Grantee may elect which tenants Grantee desires to name as parties defendant in such foreclosure and failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by the Grantor to be, a defense to any proceedings instituted by the Grantee to collect the unpaid Obligations or to collect any deficiency remaining unpaid after the foreclosure sale of the Deed Property.

(e) Receiver. Grantee may apply to any court of competent jurisdiction to have a receiver appointed to enter upon and take possession of the Deed Property, collect the Rents therefrom and apply the same as the court may direct, such receiver to have all of the rights and powers permitted under the laws of the State of Florida. The right of the appointment of such receiver shall be a matter of strict right without regard to the value or the occupancy of the Deed Property or the solvency or insolvency of Grantor. The expenses, including receiver's fees, attorneys' fees, costs and agent's commission incurred pursuant to the powers herein contained, together with interest thereon at the Default Rate, shall be secured hereby and shall be due and payable by Grantor immediately without notice or demand. Notwithstanding the appointment of any receiver or other custodian, Grantee shall be entitled as pledgee to the possession and control of any cash or deposits at the time held by, payable, or deliverable under the terms of this Deed to the Grantee, and the Grantee shall have the right to offset the unpaid Obligations against any such cash or deposits in such order as Grantee may elect.

(f) Remedies as to Personal Property. Grantee may exercise any or all of its rights and remedies under the Uniform Commercial Code-Secured Transactions as adopted by the State of Florida or other applicable law as well as all other rights and remedies possessed by Grantee, all of which shall be cumulative. Grantee is hereby authorized and empowered to enter the Deed Property or other place where the Personal Property may be located without legal process, and to take possession of the Personal Property without notice or demand, which hereby are waived to the maximum extent permitted by the laws of the State of Florida. Upon demand by Grantee, Grantor shall make the Personal Property available to Grantee at a place reasonably convenient to Grantee. Grantee may sell at one or more public or private sales and for such price as Grantee may deem commercially reasonable, any and all of the Personal Property secured by this Deed, and any other security or property held by Grantee and Grantee may be the purchaser of any or all of the Personal Property.

(g) Other. Grantee may institute and maintain any suits and proceedings as the Grantee may deem advisable (i) to prevent any impairment of the Deed Property by any acts which may be unlawful or in violation of this Deed, (ii) to preserve or protect its interest in the Deed Property, and (iii) to restrain the enforcement of or compliance with any Governmental Requirement that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such Governmental Requirement might impair the security hereunder or be prejudicial to the Grantee's interest.

8.2 Remedies Cumulative and Concurrent. No right, power or remedy of Grantee as provided in the Note, this Deed, or the other Loan Documents is intended to be exclusive of any other right, power, or remedy of Grantee, but each and every such right, power and remedy shall be cumulative and concurrent and in addition to any other right, power or remedy available to Grantee now or hereafter existing

at law or in equity and may be pursued separately, successively or together against Grantor, or any endorser, co-maker, surety or guarantor of the Obligations, or the Deed Property or any part thereof, or any one or more of them, at the sole discretion of Grantee. The failure of Grantee to exercise any such right, power or remedy shall in no event be construed as a waiver or release thereof.

8.3 Waiver, Delay or Omission. No waiver of any Event of Default hereunder shall extend to or affect any subsequent or any other Event of Default then existing, or impair any rights, powers or remedies consequent thereon, and no delay or omission of Grantee to exercise any right, power or remedy shall be construed to waive any such Event of Default or to constitute acquiescence therein.

8.4 Credit of Grantee. To the maximum extent permitted by the laws of the State of Florida, upon any sale made under or by virtue of this **Article**, Grantee may bid for and acquire the Deed Property, or any part thereof, and in lieu of paying cash therefor may apply to the purchase price, any portion of or all of the unpaid Obligations in such order as Grantee may elect.

8.5 Sale. Any sale or sales made under or by virtue of this **Article** shall operate to divest all the estate, right, title, interest, claim and demand whatsoever at law or in equity, of the Grantor and all Persons, except tenants pursuant to Leases approved by Grantee, claiming by, through or under Grantor in and to the properties and rights so sold, whether sold to Grantee or to others.

8.6 Proofs of Claim. In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition, seizure of the Deed Property by any Governmental Authority, or other judicial proceedings affecting Grantor, any endorser, co-maker, surety, or guarantor of the Obligations, or any of their respective properties, the Grantee, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have its claim allowed in such proceedings for the entire unpaid Obligations at the date of the institution of such proceedings, and for any additional amounts which may become due and payable after such date.

8.7 Waiver of Redemption, Notice, Marshalling, Etc. Grantor hereby waives and releases, for itself and anyone claiming through, by, or under it, to the maximum extent permitted by the laws of the State of Florida:

(a) all benefit that might accrue to Grantor by virtue of any present or future law exempting the Deed Property, or any part of the proceeds arising from any sale thereof, from attachment, levy or sale on execution, or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment,

(b) unless specifically required herein, all notices of default, or Grantee's actual exercise of any option or remedy under the Loan Documents, or otherwise, and

(c) any right to have the Deed Property marshalled.

8.8 Application of Proceeds. The proceeds of any sale of all or any portion of the Deed Property shall be applied by Grantee first, to the payment of receiver's fees and expenses, if any, and to the payment of all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Grantee, together with interest thereon at the Default Rate from the date so incurred, in connection with any entry, action or proceeding under this **Article** and, second, in such order as Grantee may elect, to the payment of the Obligations. Grantor shall be and remain liable to Grantee for any difference

between the net proceeds of sale and the amount of the Obligations until all of the Obligations have been paid in full.

8.9 Discontinuance of Proceedings. If Grantee shall have proceeded to enforce any right under any Loan Document and such proceedings shall have been discontinued or abandoned for any reason, then except as may be provided in any written agreement between Grantor and Grantee providing for the discontinuance or abandonment of such proceedings, Grantor and Grantee shall be restored to their former positions and the rights, remedies and powers of Grantee shall continue as if no such proceedings had been instituted.

8.10 Grantee's Actions. Grantee may, at any time without notice to any Person and without consideration, do or refrain from doing any or all of the following actions, and neither the Grantor, any endorser, co-maker, surety or guarantor of the Obligations, nor any other Person (hereinafter in this **Section** collectively referred to as the "Obligor") now or hereafter liable for the payment and performance of the Obligations shall be relieved from the payment and performance thereof, unless specifically released in writing by Grantee: (a) renew, extend or modify the terms of the Note, this Deed, and the other Loan Documents, or any of them; (b) forbear or extend the time for the payment or performance of any or all of the Obligations; (c) apply payments by any Obligor to the reduction of the unpaid Obligations in such manner, in such amounts, and at such times and in such order and priority as Grantee may see fit; (d) release any Obligor; (e) substitute or release in whole or in part the Deed Property or any other collateral or any portion thereof now or hereafter held as security for the Obligations without affecting, disturbing or impairing in any manner whatsoever the validity and priority of the lien of this Deed upon the Deed Property which is not released or substituted, or the validity and priority of any security interest of the Grantee in such other collateral which is not released or substituted; (f) subordinate the lien of this Deed or the lien of any other security interest in any other collateral now or hereafter held as security for the Obligations; (g) join in the execution of a plat or replat of the Land; (h) join in and consent to the filing of a declaration of condominium or declaration of restrictive covenants regarding all or any part of the Land; (i) consent to the granting of any easement on the Land; and (j) generally deal with any Obligor or any other party as Grantee may see fit.

## ARTICLE IX

## MISCELLANEOUS

9.1 Maximum Rate of Interest. Nothing contained herein, in the Note, in the Loan Agreement, or in any other Loan Document or in any instrument or transaction related thereto, shall be construed or so operate as to require the Grantor or any person liable for the payment of the Loan made pursuant to the Note, or liable for the payment of any Obligations, to pay interest, or any charge in the nature of interest, in an amount or at a rate which exceeds the maximum rate of interest allowed by applicable law, as amended from time to time. Should any interest or other charges in the nature of interest received by Grantee or paid by the Grantor or any parties liable for the payment of the Loan made pursuant to the Note, or liable for the payment of any Obligations, exceed the maximum rate of interest allowed by applicable law, as amended from time to time, then such excess sum shall be credited against the principal balance of the Note or the balance of the other Obligations, as applicable, unless the Grantor or such other parties liable for such payments, as applicable, shall notify the Grantee, in writing, that the Grantor or such other party elects to have such excess sum returned to it forthwith, it being the intent of the parties hereto that under no circumstances shall the Grantor or any parties liable for any of the aforesaid payments be required to pay interest in excess of the maximum rate of interest allowed by applicable law, as amended from time to time. The Grantee may, in determining the maximum rate of interest allowed under applicable law, as amended from time to time,

take advantage of any state or federal law, rule or regulation in effect from time to time which may govern the maximum rate of interest which may be reserved, charged or taken.

9.2 Continuing Agreement. This Deed and all of the Grantor's representations, warranties and covenants herein, Grantee's security interest in the Deed Property and all of the rights, powers and remedies of Grantee hereunder shall continue in full force and effect until all of the Obligations have been paid and performed in full; until Grantee has no further obligation to make any advances under the Loan; and until Grantee, upon the request of the Grantor, has executed a satisfaction of Deed. Furthermore, if for any reason no Obligations are owing, notwithstanding such occurrence, this Deed shall remain valid and in full force and effect as to subsequent Obligations, so long as Grantee has not executed a satisfaction of Deed; provided, however, that the indemnifications set forth in **Article V** of this Deed shall survive the satisfaction of this Deed.

9.3 Survival of Warranties and Covenants. The warranties, representations, covenants and agreements set forth in this Deed shall survive the making of the Loan and the execution and delivery of the Note, and shall continue in full force and effect until all of the Obligations shall have been paid and performed in full.

9.4 No Representation By Grantee. By accepting or approving anything required to be observed, performed or fulfilled, or to be given to Grantee, pursuant to this Deed, the Loan Agreement, or the other Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement, survey or appraisal, Grantee shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Grantee.

9.5 Notice. All notices, demands, requests and other communications required under this Deed may be given orally (either in person or by telephone if confirmed in writing within three (3) days thereafter), in writing delivered by hand or mail and shall be conclusively deemed to have been received if delivered or attempted to be delivered by United States first class mail, return receipt requested, postage prepaid, addressed to the party for whom it is intended at its address set forth in the introduction to this Deed. Any party may designate a change of address by written notice to the other party, received by such other party at least ten (10) days before such change of address is to become effective.

9.6 Grantee's Right to Pay and Perform. If Grantor shall fail to duly pay or perform any of the Obligations required by this Deed beyond the expiration of any applicable notice or cure period set forth herein, then at any time thereafter without notice to or demand upon Grantor, and without waiving or releasing any right, remedy, or power of Grantee, and without releasing any of the Obligations or any Event of Default, Grantee may pay or perform such Obligation for the account of and at the expense of Grantor, and shall have the right to enter and to authorize others to enter upon the Deed Property for such purpose and to take all such action thereon and with respect to the Deed Property as may be necessary or appropriate for such purpose. All payments made and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Grantee, together with interest thereon at the Default Rate from the date incurred by Grantee shall be secured by this Deed and shall be due and payable by Grantor immediately, whether or not there be notice, demand, an attempt to collect same, or suit pending.

9.7 Covenants Running With the Land. All covenants contained in this Deed shall be binding on the Grantor and shall run with the Land.

9.8 Successors and Assigns. All of the terms of this Deed shall apply to and be binding upon, and inure to the benefit of, the heirs, devisees, personal representatives, successors and assigns of Grantor and Grantee, respectively, and all persons claiming under or through them.

9.9 Invalidity.

(a) If any one or more of the provisions contained in this Deed is declared or found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, such provision or portion thereof shall be deemed stricken and severed and the remaining provisions hereof shall continue in full force and effect.

(b) If any one or more of the Obligations is declared or found by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining Obligations shall continue in full force and effect.

9.10 Modification. No agreement unless in writing and signed by an authorized officer of Grantee and no course of dealing between the parties hereto shall be effective to change, waive, terminate, modify, discharge, or release in whole or in part any provision of this Deed. No waiver of any rights or powers of Grantee or consent by it shall be valid unless in writing signed by an authorized officer of Grantee and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

9.11 Applicable Law. This Deed shall be construed, interpreted, enforced and governed by and in accordance with the laws of the State of Georgia (excluding the principles thereof governing conflicts of law), and federal law, in the event federal law permits a higher rate of interest than Georgia law.

9.12 Strict Performance. It is specifically agreed that time is of the essence as to all matters provided for in this Deed and that no waiver of any Obligation hereunder or secured hereby shall at any time thereafter be held to be a waiver of the Obligations.

9.13 Counterparts. Grantor may execute this Deed in several counterparts, and all counterparts so executed shall constitute one Deed, binding on Grantor.

9.14 USA Patriot Act Notice. Grantee hereby notifies Grantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), Grantee is required to obtain, verify and record information that identifies Grantor, which information includes the name and address of Grantor and other information that will allow Grantee to identify Grantor in accordance with the Act.

9.15 **WAIVER OF GRANTORS RIGHTS. BY EXECUTING THIS INSTRUMENT AND BY INITIALING THIS PARAGRAPH 9.15, GRANTOR EXPRESSLY ACKNOWLEDGES THAT UPON GRANTOR'S DEFAULT HEREUNDER, GRANTEE IS GIVEN THE RIGHT TO ACCELERATE THE DEBT SECURED HEREBY AND TO SELL THE PROPERTY CONVEYED HEREBY AT PUBLIC AUCTION PURSUANT TO THE POWER OF SALE CONTAINED HEREIN, AND GRANTOR HEREBY EXPRESSLY WAIVES ANY RIGHTS TO NOTICE AND HEARING BEFORE SUCH SALE UNDER POWER BY GRANTEE, OTHER THAN THE REQUIRED ADVERTISEMENT ONCE A WEEK FOR FOUR WEEKS PLUS GRANTOR'S INHERENT LEGAL RIGHT TO SEEK A COURT INJUNCTION. GRANTOR MAKES THIS WAIVER KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY, AFTER HAVING BEEN GIVEN FULL EXPLANATION**

**OF GRANTEE'S RIGHTS HEREUNDER PLUS THE OPPORTUNITY TO CONSULT AN ATTORNEY OF GRANTOR'S OWN CHOOSING BEFORE EXECUTING THIS INSTRUMENT AND INITIALING THIS PARAGRAPH.**

**Approved by Grantor ______ (Initials)**

9.16 Due on Sale Clause. If all or any part of Property or an interest therein Is sold or transferred by Grantor without Grantee's prior written consent, excluding: (a) the creation of a lien or encumbrance subordinate to this Deed; (b) the creation of a purchase money security interest for household appliances; (c) a transfer by devise, descent or by operation of law upon the death of a joint tenant; or (d) the grant of any leasehold interest of three years or less not containing an option to purchase, Grantee may, at Grantee's option, declare all the sums secured by this Deed to be immediately due and payable. Grantee shall have waived such option to accelerate if, prior to the sale or transfer, Grantee and the person to whom Property is to be sold or transferred reach an agreement in writing that the credit of such person is satisfactory to Grantee herein and the interest payable on the sums secured by this Deed shall be at such rate as Grantee herein shall request. Acceptance by Grantee of one or more installment payments on the indebtedness secured thereby subsequent to any sale or change in ownership or possession of said real estate, or any part thereof, as to which the Grantee has not granted its written consent, shall not constitute a waiver of the Grantee's said option, which may be exercised by the Grantee at any time.

[EXECUTION APPEARS ON FOLLOWING PAGE]

**IN WITNESS WHEREOF,** Grantor has executed this instrument as of the day and year first above written.

Signed, sealed and delivered in the presence of:

Name: Unofficial Witness

Name: Notary Public

NATALY STUART
Notary Public - State of Florida
Commission # HH 135674
My Comm. Expires 05-27-2025
Bonded Through
NNAF

**GRANTOR:**

Neis Acquisitions 5192, LLC, a GA LLC

By: __________
Name: Zachary Zurich
Title: Member

Signed, sealed and delivered in the presence of:

Name: Unofficial Witness

Name: Notary Public

NATALY STUART
Notary Public - State of Florida
Commission # HH 135674
My Comm. Expires 05-27-2025
Bonded Through
NNAF

**GRANTOR:**

Neis Acquisitions GA, LLC

By: __________
Name: David Neiswenter
Title: Member

Signed, sealed and delivered in the presence of:

Name: Unofficial Witness

Name: Notary Public

NATALY STUART
Notary Public - State of Florida
Commission # HH 135674
My Comm. Expires 05-27-2025
Bonded Through
NNAF

**GRANTOR:**

2364 TICZ, LLC, a GA LLC

By: __________
Name: Zachary Zurich
Title: Member

# EXHIBIT "A"

Legal Description

All that tract or parcel of land being and being in Land Lot 111 of the 4th Land District, Bibb County, Georgia being more particularly described as follows:

To find the True Point of Beginning, commence at an iron pin set at the intersection of the Westerly right-of-way line of Log Cabin Drive (60 foot right-of-way) and the Northerly right-of-way line of Presidential Parkway (right-of-way varies); thence running in a Southerly direction along the Westerly right-of-way line of Log Cabin Drive South 00° 22' 46" West a distance of 118.45 feet to a point located at the intersection of the Westerly right-of-way line of Log Cabin Drive and the Southerly right-of-way line of Presidential Parkway; thence running along the Southerly right-of-way line of Presidential Parkway North 89°32' 20" West a distance of 204.11 feet to a point and the True Point of Beginning; from said True Point of Beginning thus established, thence running along the Southern right-of-way line of Presidential Parkway North 89° 32' 20" West a distance of 234.00 feet to a point; thence leaving said Southerly right-of-way line and running South 00° 27' 40" West a distance of 168.44 feet to a point; thence running North 89° 32' 20" West a distance of 124.50 feet to a point; thence running North 00° 27' 40" East a distance of 168.44 feet to a point located on the Southerly right-of-way line of Presidential Parkway; thence running along said Southerly right-of-way line the following courses and distances: North 89° 32' 20" West a distance of 379.18 feet to a point; along the arc of a curve to the left (said arc having a radius of 205.00 feet and being subtended by a 289.91 foot chord bearing South 45° 27' 40" West) an arc distance of 322.01 feet to a point; South 00° 27' 40" West a distance of 55.07 feet to a point; thence leaving said right-of-way line of Presidential Parkway and running South 89° 32' 20" East a distance of 417.80 feet to a point; thence running South 00° 21' 29" West a distance of 174.40 feet to a point; thence running South 89°32' 20" East a distance of 5.28 feet to a point; thence running South 00° 27' 40" West a distance of 90.00 feet to a point, thence running South 89°32' 20" East a distance of 21.25 feet to a point; thence running South 00° 27' 40" West a distance of 20.35 feet to a point, thence running South 15° 04' 55" East a distance of 208.39 feet to a 1/2" rebar found on the Northwestern comer of land now or formerly owned by Chijobibco the Northerly line or said land now formerly owned by Chijobibco; thence running along the Northerly line of said land now or formerly owned by Chijobibco South 89° 37' 22" a distance 684.29 feet to a 1/2" rebar found on the Westerly right-of-way line of Log Cabin Drive; thence running along the Westerly right-of-way line of Log Cabin Drive along the arc of a curve to the right (said arc having a radius of 1175.92 feet and being subtended by a 85.10 foot chord bearing North 11° 56' 28" West) an arc distance of 85.12 feet to a point; thence leaving said Westerly right-of-way line of Log Cabin Drive and running North 89° 32' 20" West a distance of 182.31 feet to a point; thence running North 00° 27' 40" East a distance of 175.33 feet to a point; thence running along the arc of a curve to the right (said arc having a radius of 45.00 feet and being subtended by a 63.64 foot chord bearing North 45° 27' 40" East) an are distance of 70.69 feet to a point; thence running South 89°32' 20" East a distance of 118.24 feet to a point on the Westerly right-of-way line of Log Cabin Drive; thence running along said right-of-way line of Log Cabin Drive North 00° 22' 46" East a distance of 176.13 feet to a point; thence leaving said Westerly right-of-way line of Log Cabin Drive and running North 89°32' 20" West a distance of 204.49 feet to a point; thence running North 00° 27' 40" East a distance of 265.00 feet to a point and the True Point of Beginning.

Said tract of land totaling 12.00 acres, more or less, and more particularly shown as Eastern Developer Tract Phase 2 (7.42 acres, more or less, excluding right-of-way area) and Kroger Tax Parcel Phase II (4.58 acres, more or less) on that certain Survey entitled "As-built Survey for Faison-Sofran Partnership No. II, and Inland Southeast Eisenhower, L.L.C." prepared by Donaidson, Garrett & Associates, Inc., bearing the seal of Ralph A True, G.R.L.S. No. 2202, dated January 30, 2002, last revised March 21, 2002.

As a matter of information only:

Bibb County, GA tax parcel L0840167 and L0840168

This is a PROFORMA Policy. It does not reflect the present state of the Title and is not a commitment to (i) insure the Title or (ii) issue any of the attached endorsements. Any such commitment must be an express written undertaking on appropriate forms of the Company.

**Copyright American Land Title Association. All rights reserved.**

AMERICAN LAND TITLE ASSOCIATION

The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

**EXHIBIT "B"**

Tax Parcel Map




| Parcel ID | Acres | 2020 Assessed Value |
|---|---|---|
| L084-0160 | 2.02 | $1,304,582 |
| L084-0163 | 25.25 | $16,645,173 |
| L084-0167 | 4.48 | $5,608,559 |
| L084-0168 | 7.34 | $3,418,018 |
| L084-0169 | 9.27 | $7,576,145 |
| L084-0170 | 1.22 | $566,645 |
| L091-0033 | 0.5 | $627 |
| L091-0051 | 0.15 | $3,764 |
| M083-0285 | 0.08 | $800 |
| | **50.31** | **$35,124,313** |

21