IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **Zachary Zurich**,<br><br>Plaintiff and<br>Counterclaim-Defendant<br><br>v.<br><br>**David Neiswenter**, individually, and David Neiswenter as member of all named nominal defendants.<br><br>Defendant and<br>Counterclaim-Plaintiff<br><br>**NEIS Acquisitions 5192, LLC**, a Georgia limited liability company<br><br>**NEIS Acquisitions AUXGA, LLC**, a Georgia limited liability company<br><br>Nominal Defendants,<br><br>**NEIS Acquisitions GA, LLC**, a Georgia limited liability company,<br><br>**NEIS Acquisitions PopGA1, LLC**, a Georgia limited liability company,<br><br>**NEIS Acquisitions 5192, LLC**, a Tennessee limited liability company,<br><br>**NEIS Acquisitions 5192, LLC**, an Illinois limited liability company,<br><br>**NEIS Acquisitions 6433 KY, LLC**, a Kentucky limited liability company,<br><br>**NEIS Acquisitions 6471, LLC**, a Kentucky limited liability company,<br><br>**NEIS Acquisitions 28232 PA, LLC**, a Pennsylvania limited liability company, | ) | Civil Action File No.<br>5:26-cv-00388-MTT |

**NEIS Acquisitions 28382 PA, LLC**, a Pennsylvania limited liability company,

**NEIS Acquisitions 3502 IN, LLC**, an Illinois limited liability company,

**NEIS Acquisitions 22298, LLC**, a Texas limited liability company,

**NEIS Acquisitions 4651 SC, LLC**, a South Carolina limited liability company,

**FDSTLMO 26945, LLC**, a Missouri limited liability company, and

**National Property Management Services, LLC**, a Georgia limited liability company.

Additional Nominal Defendants Joined Pursuant to Rules 13(h), 19, and 20,

**The Law Office of Zachary Zurich, P.A.**, a Florida Professional Association and

**2364 TICZ, LLC**, a Georgia limited liability company

Additional Counterclaim Defendants Joined Pursuant to Rules 13(h) and 20.

**BRIEF IN SUPPORT OF DAVID NEISWENTER'S EMERGENCY MOTION FOR APPOINTMENT OF A RECEIVER AND ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

COMES NOW Defendant, Counterclaim-Plaintiff, and Third-Party Plaintiff David Neiswenter ("**Neiswenter**" or "**Counterclaim-Plaintiff"**), by and through counsel, individually

and as a member of jointly-owned company Defendants named nominally herein[12], and hereby submits his brief in support ("**Brief**") of *David Neiswenter's Emergency Motion for Appointment of Receiver and Entry of a Temporary Restraining Order and Preliminary Injunction* ("**TRO/Receiver Motion**") filed simultaneously herewith. Pursuant to Federal Rules of Civil Procedure ("**Rule**") 65 and 66 and applicable law, Neiswenter seeks appointment of a Federal Receiver ("**Receiver**") and entry of a temporary restraining order and preliminary injunction against Plaintiff and Counterclaim-Defendant Zachary Zurich ("**Zurich**" or "**Counterclaim-Defendant**") and Counterclaim-Defendants The Law Office of Zachary Zurich, P.A., a Florida professional association (the "**Law Office**"), and 2364 TICZ, LLC, a Georgia limited liability company ("**TICZ**") (collectively herein, Zurich, the Law Office, and TICZ are ("**Counterclaim-**

---

[1] Plaintiff originally named **NEIS Acquisitions 5192, LLC**, a Georgia limited liability company, and **NEIS Acquisitions AUXGA, LLC**, a Georgia limited liability company as nominal Defendants in the above-referenced action. Additional nominal Defendants listed in the case-style are joined pursuant to Federal Rule of Civil Procedure (the "Rules" and each a "Rule") 13(h), 19, and 20.

[2] At times relevant to this matter, Neiswenter and Zurich have been equal 50/50 owners of the Jointly Owned Companies and affiliated entities holding interests in commercial real estate, banking relationships, operating accounts, and related assets (collectively, the "**Jointly Owned Companies**" or "**Companies**" or each/any a "**Company**"). As used herein, the Jointly Owned Companies include: (a) NEIS Acquisitions 5192, LLC, a Georgia limited liability company; (b) NEIS Acquisitions AUXGA, LLC, a Georgia limited liability company; (c) NEIS Acquisitions PopGA1, LLC, a Georgia limited liability company; (d) NEIS Acquisitions 5192, LLC, a Tennessee limited liability company; (e) NEIS Acquisitions 5192, LLC, an Illinois limited liability company; (f) NEIS Acquisitions 6433 KY, LLC, a Kentucky limited liability company; (g) NEIS Acquisitions 6471, LLC, a Kentucky limited liability company; (h) NEIS Acquisitions 28232 PA, LLC, a Pennsylvania limited liability company; (i) NEIS Acquisitions 28382 PA, LLC, a Pennsylvania limited liability company; (j) NEIS Acquisitions 3502 IN, LLC, an Illinois limited liability company; (k) NEIS Acquisitions 22298, LLC, a Texas limited liability company; (l) NEIS Acquisitions 4651 SC, LLC, a South Carolina limited liability company; (m) FDSTLMO 26945, LLC, a Missouri limited liability company; and (n) National Property Management Services, LLC, a Georgia limited liability company. (Countercl. ¶ 2). A demonstrative chart setting forth the Jointly Owned Company and the respective commercial real estate assets over which Neiswenter seeks appointment of a Federal Receiver is attached hereto as **Exhibit "A"**.

**Defendants**" or "**Zurich Parties**")) and shows the Court as follows:

## I. **INTRODUCTION**

In a strategy that can only be described as a reckless and needlessly expensive game of whack-a-mole, Plaintiff/Counterclaim-Defendant Zurich commenced the present action against Neiswenter and several jointly owned companies ***one day*** after Zurich realized he could not accomplish his unilateral goals with a receiver of his choice to exert control and drain funds from the Jointly Owned Companies. As described below, Zurich commenced a similar lawsuit in the Superior Court of Bibb County seeking appointment of a receiver over some of the Jointly Owned Companies, dissolution of these Companies, and other relief (the "State Lawsuit"). At the urging of Zurich, the Superior Court held an emergency evidentiary hearing regarding Zurich's requests. At the evidentiary hearing in the State Lawsuit, Neiswenter consented to the appointment of a receiver to, *inter alia*, return the Jointly Owned Companies to the *status quo*, continue historically recurring distributions and partner-debt interest payments, perform necessary accounting, prevent unlawful transfers, and break deadlocks between members. Neiswenter proposed John F. Kennedy ("Kennedy"), who is local to Macon, to serve as receiver to the Superior Court. At this evidentiary hearing, the court announced on the record that it would be appointing a receiver, *i.e.*, the exact relief sought by Zurich. After the Superior Court solicited input for an order from John F. Kennedy, Zurich circumvented the appointment of a receiver and ***voluntarily dismissed*** the State Lawsuit on September 3, 2026. That is, after Zurich's adamant requests for an emergency and expedited evidentiary hearing and the court in the State Lawsuit indicated it would appoint a receiver (as Zurich requested) that would *not* immediately dissolve the Jointly Owned Companies (contrary to Zurich's requests), Zurich voluntarily dismissed the State Lawsuit.

The next day, Zurich filed the present action in this Court based on the same set of common

facts as the State Lawsuit. Notably, Zurich abandoned any claim for a receiver whatsoever in this present action, continuing his hide-the-ball tactics presumably to ***prevent*** any oversight of Zurich's ongoing unilateral and unauthorized actions related to the Jointly Owned Companies' real and personal assets in various states while bogging Neiswenter down with protracted litigation.

On October 8, 2026, Neiswenter filed his *Verified Answer, Affirmative Defenses, and Counterclaims* ("**Answer/Counterclaims**" or "**Countercl**.") against Zurich, the Law Office, and TICZ asserting a number of affirmative defenses and counterclaims, including counts for: (1) breach of fiduciary duty; (2) breach of operating agreements; (3) accounting; (4) declaratory judgment respecting the rights, obligations, authority, and duties related to the Jointly Owned Companies and the real and personal assets owned by the Companies; (5) injunctive relief to prevent Counterclaim-Defendants from engaging in unilateral actions affecting Company finances, operations, records, leasing opportunities, tenant relations, and Jointly Owned Companies assets in general; (6) conversion of at least $3,935,384.44 in Jointly Owned Companies funds and counting; (7) appointment of a receiver; (8) Georgia RICO violations; and (9) Federal RICO violations.

This present TRO/Receiver Motion stems from Neiswenter's discovery that Zurich, ***without Neiswenter's knowledge or consent,*** transferred approximately $3,935,384.44 in funds belonging to the Jointly Owned Companies, *i.e.*, owned ***jointly*** by Neiswenter and Zurich. The banking records and communications presently available to Neiswenter indicate that Zurich transferred Company funds into an account ending in 642187, which Zurich has described in writing as "my trust account," and Zurich thereafter moved substantial portions through a company operating account into Treasury Direct accounts. Neiswenter ***did not*** authorize these transfers and ***to this date*** has not received documentation establishing the ownership, present location, maturity,

accessibility, or disposition of the funds. Since the discovery of these unauthorized transfers, Neiswenter has learned of ***additional*** unauthorized transfers and activities that directly threaten the continued operations of the Jointly Owned Companies and their commercial real estate assets.

The Jointly Owned Companies own, operate, manage, and lease substantial commercial real property and maintain significant financial accounts, investment accounts, banking relationships, tenant relationships, and other assets requiring ongoing management and oversight. Zurich has exercised unilateral control over substantial Company funds and has transferred Company funds into Treasury Direct accounts, trust accounts, investment accounts, and other financial arrangements outside the Companies' ordinary operating accounts. The parties' disputes have reached a point where it is no longer reasonably achievable for the Companies to be continually managed through ordinary cooperation. According to Zurich's own testimony and representations in the State Lawsuit, the Companies are presently facing significant financial and operational issues, including the maturity of a loan with City National Bank scheduled for December 17, 2026, ongoing leasing issues affecting property performance, disputes concerning Company reserves and financial management, and the need for coordinated lender communications and refinancing efforts.

Resolution of lender issues, refinancing efforts, leasing opportunities, tenant negotiations, preservation of Company assets, administration of Company funds, and operation of the Companies require neutral oversight. The need for receivership and injunctive relief is further demonstrated by the parties' disputes concerning the transfer, administration, investment, location, and control of millions of dollars in Company funds, including disputed transfers involving Treasury Direct accounts, trust accounts, and other financial accounts outside the Companies' ordinary operating structure. Less restrictive remedies are presently inadequate because substantial

disputes exist concerning control of Company funds, disputed transfers, account administration, leasing authority, refinancing authority, access to Company records, and day-to-day management of the Companies. The Companies' ability to operate efficiently and address upcoming lender, leasing, and operational issues has been materially impaired by the parties' equal ownership interests and inability to resolve these disputes.

For the reasons stated herein and in Neiswenter's TRO/Receiver Motion, Answer/Counterclaims, all other matters of record, and as will be demonstrated at an evidentiary hearing, the TRO/Receiver Motion should be granted.

## II. STATEMENT OF FACTS

### A. Relevant Parties and Background

At times relevant to this matter, Neiswenter and Zurich have been equal 50/50 owners of the Jointly Owned Companies and affiliated entities holding interests in commercial real estate, banking relationships, operating accounts, and related assets. (Countercl. ¶ 1). The Jointly Owned Companies are identified as nominal Defendants and are the target entities over which a Federal Receiver is sought in the present TRO/Receiver Motion. *See* Jointly Owned Companies List, **Exhibit "A"** hereto.

Separate from the Jointly Owned Companies, NEIS Acquisitions GA, LLC is owned solely by Neiswenter and holds an ownership interest in portions of the real property that is the subject of this action. Additionally, separately from the Jointly Owned Companies, TICZ is owned solely by Zurich and likewise holds an ownership interest in portions of the real property that is the subject of this action. (hereinafter NEIS Acquisitions GA, LLC and TICZ may be referred to as

the "**Separately Owned Affiliate Entities**" herein). (Countercl. ¶ 3).[3]

Additional Counterclaim Defendant The Law Office of Zachary Zurich, P.A. (the "**Law Office**") is, upon information and belief, a professional association organized under the laws of Florida. (Countercl. ¶ 5). At all relevant times, Zurich acted as an owner, officer, shareholder, employee, agent, or representative of the Law Office. (Countercl. ¶ 6). On information and belief, the Law Office maintained or administered one or more bank, trust, escrow, business, or financial accounts through which Company funds were received, held, transferred, administered, or retained, including an account ending in 642187. (Countercl. ¶ 7, 20).

As of the time of this TRO/Receiver Motion, Zurich has failed and refused to provide information sufficient for Neiswenter to determine conclusively the legal title, precise account classification, authorized signatories, or complete account history for account ending in 642187. (Countercl. ¶ 8). Zurich nevertheless described the account in writing as "my trust account," and available banking records reflect transfers of Company funds into and out of that account. (*Id.*).

## B. The Georgia Properties and Ownership Structure

### *i. The Encumbered Tenant-in-Common Property – Shopping Center at Eisenhower Crossing*

At all times relevant hereto, the Parties held ownership interests in multiple Georgia limited liability companies and Georgia real estate assets. (Countercl. ¶ 24). One such asset is a commercial shopping-center property commonly known as 4628 and 4640 Presidential Parkway, Macon, Georgia 31206, consisting of approximately 99,963 square feet and commonly referred to by the parties as a grocery-anchored shopping center and located in the Eisenhower Crossing

[3] Unless otherwise specifically identified, references herein to the "**Companies**" shall mean the Jointly Owned Companies collectively, together with their assets, bank accounts, money-market accounts, reserve accounts, treasury accounts, financial records, business operations, and property interests. (Countercl. ¶ 4).

shopping area (the "**Tenant-in-Common Property**"). (Countercl. ¶ 25). The Tenant-in-Common Property consists of Bibb County tax parcels L0840167 and L0840168. (Countercl. ¶ 26).

Title to the Tenant-in-Common Property is held through a tenancy-in-common ownership structure as follows:

| Entity | State of Incorporation | Who Has Ownership Interest | Percentage Ownership of the Tenant-in-Common Property |
|---|---|---|---|
| NEIS Acquisitions 5192, LLC | Georgia | Jointly owned by Neiswenter and Zurich | 60.75% |
| Neis Acquisitions GA, LLC | Georgia | Wholly owned by Neiswenter | 19.625% |
| 2364 TICZ, LLC | Georgia | Wholly owned by Zurich | 19.625% |

(Countercl. ¶ 27). As a result of the foregoing ownership structure, Neiswenter possesses, directly and indirectly, an aggregate fifty-percent ownership interest in the Tenant-in-Common Property and Zurich likewise possesses, directly and indirectly, an aggregate fifty-percent ownership interest in the Tenant-in-Common Property. (Countercl. ¶ 28).

The Tenant-in-Common Property is improved with income-producing commercial real estate and is operated through a combination of the tenancy-in-common ownership structure and the Jointly Owned Companies described herein. (Countercl. ¶ 29). The Tenant-in-Common Property constitutes the ***only*** Georgia real property pledged as collateral securing the City National Bank of Florida loan maturing on or about December 17, 2026 (the "**CNB Loan**"). (Countercl. ¶ 30, Countercl. Ex. A). Only parcels L0840167 and L0840168 are encumbered by the deed to secure debt associated with the City National Bank financing relationship. (Countercl. ¶ 31, Countercl Ex. A). Contrary to Counterclaim-Defendants' contentions in the Complaint, no other Georgia property described herein is pledged as collateral for the CNB Loan. (Countercl. ¶ 32).

### *ii. The Unencumbered AUXGA Property - Eisenhower Crossing Property Owned by NEIS Acquisitions AUXGA, LLC*

Neiswenter and Zurich also jointly own NEIS Acquisitions AUXGA, LLC, a Georgia limited liability company, with each party holding a fifty-percent membership interest. (Countercl. ¶ 33). NEIS Acquisitions AUXGA, LLC owns the retail and commercial property commonly known as 4657, 4658, 4659, and 4696 Presidential Parkway, Macon, Georgia 31206 (the "**AUXGA Property**"). (Countercl. ¶ 34). The AUXGA Property consists of approximately 320,153 square feet of retail, commercial, parking, access, and ancillary real estate and includes Bibb County tax parcels L0840163, L0840169, L0840170, L0840160, L0910033, L0910051, and M0830285. (Countercl. ¶35, 36, Countercl. Ex. B).[4]

Unlike the Tenant-in-Common Property, the AUXGA Property is owned ***solely*** by NEIS Acquisitions AUXGA, LLC and is not owned through the tenancy-in-common ownership structure described above. (Countercl. ¶ 38). The AUXGA Property is ***not encumbered*** by the City National Bank of Florida loan secured by parcels L0840167 and L0840168. (Countercl. ¶ 39).

### *iii. Additional Affiliated Entities, Intercompany Relationships, and Need for a Full Accounting*

The Parties also possess ownership interests in additional affiliated entities, including NEIS Acquisitions 5192, LLC, a Tennessee limited liability company, and NEIS Acquisitions PopGa1, LLC. (Countercl. ¶ 40). Upon information and belief, revenues, reserves, distributions, tenant income, reimbursements, transfers, Treasury Direct investments, trust-account funds, and other monies associated with the Tenant-in-Common Property, the AUXGA Property, NEIS Acquisitions 5192, LLC, the Tennessee entity bearing the same name, NEIS Acquisitions PopGa1, LLC, and

[4] Parcel L0840169 forms part of the AUXGA Property and is not owned through the tenancy-in-common ownership structure applicable to parcels L0840167 and L0840168. (Countercl. ¶37.)

other affiliated entities have been transferred among accounts controlled or administered by Zurich. (Countercl. ¶ 41).

Upon information and belief, Company funds have been transferred among multiple affiliated entities and accounts ***without*** adequate disclosure and ***without*** a complete accounting concerning the ownership, source, destination, allocation, administration, and disposition of those funds. (Countercl. ¶ 42). The ownership, allocation, source, destination, accounting treatment, and present status of such funds cannot presently be determined without discovery, production of banking records, Treasury Direct records, trust-account records, accounting records, and a complete accounting. (Countercl. ¶ 43). The existence of multiple jointly and separately owned entities, multiple real-estate assets, multiple bank accounts, multiple investment accounts, and multiple intercompany transactions makes a complete and transparent accounting necessary to determine the ownership and disposition of Company funds and the rights and obligations among the affiliated entities. (Countercl. ¶ 44).

### B. Events Leading to Dispute, Alleged Deadlock, and Zurich's Unauthorized and Unilateral Siphoning of Company Funds

#### *i. Neiswenter Discovery of Undisclosed Company Bank Accounts and Denial of Access*

Around the beginning of 2026, Neiswenter discovered that multiple Company bank accounts existed for entities in which he possessed ownership interests and management rights but to which he had not been granted access, signatory authority, viewing authority, administrative rights, or other account privileges. (Countercl. ¶ 47). Upon information and belief, Zurich exercised exclusive control over the administration of the Company's banking relationships and account-access rights and maintained multiple Company accounts without affording Neiswenter equal access to those accounts. (Countercl. ¶ 48).

After discovering the existence of the accounts, Neiswenter contacted representatives of City National Bank of Florida and requested access to the Company accounts and recognition as an authorized signer and account representative. (Countercl. ¶ 49). On or about August 6, 2026, representatives of City National Bank of Florida advised the parties that updated signature cards would be circulated to add Neiswenter as an authorized signer on multiple Company accounts maintained by the Companies. (Countercl. ¶ 50).

The bank communication identified Company accounts maintained in the names of: (a) NEIS Acquisitions 6471, LLC (account ending in 6633); (b) NEIS Acquisitions AUXGA, LLC (account ending in 5063); (c) NEIS Acquisitions 4651 SC, LLC (account ending in 1582); (d) NEIS Acquisitions 22298, LLC (account ending in 1078); (e) NEIS Acquisitions 3502 IN, LLC (account ending in 2041); and (f) National Property Management Services, LLC (account ending in 8734). (Countercl. ¶ 51). Prior to receiving the communication from City National Bank, and for unknown reasons, Neiswenter ***had not been provided access*** to those accounts and ***had not been granted*** signatory authority, administrative authority, viewing authority, online access, or other account privileges with respect to those accounts. (Countercl. ¶ 52). The existence of the ***previously unknown*** accounts and the need for City National Bank to circulate updated signature cards demonstrated that Company banking relationships existed for multiple entities without Neiswenter possessing the access ordinarily associated with an equal owner and manager. (Countercl. ¶ 53).

Upon information and belief, Zurich had previously exercised unilateral authority concerning the administration of those accounts and the granting or withholding of account-access rights. (Countercl. ¶ 54). Shortly after City National Bank informed the parties that Neiswenter would be added as an authorized signer on the identified Company accounts, Zurich sent

Neiswenter an email acknowledging Neiswenter's efforts to obtain access to the accounts and stating: “I see you intend to escalate.” (Countercl. ¶ 55). A true and correct copy of the aforementioned email is attached hereto as **Exhibit “B”** and incorporated herein by reference). That is, Zurich thought Neiswenter’s request to view the bank accounts of their Jointly Owned Companies as an escalation. *Id.* In the same communication, Zurich advised Neiswenter: “I ***will not consent*** to your request to be added to the various company bank accounts you requested” and instructed Neiswenter to withdraw the request submitted to City National Bank. (Countercl. ¶ 56) (emphasis supplied). Zurich further threatened that if Neiswenter refused to withdraw the request by the end of the day, Zurich intended to dissolve the remaining entities and initiate litigation in multiple jurisdictions, stating that Neiswenter would be required to retain counsel in each state and that Company assets would be turned over to ***receivers*** for management and sale. (*Id.* ¶ 57).

Zurich's refusal to permit equal access to Company accounts, coupled with his demand that Neiswenter abandon his efforts to obtain access and his threat to pursue dissolution and multi-jurisdictional litigation if Neiswenter persisted, formed part of Zurich’s broader effort ***to maintain exclusive control*** **–** over Company funds, records, distributions, reserves, investments, and banking relationships. (Countercl. ¶ 58). Zurich's refusal to permit access to Company accounts and his opposition to Neiswenter’s addition as an authorized signer forms part of the conduct giving rise to the fiduciary-duty, contract, accounting, declaratory-relief, conversion, receivership, and Georgia RICO claims asserted in Neiswenter’s Counterclaims.

***ii. Zurich’s Pattern of Financial Control and Exclusion of Neiswenter From Management***

Beginning no later than early 2026 and continuing through the present, Zurich has engaged in and engages in a pattern of conduct that interferes(d) with the rights of Neiswenter and the Companies, including without limitation: (a) restricting access to Company bank accounts and

financial information; (b) excluding Neiswenter from Company banking relationships and account administration; (c) denying signatory authority and account-access rights to Neiswenter; (d) transferring Company funds without authorization; (e) commingling Company funds and accounts; (f) exercising unilateral authority over Company finances and investments; (g) interfering with Company governance; and (j) utilizing Company assets, personnel, and resources for purposes not jointly approved by the parties (*See* Countercl. ¶¶ 60 – 62).

***iii. Unauthorized Treasury Direct and Trust-Account Transfers of Approximately $4,000,000 in Company Funds***

One of the most significant disputes concerns Zurich's ***unilateral*** removal, transfer, administration, and retention of almost **four-million-dollars** of Company funds. (Countercl. ¶ 63). On or about May 12, 2026, approximately $1,994,384.44 was transferred from a Company account into a Treasury Direct account. The transaction was initiated ***unilaterally*** by Zurich and ***without authorization*** from Neiswenter. (Countercl. ¶ 64). Bank records subsequently reviewed by Neiswenter reflected a transaction identified as "TREASURY DIRECT TREAS DRCT" in the amount of $1,994,384.44. Upon information and belief, those funds were transferred into one or more Treasury Direct accounts under Zurich's control or administration. (Countercl. ¶ 65).

Thereafter, on or about August 6, 2026, Zurich caused an additional $1,941,000.00 to be withdrawn from a Company money-market account ending in 547561. (Countercl. ¶ 66). The August 6, 2026 transaction was reflected in Company banking records as "WEBXFR TO COMM MMA 642187" in the amount of $1,941,000.00. The transfer reduced the available balance of the account to approximately $1,000.30. (Countercl. ¶ 67). The August 6, 2026 transfer was undertaken ***without the knowledge, authorization, approval, or consent of Neiswenter***. (Countercl. ¶ 68).

As a result of the May 12, 2026 and August 6, 2026 transactions alone, at least

***$3,935,384.44 in Company funds*** had been removed from Company accounts through transactions initiated by Zurich ***without authorization*** from Neiswenter. (Countercl. ¶ 69). Immediately after discovering the August 6, 2026 withdrawal, Neiswenter contacted Zurich and advised him that: “You have withdrawn $1,941,000 from our Company Bank Account today, without my consent. You need to send me evidence of where this money was moved to and the name of the Account Holder in which it is held, today.” (Countercl. ¶ 70). A true and correct copy of the aforementioned email is attached hereto as **Exhibit “C”** and incorporated herein by reference. Zurich responded by admitting that the transferred funds had been placed into a trust account under his control and stated: “The funds are in my trust account and they'll stay there until further order of the court.” (Countercl. ¶ 71). *See* Ex. C.

At the time Zurich made that statement, no court order had authorized Zurich to remove the funds from the Company's account, place the funds into a trust account, exercise exclusive control over the funds, or restrict access to those funds by Neiswenter. (Countercl. ¶ 72). Zurich further stated that he was in the process of filing litigation in multiple jurisdictions and intended to keep the funds in the trust account. (*Id.*).

Following Zurich's admission that Company funds had been placed into a trust account, Neiswenter advised Zurich that the Law Office was not a party to the Company's governance disputes, objected to the unilateral transfer of Company funds into a law-firm trust account, demanded the immediate return of the funds, and advised Zurich that complaints would be submitted to applicable bar authorities if the funds were not returned. (Countercl. ¶ 74). Rather than returning the funds or providing the requested information, Zurich responded: “go for it.” (Countercl. ¶ 75). *See* Ex. C.

Zurich did not return the funds and still has not returned the funds to this date. (Countercl.

¶ 76). Instead, Zurich has continued to maintain, administer, transfer, control, or direct control over the disputed funds ***notwithstanding*** Neiswenter's repeated objections, demands for disclosure, requests for an accounting, and demands for return of the funds. (Countercl. ¶ 77). On information and belief, all or substantial portions of the funds were thereafter placed into one or more trust accounts, Treasury Direct accounts, investment accounts, or other accounts ***outside*** the Companies' ordinary operating structure. (Countercl. ¶ 78).

On or about August 11, 2026, approximately $997,168.89 was transferred from the trust account through the operating account of NEIS Acquisitions 5192, LLC (Tennessee) and thereafter transferred into one or more Treasury Direct accounts. (Countercl. ¶ 79). Upon further review of City National Bank records and online banking activity, Neiswenter discovered additional transactions occurring on or about August 18, 2026 involving the same group of funds previously transferred from Company accounts. (Countercl. ¶ 80).

Bank records reflected that approximately $963,276.42 was transferred from Zurich's trust account into the operating account of NEIS Acquisitions 5192, LLC, a Tennessee limited liability company, account ending in 420508. (Countercl. ¶ 81). Upon information and belief, substantially all of those funds were immediately transferred out of the operating account and into one or more Treasury Direct accounts or Treasury investments. (Countercl. ¶ 82). Bank records further reflected that approximately $19,445.31 was transferred from the operating account of NEIS Acquisitions 5192, LLC, account ending in 420508, back into the trust account maintained by the Law Office, account ending in 642187. (Countercl. ¶ 83).

Upon information and belief, these transactions constituted additional transfers of Company funds through Zurich's trust account and through Company operating accounts ***without*** the authorization, approval, or consent of Neiswenter. (Countercl. ¶ 84). Upon information and

belief, these transactions were undertaken as part of a continuing course of conduct through which Zurich exercised exclusive control over Company funds, restricted Neiswenter's access to those funds, and moved Company assets among trust accounts, operating accounts, Treasury Direct accounts, and other financial accounts outside the Companies' ordinary operating structure. (Countercl. ¶ 85).

As a result of the ***unauthorized and unilateral*** transfers orchestrated by Zurich occurring on May 12, 2026, August 6, 2026, August 11, 2026, August 18, 2026, and related transactions, ***approximately $4 million in Company funds were removed from ordinary Company accounts and placed into accounts controlled or administered by Zurich, including trust accounts and Treasury Direct accounts***. (Countercl. ¶ 86). Upon information and belief, the transfers rendered substantial Company funds unavailable for ordinary Company operations, distributions, management decisions, investment decisions, and other Company purposes absent Zurich's unilateral approval. (Countercl. ¶ 87). Zurich's conduct deprived Neiswenter of equal access to, oversight of, and participation in the management of significant Company assets and forms a substantial portion of the conduct giving rise to the claims asserted in Defendants' Counterclaims.

### C. Zurich Initiated and Then Dismissed the State Lawsuit Receivership Proceedings on the Eve of Entry of State Court Order Appointing a Receiver

Following through on his threats outlined above, on August 4, 2026, Zurich filed a complaint, as amended, in the Superior Court of Bibb County, State of Georgia, against Neiswenter, and several affiliated defendants seeking judicial dissolution, appointment of a receiver, injunctive relief, and other remedies relating to commercial real estate and jointly owned limited liability companies ("State Lawsuit ").[5] On August 17, 2026, Zurich filed an *Emergency*

[5] A copy of the docket ("**State Lawsuit Docket**") and the Complaint in the State Lawsuit are attached hereto as **Exhibit "D"** and **Exhibit "E"** respectively, are publicly available, and are

*Motion for Temporary and Permanent Injunction and Request for Expedited Hearing* ("**Zurich's TRO/Receiver Motion**").[6] In Zurich's TRO/Receiver Motion, Zurich alleged that an approximately $8.5 million loan would mature on December 17, 2026; that the Companies lacked sufficient liquid funds to pay the loan; that a marketing and sale process could require four to five months; and that continued delay threatened the loss of tenants, increased vacancy, higher operating costs, foreclosure risk, and diminution in the value of the Companies' property. Zurich represented that monetary damages would not provide an adequate remedy and asked the Court hear the matter at the earliest possible date. Zurich urged for the appointment a receiver without notice in the State Lawsuit, contending that the subject assets faced a risk of loss or injury and that further delay would cause significant harm. The Court declined to appoint a receiver *ex parte*, explaining that doing so would deprive Defendant of due process and that an evidentiary hearing was required before the requested extraordinary relief could be considered.

Zurich's requested emergency relief was extensive. Among other relief, he requested an order prohibiting distributions, new debt, further encumbrances, transfers of property, material leasing or sale decisions, and certain communications or negotiations regarding the property unless authorized by mutual agreement, the Superior Court, or a court-appointed receiver. Zurich also asked the Superior Court to direct Neiswenter to withdraw a response to a prospective tenant. Zurich simultaneously sought to amend the complaint to add a claim for breach of fiduciary duty

---

incorporated herein by reference. Pursuant to Federal Rule of Evidence 201 and applicable law, Defendants request that this Court take judicial notice of certain filings referenced herein that were submitted by the Parties' in the State Lawsuit. The fact that certain filings were made on the Superior Court Receiver Action docket can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. *See* FRE 201.

[6] *See* State Lawsuit Docket, **Ex. D**; *see also* Zurich's TRO/Receiver Motion, attached hereto as **Exhibit F**, and incorporated herein by reference.

and damages. ***Zurich's*** proposed amended complaint sought judicial dissolution of the jointly owned entities, ***appointment of a receiver*** with authority to manage, market, lease, and sell the subject properties, winding up of the entities, distribution of sale proceeds, permanent injunctive relief, and compensatory damages exceeding $15,000.[7]

Zurich actively pursued an expedited evidentiary hearing in the State Lawsuit, and the Superior Court conducted the expedited evidentiary hearing on August 31, 2026.[8] After the hearing concluded, Zurich immediately sought an additional hearing on his request for injunctive relief and moved for a limited rehearing or reconsideration so that Zurich's preferred receiver could testify regarding that candidate's qualifications, experience, and proposed compensation. Zurich expressly requested an opportunity for the Court to compare Plaintiff's proposed receiver with the receiver proposed by Neiswenter before the Court ruled. Zurich wanted, pushed for, and reiterated ***his*** emergency requests for a receiver.

On September 1, 2026, the Court ***denied*** Plaintiff's request for rehearing or reconsideration and announced its ruling on the receivership. The Court stated that it was appointing a receiver, that the receiver would possess the "full breadth of powers" warranted by the circumstances,

---

[7] On August 25, 2026, Neiswenter's counsel sent a demand letter to Zurich, *pro se*, to preserve the status quo and create an opportunity to resolve issues identified in the letter without unnecessary emergency proceeding based on Zurich's attempted transfer or transfer of substantial company funds without Neiswenter's knowledge or consent, denial of access to Company accounts, and unilateral suspension of historically recurring distributions and partner-debt interest payments. A true and correct copy of the August 25, 2026 Demand is attached hereto as **Exhibit "G"**, and incorporated herein by reference**.** Zurich ***failed to respond*** to the August 25, 2026 Demand, and on September 4, 2026, Neiswenter's counsel sent a second demand to Zurich's counsel, DC Lamb, reiterating the restrictions, information requests, and obligations in the August 25, 2026 Demand and identifying additional demands and preservation obligations. A true and correct copy of the September 4, 2026 Demand is attached hereto as **Exhibit "H"** and incorporated herein by reference**.** Zurich also ***failed to respond*** to the September 4, 2026 Demand.

[8] A true and correct copy of the evidentiary hearing transcript is attached hereto as **Exhibit "I"** and is hereby incorporated herein by reference.

including authority concerning negotiations, leasing, and sale, and that Kennedy would serve as receiver. The Court found Kennedy's experience more than adequate and identified his locality and availability as benefits to the receivership. Zurich initially proceeded in accordance with that ruling, and even submitted a proposed order appointing Kennedy as receiver, discussed the anticipated terms of his compensation, and subsequently advised the Superior Court that Zurich would not object to Kennedy's appointment based upon a potential issue Zurich had raised concerning separate litigation involving Target Corporation.

On September 2, 2026, the Superior Court requested that Kennedy provide his preferred form of appointment order so that the terms he considered helpful to performing his duties could be considered. The Court reiterated its intent to appoint Kennedy and stated that, if he did not submit a proposed order, the Court would modify the parties' submissions to provide the breadth of powers to be granted.

On September 3, 2026, Kennedy submitted his proposed appointment order. Zurich then filed limited objections to the [appointment of Kennedy] [proposed appointment order], seeking continued informational access to the Companies' financial accounts, a receiver's bond of at least $2.5 million, and errors-and-omissions and fidelity coverage of at least $10 million. Zurich expressly stated in those objections that Zurich did not withdraw the request for appointment of a receiver, did not object to the appointment of Kennedy, and did not object to the receiver holding exclusive signing and disposition authority over the Companies' accounts and assets. Neiswenter likewise advised the Superior Court that he had no objection to Kennedy's proposed order and did not oppose Zurich's request for view-only access to the Companies' accounts.

In a drastic turn of events, and contrary to Zurich's entire expressed purpose in dragging Neiswenter to and through the State Lawsuit, later on September 3, however, Zurich advised that

the receivership was becoming "wholly unworkable" and withdrew the request that a receiver be appointed. Zurich then filed a voluntary dismissal without prejudice at 8:09 p.m. that same evening. A true and correct copy of the aforementioned email is attached hereto as **Exhibit "J"** and a copy of the Dismissal is attached hereto as **Exhibit "K"** and incorporated herein by reference.

Zurich's dismissal terminated the State Lawsuit before the contemplated appointment order was entered. That is, Zurich essentially invoked emergency procedures, represented that immediate judicial intervention was required to prevent irreparable harm, selected and prepared for an expedited in-person evidentiary hearing, and obtained a ruling granting the principal interim relief ***Zurich himself requested***, namely appointment of a receiver with broad authority. Zurich nevertheless dismissed the entire action after the Superior Court selected Kennedy and the parties and proposed receiver began addressing the terms under which the receivership would operate.[9]

**D. <u>Zurich's Federal Lawsuit and Intentional Abandonment of Request for Appointment of a Receiver</u>**

Presumably unhappy that he got what he was asking for in the State Lawsuit, *i.e.*, the appointment of a receiver, on September 4, 2026, one day after the voluntary dismissal of the State Lawsuit, Zurich *pro se* commenced the above-referenced action in this Court. Zurich's present Complaint asserts two counts for: (1) judicial dissolution of NEIS Acquisitions 5192, LLC and NEIS Acquisitions AUXGA, LLC under O.C.G.A. § 14-11-603; and (2) and for breach of fiduciary duty against Neiswenter (the "**Complaint**"). (Doc. 1.) Notably absent from Zurich's Complaint before this Court is any request for appointment of a receiver. On September 11, 2026, Zurich filed

[9] *See* Docket, Exs. I, J; *see also* attached hereto as **Exhibit "L"** and incorporated herein by reference, Neiswenter's *Motion for Attorney's Fees and Expenses of Litigation Pursuant to O.C.G.A.§ 9-15-14* which remains pending in the Superior Court Receiver Action.

his First Amended Complaint asserting the same two counts above (the "**Amended Complaint**"). (Doc. 2).

As of the date of filing of this TRO/Receiver Motion, Zurich has ***continued to unilaterally and unlawfully restrict*** Neiswenter's access to Company financial information and Zurich continues to ***conceal*** necessary information concerning Treasury Direct accounts, banking platforms, distributions, transfers, and related account activity to which Neiswenter is entitled. Zurich has ***refused*** to restore access, resume historically recurring distributions or partner-debt interest payments or otherwise provide the information demanded regarding transferred Company funds. Zurich continues to threaten to transfer or cause to be transferred, additional Company funds without the input or consent of Neiswenter.

Since sending its initial demand, Neiswenter has further learned that Zurich is continuing his wrongful and unilateral effort to market, list, solicit offers for, negotiate the sale and/or lease of, broker, advertise, circulate offering memoranda, provide due diligence materials, or otherwise represent that certain Jointly Owned Company property is available for sale and/or lease ***without*** the prior written consent of Neiswenter or further agreement of the parties. Further, on information and belief, Zurich appears to have compensated personnel through the Jointly Owned Companies who have been directed to perform services for properties, entities, or ventures in which Neiswenter holds no ownership interest and from which the jointly owned companies receive no benefit. Neiswenter has also learned that Zurich has communicated with existing and prospective tenants, tenant representatives, counterparties, and opposing transactional counsel in a manner that misrepresents or creates the misleading impression that he is acting in a legal-representation capacity on behalf of the Jointly Owned Companies.

The appointment of a receiver over the Jointly Owned Companies and their assets and injunctive relief is necessary to prevent Zurich's continued, unilateral, and unauthorized siphoning of funds from the Jointly Owned Companies and concealment of documentation establishing the ownership, present location, maturity, accessibility, or disposition of the $3,935,384.44 Zurich has already transferred. Immediate relief is necessary to break deadlocks, preserve Jointly Owned Company funds and other assets, prevent further unauthorized transfers, and permit a prompt accounting of commingled funds recklessly moved between each of the Companies.

## III. ARGUMENT AND CITATION OF AUTHORITIES

### A. The Court has Subject-Matter Jurisdiction Over This Action[10]

In its October 21, 2026 Order, the Court directed the parties to address the basis for subject-matter jurisdiction over Zurich's Complaint and Neiswenter's Counterclaims, including whether NEIS Acquisitions 5192, LLC ("5192") and NEIS Acquisitions AUXGA, LLC ("AUXGA") are nominal parties whose citizenship should be disregarded for purposes of diversity jurisdiction. (Doc. 7 at 3-4). Although Zurich named 5192 and AUXGA as nominal defendants, the substantive dispute underlying Zurich's Complaint concerns the competing rights and alleged conduct of Zurich and Neiswenter as the Companies' two fifty-percent members, and Zurich seeks no damages against either Company. Moreover, this Court has original federal-question jurisdiction

[10] Neiswenter's request for leave to file a thirty-three-page supporting brief (Doc. 6) preceded the Court's directive requiring additional briefing on subject-matter jurisdiction. In granting Neiswenter's request, the Court authorized a supporting brief not exceeding thirty-three pages and simultaneously directed Neiswenter to address subject-matter jurisdiction in the first section of this Brief. (Doc. 7 at 1, 3–4). Thus, the jurisdictional briefing now presented was neither contemplated nor included in Neiswenter's original request for thirty-three pages. Excluding the subject-matter jurisdiction section added in response to the Court's subsequent directive, this Brief does not exceed the thirty-three-page limitation authorized by the Court. Neiswenter therefore respectfully submits that the pages devoted to the Court-ordered subject-matter jurisdiction briefing should not be counted against the previously authorized thirty-three-page limitation.

over Neiswenter's federal RICO claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his factually related state-law claims pursuant to 28 U.S.C. § 1367.[11]

**1. <u>5192 and AUXGA Are Nominal Defendants Because the Actual Controversy Is Between Zurich and Neiswenter.</u>**

Federal courts "must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy." *Thermoset Corp. v. Bldg. Materials Corp. of Am.*, 849 F.3d 1313, 1317 (11th Cir. 2017) (quoting *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980)). While "there is no bright line rule" for distinguishing between real and nominal parties, *Payroll Mgmt., Inc. v. Lexington Ins. Co.*, 566 Fed. Appx. 796, 799 (11th Cir. 2014) (per curiam) (unpublished), a nominal party is one that is "neither necessary nor indispensable to the action," and the "ultimate test" is "whether in the absence of the defendant, the Court can enter a final judgment consistent with equity and good conscience which would not be in any way unfair or inequitable to [the] plaintiff." *Thermoset Corp.*, 849 F.3d at 1317 (quoting *Tri-Cities Newspapers, Inc. v. Tri-Cities Printing Pressmen & Assistants' Local 349*, 427 F.2d 325, 327 (5th Cir. 1970)).

Relatedly, in determining if a defendant is nominal, the Eleventh Circuit considers whether the party possesses a "real and substantial stake in the litigation" and whether it exercises "substantial control over the litigation." *Broyles v. Bayless*, 878 F.2d 1400, 1403 (11th Cir. 1989). In applying these principles, courts look beyond a party's formal designation and examine the

[11] Neiswenter additionally recognizes that Counterclaim-Defendant The Law Office of Zachary Zurich, P.A. is alleged to be a Florida citizen, as is Neiswenter, and therefore its citizenship arguably would preclude reliance upon diversity jurisdiction as an independent basis for jurisdiction over the Counterclaims. That issue does not, however, deprive the Court of subject-matter jurisdiction over the Counterclaims because Neiswenter asserts a claim arising under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), over which this Court has original federal-question jurisdiction pursuant to 28 U.S.C. § 1331. The Court may therefore exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Neiswenter's related state-law counterclaims that form part of the same case or controversy.

"essential nature" of the proceeding and the directness of the party's interest in the controversy. *Id.* at 1405. Indeed, *Broyles* recognized that a party may possess a financial interest in the outcome of litigation without being a real party in interest for purposes of determining diversity where that interest is contingent and indirect. *Id.*

The Southern District of Florida recently applied these principles in *Thomas Machinery, Inc. v. Everest National Insurance Co.*, 2020 WL 2616193, at *4–6 (S.D. Fla. May 21, 2020). Applying *Thermoset* and *Broyles*, the court in *Thomas Machinery* disregarded a non-diverse defendant's citizenship after considering whether that defendant was necessary or indispensable, whether it possessed a "real and substantial stake in the litigation," and whether it exercised "substantial control over the litigation." *Id.* at *4–5. Significantly, the court explained that the nominal-party inquiry does not turn merely on whether the party has some interest in the ultimate outcome. Rather, the court considered the "essential nature" of the present controversy and whether the allegedly nominal defendant's interest was sufficiently direct and substantial to make it a real party to that controversy. *Id.* at *5 (quoting *Broyles*, 878 F.2d at 1405).

The Court should treat 5192 and AUXGA as nominal defendants to Zurich's claims. Zurich's Complaint asserts a breach-of-fiduciary-duty claim against Neiswenter and seeks judicial dissolution of 5192 and AUXGA pursuant to Georgia law. (Doc. 2 ¶¶ 80-98). Zurich seeks no damages from 5192 or AUXGA and alleges no independent misconduct by either Company for which either Company could be liable to him. Rather, the Companies are the subject of the underlying dispute between their two equal members.

Moreover, the "essential nature" of Zurich's present action is a controversy between Zurich and Neiswenter concerning their respective rights and Neiswenter's alleged conduct as a fifty-percent member and manager of the Companies. *See Broyles*, 878 F.2d at 1405. The Companies

themselves have not asserted claims against either member, Zurich does not seek to impose monetary liability against them, and the Companies are not alleged to have independently engaged in the conduct forming the basis of Zurich's fiduciary-duty claim. Thus, while the Companies plainly have an interest that may be affected by the resolution of the members' dispute, the existence of that interest does not, standing alone, resolve whether they are real parties to the controversy for purposes of diversity jurisdiction. *See Thomas Machinery*, 2020 WL 2616193, at *5* (recognizing, based on *Broyles*, that a financial interest in litigation does not necessarily make a party a real party in interest for diversity purposes).

The Middle District of Georgia's recent decision in *Fox v. Bulkley*, is particularly instructive. 2024 WL 2239742 (M.D. Ga. May 17, 2024). Like this action, *Fox* involved a dispute between two fifty-percent members of a Georgia LLC in which one member sought judicial dissolution of the company pursuant to O.C.G.A. § 14-11-603. Although the LLC shared the plaintiff's citizenship, the court held that the LLC was a nominal party whose citizenship did not defeat complete diversity. In doing so, the court applied the *Thermoset/Tri-Cities* test and concluded that Georgia's dissolution statute did not require the LLC itself to be named as a separate party. In doing so, the court further emphasized that the plaintiff asserted no monetary or other affirmative claim against the LLC and that the real dispute was between its two members. *Id.* at *5. The *Fox* court also weighed that it was not a procedural requirement for the plaintiff to name the LLC as a separate party, and thus because the plaintiff "did not have to name [the LLC] as a separate party in his action for dissolution, so [the LLC] cannot be said to be 'necessary' or 'indispensable' to the action." *Id.* at * 4. In deciding the LLC was a nominal party, *Fox* found the LLC's absence as an indispensable party "would not be in any way unfair or inequitable to" the LLC. *Id.*

The same considerations are present here. Zurich and Neiswenter are the adverse parties whose rights and conduct form the substance of Zurich's claims. The fact that 5192 and AUXGA are the entities through which the parties conducted their Jointly Owned Businesses, and that those entities necessarily may be affected by resolution of their members' dispute, does not itself make the entities adverse litigants. Similar to the dissolution statutory framework in *Fox*, there is no requirement under Georgia law that 5192 or AUXGA be named as parties for any of the relief sought by either Zurich or Neiswenter. *Fox* demonstrates that even where dissolution itself is requested, the affected LLC may remain nominal when the substantive controversy is between its members.

Further, the mere fact that the ultimate resolution of this litigation may affect the Companies should not alter this reasoning. If that were enough, *Fox* could not have treated the LLC before it as nominal because judicial dissolution necessarily affected the existence and property of that entity. Yet, *Fox* holds that the LLC remained nominal because Georgia law did not require its joinder, no affirmative monetary claim was asserted against it, and the substantive controversy remained between its two members. *Fox*, 2024 WL 2239742, at *5*. That functional approach is consistent with *Thermoset*, *Broyles*, and *Thomas Machinery*: the inquiry focuses upon the Company's actual role in the controversy, rather than merely upon whether adjudication of the controversy will have consequences for it.

Here, 5192 and AUXGA neither stand accused of wrongdoing nor face affirmative monetary liability to Zurich. The relevant conduct alleged by Zurich is Neiswenter's conduct; likewise, Neiswenter's counterclaims assert wrongdoing and seek affirmative relief against Zurich and the other Counterclaim-Defendants, not against 5192 or AUXGA. The Companies thus are not the allegedly culpable actors on either side of the parties' substantive claims. Rather, they are the

jointly owned entities whose management, assets, operations, and ultimate disposition form part of the subject matter of the dispute between their two fifty-percent members. The competing substantive interests in this lawsuit, as alleged by Zurich's original claims and Neiswenter's counterclaims, are therefore those of Zurich and Neiswenter, and the underlying controversy is one between those members concerning their respective conduct, rights, obligations, and the management and future of their jointly owned businesses. Although resolution of those claims necessarily may affect 5192 and AUXGA, the claims themselves seek to impose liability and obtain relief based upon the alleged conduct of the members and other Counterclaim-Defendants, not wrongdoing by the Companies.

As the Court explained and held in *Fox*, here, 5192 and AUXGA are nominal parties if there are neither necessary nor indispensable to the action and if, in their absence, the Court can enter a final judgment consistent with equity and good conscience which would not be in any way unfair or inequitable to Zurich. *See id.* at *4. That is the case here. Accordingly, the Companies' presence as nominal defendants should not defeat complete diversity between the real adverse parties.

**2. *Masters v. Harkleroad Is Distinguishable From the Claims and Relief in this Case.***

Neiswenter recognizes that *Masters v. Harkleroad*, requires careful consideration. 303 F. App'x 859 (11th Cir. 2008). There, the petitioners sought to (1) enjoin the LLCs from further acquisition, development, or financing activities; (2) place the LLCs into receivership; (3) judicially dissolve the LLCs; and (4) distribute their assets. *Id.* at 860-61. The Eleventh Circuit rejected the petitioners' characterization of the companies as mere stakeholders and concluded they were not nominal parties. *Id.* at 861.

The scope of *Masters*' holding is significant. The Eleventh Circuit did not announce a categorical rule that an LLC is necessarily a real party whenever litigation may affect its property, management, or ultimate disposition. Rather, after contrasting the LLCs before it with the "mere stakeholders" addressed in *Matchett v. Wold*, 818 F.2d 574 (7th Cir. 1987), the court emphasized the combined relief actually sought against the entities: "Petitioners seek to enjoin the LLCs from engaging in further business, appoint a receiver for the LLCs, dissolve the LLCs, and distribute their assets." *Masters,* 303 F. App'x at 861. The court then observed that it had "found no authority" holding that an LLC that a plaintiff seeks "to put into receivership, dissolve, and enjoin from engaging in any business activity is merely a nominal party." *Id.* (emphasis added).

The relief at issue here is materially different than that in *Masters*. Zurich's operative Complaint does not seek to place 5192 or AUXGA into receivership or enjoin the Companies from conducting business. Although Zurich seeks dissolution, *Fox* subsequently held that an LLC may remain nominal in an action seeking judicial dissolution under the same Georgia statute invoked here. Thus, dissolution alone cannot supply the distinction between *Masters* and *Fox*. What distinguished the entities in *Masters* was the broader combination of relief sought directly against them, including receivership, cessation of further business activities, dissolution, and distribution of their assets. *Masters*, 303 F. App'x at 860–61.

Neiswenter acknowledges that his Counterclaims now seek appointment of a receiver. But the receivership sought by Neiswenter is not designed to terminate Company operations, distribute Company assets, or prohibit the Companies from engaging in business. To the contrary, the requested receivership is a provisional and preservative remedy intended to maintain the Companies' assets and operations during the pendency of an active dispute between their fifty-percent owners (Zurich and Neiswenter). Georgia law provides the following regarding receivers:

> Georgia law provides for the appointment of a receiver "when any fund or property is in litigation and the rights of either or both parties cannot otherwise be fully protected." OCGA § 9-8-1. This is an equitable remedy, similar to an interlocutory injunction. *See generally Patel v. State of Ga.*, 289 Ga. 479, 482 (1), 713 S.E.2d 381 (2011) (interlocutory injunction and receivership both apply equitable principles to protect parties during pendency of litigation). As such, it is appropriate "only where there is no available adequate and complete remedy at law." *Cantrell v. Henry County*, 250 Ga. 822, 824 (1), 301 S.E.2d 870 (1983). *See generally* OCGA § 23-1-3 ("Equity jurisdiction is established and allowed for the protection and relief of parties where, from any peculiar circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done."). "The power of appointing receivers should be prudently and cautiously exercised and except in clear and urgent cases should not be resorted to." OCGA § 9-8-4. Nevertheless, "the decision as to whether the circumstances are sufficiently clear and urgent enough to warrant a receiver is committed to the trial court's discretion, which will not be interfered with on appeal unless it was manifestly abused." *Alstep, Inc. v. State Bank & Trust Co.*, 293 Ga. 311, 313 (3), 745 S.E.2d 613 (2013). The trial court has broad discretion to make this determination even though, as here, the facts relevant to the determination are in conflict. *Warner v. Warner*, 237 Ga. 462 (1), 228 S.E.2d 848 (1976). … Appointing a receiver under OCGA § 9-8-1 is justified where there is a danger that the assets at issue will be depleted or impaired if they remain in one party's control." *Alstep, Inc.*, 293 Ga. at 313 (3), 745 S.E.2d 613.

*Nayyar v. Bhatia*, 348 Ga. App. 789, 789-90 (2019) (cleaned up). The contemplated and requested receiver would align with Georgia law, preserve Company property, administer Company funds, maintain access to Company records, supervise leasing and refinancing activities, and facilitate payment of ordinary-course Company obligations pending adjudication of the parties' claims.

That distinction bears directly on *Masters* where the petitioners sought judicial relief that would ***stop*** the LLCs from conducting further business, dissolve them, and distribute their property. *Masters*, 303 F. App'x at 860-61. Here, Neiswenter seeks ***preservation*** rather than termination of the Companies' business and assets while the Court resolves an existing deadlock between the members.

Moreover, receivership is an equitable remedy rather than an independent substantive cause of action. *See Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir.

1998). Neiswenter seeks the receivership remedy not because either 5192 or AUXGA engaged in actionable conduct against him, but because of the conduct of Zurich and the Law Office concerning Company funds and operations.

Thus, while *Masters* warrants consideration, it does not compel the conclusion that every LLC subject to any form of receivership relief is necessarily a real, adverse, indispensable, or necessary party. Its holding arose from materially broader relief directed to the LLCs themselves, while *Fox* confirms that the nominal-party inquiry remains focused on the substance of the claims, the relief sought, and whether the entity is necessary to adjudicate the controversy between its members.

3. **The Court independently possesses federal-question jurisdiction over Neiswenter's federal RICO counterclaim and supplemental jurisdiction over the related state-law counterclaims.**

Separate from diversity jurisdiction over Zurich's claims, Neiswenter's Counterclaims present an independent basis for federal subject-matter jurisdiction. Neiswenter asserts a claim under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (Countercl. ¶¶ 231-314) and as this Court has already observed, "[t]he Court has original jurisdiction over this claim." (Doc. 7 at 3 n.2). *See* 28 U.S.C. § 1331.

That federal claim arises from the same nucleus of conduct underlying Neiswenter's state-law counterclaims: the parties' ownership and management of the Jointly Owned Companies, control over Company funds and financial accounts, disputed transfers of Company funds, and alleged unilateral actions concerning the Companies' finances and operations. Accordingly, Neiswenter's related state-law counterclaims form part of the same Article III case or controversy and fall within the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

The Court therefore has two distinct jurisdictional inquiries before it. As to Zurich's Complaint, 5192 and AUXGA are nominal defendants under the functional test articulated in *Thermoset* and applied to an analogous Georgia LLC dissolution claim in *Fox*, such that their citizenship should be disregarded for purposes of § 1332. As to Neiswenter's Counterclaims, the Court independently possesses original federal-question jurisdiction over the § 1962(c) claim under § 1331 and supplemental jurisdiction over the related state-law claims under § 1367.

Accordingly, the Court possesses subject-matter jurisdiction over the claims before it.

**B. <u>The Court Should Appoint a Receiver</u>**

"The Eleventh Circuit has made clear that 'federal law governs the appointment of a receiver by a federal court exercising diversity jurisdiction.'" *Comerica Bank v. Everglades Dressage, LLC*, 20-CIV-81360-RAR, 2021 WL 911065, at *2 (S.D. Fla. Feb. 28, 2021) (citing *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998)). Accordingly, the Court must look to Rule 66 of the Federal Rules of Civil Procedure which provides that "[t]hese rules govern an action in which the appointment of a receiver is sought ..., [b]ut the practice in administering an estate by a receiver ... must accord with the historical practice in federal courts or with a local rule." Fed. R. Civ. P. 66. The appointment of a receiver is "an extraordinary equitable remedy .... And equity intervenes only when there is no remedy at law or the remedy is inadequate." *United States v. Bradley*, 644 F.3d 1213, 1310 (11th Cir. 2011) (internal citation omitted). "[T]he appointment of a receiver in equity is not a substantive right; rather, it is an ancillary remedy which does not affect the ultimate outcome of the action." *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291. "Pursuant to Rule 66, district courts maintain *broad discretion* to decide whether it is appropriate to appoint a receiver over assets in dispute in litigation." *Comerica Bank*, 2021 WL 911065, at *2 (quoting *PNC Bank, N.A. v. Prime Props. of Clearwater, Inc.*, No. 8:16-

cv-747-T-23TGW, 2016 WL 11493324, at *1 (M.D. Fla. June 21, 2016)) (emphasis added). To exercise that discretion, a receivership is "justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (citations omitted). "Typically, the party seeking a receivership over certain property must 'show that he or she has some legally recognized right in that property that amounts to more than a mere claim against [the] defendant.'" *U.S. Bank National Ass'n v. LG-328 Huntsville, AL, LLC*, No. 5:17-CV-01378-AKK, 2017 WL 5668392, at *1 (N.D. Ala. Nov. 27, 2017).

Federal courts typically consider the following factors when determining whether to appoint a receiver:

> (1) the probability that fraudulent conduct has occurred or will occur to frustrate that claim;
> (2) imminent danger that property will be concealed, lost, or diminished in value;
> (3) inadequacy of legal remedies;
> (4) lack of a less drastic equitable remedy; and
> (5) likelihood that appointing the receiver will do more good than harm.

*VC Macon Ga, LLC v. Virginia College*, LLC, 18-cv-00388-TES, 2018 WL 11702719, at *2 (M.D. Ga. Nov. 14, 2018) (Tilman, J.) (appointing a Federal Receiver and exercising ancillary jurisdiction to protect property and various states); *see also Hawes v. Madison Ave. Media, Inc.*, 11-CV-81025, 2012 WL 12861096, at *2 (S.D. Fla. June 26, 2012)[12] Moreover, a "receiver may be appointed ***to avert further loss of assets through waste and mismanagement***." *Comerica Bank*,

[12] "[A]lthough no precise formula exists for determining when a court should resort to appointing a receiver, several factors should be considered: (1) whether fraudulent activity has or will occur, (2) the validity of the claim, (3) the danger that property will be lost or diminished in value, (4) inadequacy of legal remedies, (5) availability of less severe equitable remedy, and (6) the probability that a receiver may do more harm than good." citing *Clough Mktg. Services, Inc. v. Main Line Corp.*, No. CIV.A. 1:07-CV-0173R, 2007 WL 496739, at *2 (N.D. Ga. Feb. 13, 2007).

2021 WL 911065, at *2 (quoting *Hawes*, 2012 WL 12861096, at *2) (emphasis supplied).

***Receiver Factor 1 – Zurich and the Zurich Law Office Have Caused and Will Continue to Cause Fraudulent or Concealment Activity Related to the Jointly Owned Properties:*** as demonstrated above, and Neiswenter's Answer/Counterclaims as of the date of filing of this TRO/Receiver Motion, Zurich has ***continued to unilaterally and unlawfully restrict*** access to Company financial information and Zurich continues to ***conceal*** necessary information concerning Treasury Direct accounts, banking platforms, distributions, transfers, and related account activity to which Neiswenter is entitled. Zurich has ***refused*** to restore access, resume historically recurring distributions or partner-debt interest payments or otherwise provide the information demanded regarding transferred Company funds.

Zurich continues to threaten to transfer or cause to be transferred, additional Company funds without the input or consent of Neiswenter. Since sending its initial demand, Counterclaim-Plaintiffs have further learned during the course of the State Lawsuit, that Zurich is continuing his wrongful and unilateral effort to market, list, solicit offers for, negotiate the sale and/or lease of, broker, advertise, circulate offering memoranda, provide due diligence materials, or otherwise represent that certain Jointly Owned Company property is available for sale and/or lease ***without*** the prior written consent of Neiswenter or further agreement of the parties. Further, on information and belief, Zurich appears to have compensated personnel through the Jointly Owned Companies who have been directed to perform services for properties, entities, or ventures in which Neiswenter holds no ownership interest and from which the jointly owned companies receive no benefit. Neiswenter has also learned that Zurich has communicated with existing and prospective tenants, tenant representatives, counterparties, and opposing transactional counsel in a manner that

misrepresents or creates the misleading impression that he or the Law Office is acting in a legal-representation capacity on behalf of the Jointly Owned Companies.

The appointment of a receiver over the Jointly Owned Companies and their assets is necessary to prevent Zurich and the Law Office's continued, unilateral, and unauthorized siphoning of funds from the Jointly Owned Companies and concealment of documentation establishing the ownership, present location, maturity, accessibility, or disposition of the $3,935,384.44 and other funds already caused to be transferred outside of the course of business by Zurich.

***Receiver Factor 2: Neiswenter Has Valid Defenses and Counterclaims for Equitable and Other Relief Against Counterclaim-Defendants*****:** As set forth above, and in Neiswenter's Answer/Counterclaims, and as will be demonstrated at an evidentiary hearing on the present TRO/Receiver Motion, Counterclaim-Plaintiff Neiswenter holds valid defenses and counterclaims against Counterclaim-Defendants Zurich, the Law Office, and TICZ including affirmative claims for: (1) breach of fiduciary duty; (2) breach of operating agreements; (3) accounting; (4) declaratory judgment respecting the rights, obligations, authority, and duties related to the Jointly Owned Companies and the real and personal assets owned by the Jointly Owned Companies; (5) injunctive relief to prevent Counterclaim-Defendants from engaging in unilateral actions affecting Company finances, operations, records, leasing opportunities, tenant relations, and Company assets in general; (6) conversion of at least $3,935,384.44 in Company funds and counting; (7) Georgia RICO violations; and (8) Federal RICO violations. (*See* Countercl. ¶¶ 90 - 314.)

***Receiver Factor 3: There is Imminent Danger That Company Assets and Other Property Will be Concealed, Lost, or Diminished in Value if a Receiver is Not Appointed***: As set forth above, and in Neiswenter's Answer/Counterclaims, and as will be demonstrated at an evidentiary

hearing, there is imminent danger that the Jointly Owned Companies' assets and other property will continue to be concealed, lost, or diminished in value. If a Federal Receiver is not appointed, the Jointly Owned Companies' value, assets, and continued operations will remain at risk. In addition to their ongoing misconduct relating to the Companies' daily operations and real estate transactions, Zurich will continue to unilaterally exclude Neiswenter and divert jointly owned assets for his own benefit.

***Receiver Factor 4: There are Inadequate Alternative Legal Remedies:*** As set forth above, and in Neiswenter's Answer/Counterclaims, there are inadequate legal remedies to address the parties' ongoing disputes concerning the transfer, administration, investment, location, and control of millions of dollars in Company funds, including disputed transfers involving Treasury Direct accounts, trust accounts, and other financial accounts outside the Companies' ordinary operating structure. Immediate relief and appointment of a Federal Receiver is necessary to break deadlocks, preserve Jointly Owned Company funds and other assets located in multiple states over which a Federal Receiver is more equipped to manage and operate, prevent further unauthorized transfers, and permit a prompt accounting. There are no sufficient legal remedies that could rectify the nature of this dispute given the number of Jointly Owned Company assets that are currently at risk if a Federal Receiver is not appointed.

***Receiver Factor 5: There is No Less Drastic Remedy to Protect Against the Ongoing and Imminent Harm to Neiswenter and the Jointly Owned Companies:*** As set forth above, and in Neiswenter's Answer/Counterclaims, less restrictive remedies are presently inadequate because substantial disputes exist concerning control of Company funds, disputed transfers, account administration, leasing authority, refinancing authority, access to Company records, and day-to-day management of the Companies. The parties' equal ownership interests and inability to resolve

these disputes have materially impaired the Companies' ability to operate efficiently and address upcoming lender, leasing, and operational issues.

***Receiver Factor 6: The Appointment of a Receiver Will do More Good Than Harm***

As set forth above, and in Neiswenter's Answer/Counterclaims, and as will be demonstrated at an evidentiary hearing, the appointment of a Federal Receiver will do more good than harm for the Jointly Owned Companies and its members given the deadlock in management and the need to protect Company assets and preserve Company operations. A Federal Receiver would serve to take control of Jointly Owned Company assets across several states and efficiently resolve management disputes involving commercial real estate holdings and non-parties involved in potential sales or prospective leases and safeguard the interests of the Companies and their stakeholders. Zurich previously testified under oath and to the Superior Court that the appointment of a receiver is and was necessary given the deadlock in management, the approaching maturity on the CNB Loan for the encumbered Tenancy-in-Common Property in Georgia, and to resolve other complex issues relating to the sale or lease transactions of other jointly held commercial real estate.

**C. <u>The Court Should Enter a Temporary Restraining Order and Preliminary Injunctive Relief</u>**

The standard for granting either a TRO or preliminary injunctive relief is the same. Pursuant to Rule 65, a TRO and preliminary injunctive relief are warranted if Counterclaim-Plaintiffs demonstrate that: (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury if the injunction is not granted; (3) an injunction will not substantially injure other interested parties; and (4) an injunction will further the public interest. *See Winter v. Nat'l Res. Defense Council*, 555 U.S. 7, 20 (2008) (identifying factors for preliminary injunctive relief); *see also, Jysk Bed'N Linen*, 810 F.3d 767, 774 (11th Cir. 2015) (listing preliminary

injunction factors); *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001) (a movant must demonstrate: (1) there is a substantial likelihood that the moving party will prevail on the merits; (2) the moving party will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the moving party outweighs the threatened harm the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest); *see also, Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (identifying preliminary injunction factors).

The purpose of a temporary restraining order, like a preliminary injunction, is to protect the movant from irreparable injury and to preserve the *status quo* until the district court renders a meaningful decision on the merits. *See Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).[13] *See Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034–35 (11th Cir. 2001); *Butler v. Alabama Jud. Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1229 (M.D. Ala. 2000) (citing *Johnson v. U.S. Department of Agriculture,* 734 F.2d 774, 781 (11th Cir.1984)); *see also* Fed. R. Civ. P. 65(b)(1)(A).

Likelihood of success on the merits "is generally regarded as the most important [element] because the granting of a temporary restraining order would be inequitable if the movant has no chance of succeeding on the merits of the case." *Butler v. Alabama Jud. Inquiry Comm'n*, 111 F. Supp. 2d at 1230. The other elements require the movant to show the "balance the equities" tips in favor of the temporary restraining order. *Butler v. Alabama Jud. Inquiry Comm'n*, 111 F. Supp. 2d at 1230 (citing cases). The "decision to grant or deny a temporary restraining order is within the sound discretion of the district court." *Sierra Club v. Georgia Power Co.,* 180 F.3d 1309, 1310

[13] Decisions rendered by the Fifth Circuit prior to October 1, 1981 constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

(11th Cir.1999). The first element does not require "the court . . . to find that Plaintiffs have a substantial likelihood of success on *every* claim set forth in their Complaint; it is sufficient if the law or facts support a substantial likelihood of success on at least one claim that would sustain the issuance of a temporary restraining order." *Butler v. Alabama Jud. Inquiry Comm'n*, 111 F. Supp. 2d at 1230 (citing *Atlanta School of Kayaking, Inc. v. Douglasville–Douglas County Water and Sewer Auth.*, 981 F. Supp. 1469, 1472 (N.D.Ga.1997)).

***TRO/Injunction Factor 1: Neiswenter Has a Substantial Likelihood of Success on the Merits on Their Defenses and Counterclaims for Equitable and Other Relief Against the Zurich Entities:*** Neiswenter just has to establish a likelihood of success on the merits on one of the counterclaims in his Answer/Counterclaims to sustain the issuance of a temporary restraining order. *Butler*, 11 F. Supp. 2d at 1230. Here, Neiswenter has alleged, and Zurich has admitted, that Zurich unilaterally transferred and concealed at least ***$3,935,384.44*** in Jointly Owned Company funds without authority and outside the ordinary course of business.

Zurich has actively and in writing denied Neiswenter access to Company bank accounts, financial records, administrative platforms, and other financial information necessary for Neiswenter to exercise his rights as a fifty-percent owner. Zurich has further: caused Company assets and Company funds to be commingled with funds belonging to affiliates, related entities, and third parties, thereby impairing transparency and making it more difficult to determine the ownership, source, and disposition of Company funds; utilized or permitted the utilization of Company-paid personnel, contractors, and resources for the benefit of entities and assets that were not jointly owned by the parties and from which Neiswenter derived no corresponding benefit; permitted individuals possessing no ownership interest in the Companies, including third parties and family members, to possess administrative authority, management authority, access rights, or

control over Company banking relationships and Company financial accounts while simultaneously restricting Neiswenter's access to those same accounts; and repeatedly acted unilaterally concerning Company operations, financial relationships, leasing matters, banking relationships, and management decisions despite the parties' equal ownership interests and despite governing documents requiring joint decision-making.

All of the above acts, words, and omissions form the basis for the assertions of Neiswenter's claims for breach of fiduciary duties, breach of the operating agreements, and conversion claims and are supported by admissible evidence identified in the verified Counterclaims and exhibits thereto. Accordingly, as set forth above and as will be shown at an evidentiary hearing, Neiswenter has demonstrated a substantial likelihood of success on the merits of its breach of fiduciary duties, breach of the operating agreements, and conversion claims, all of which claims would sustain the issuance of a temporary restraining order.

***TRO/Injunction Factor 2: Neiswenter and the Jointly Owned Companies Will Suffer Irreparable Injury if the Injunction is Not Granted:*** As set forth above, and in Neiswenter's Answer/Counterclaims, and as will be demonstrated at an evidentiary hearing, there is imminent danger that Company assets and other property will continue to be concealed, lost, or diminished in value, and the Companies and their stakeholder(s) will suffer irreparable injury if an injunction is not granted. "Irreparable injury" means an injury that "cannot be undone through monetary damages." *Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). The availability of a money judgment in this case is meaningless because it is clear that Zurich will continue to unilaterally exclude Neiswenter from on-going decision making regarding the Jointly Owned Company assets and continue to drain Company funds through unauthorized transfers. If the Court does not order a temporary restraining order and preliminary injunction, the Jointly

Owned Companies' value, assets, and continued operations will remain at risk.

***TRO/Inunction Factor 3: A Narrowly Tailored Injunctive Order Will Not Substantially Injure the Counterclaim-Defendants*****:** Zurich has previously asserted under oath and to the Superior Court that the appointment of a receiver was necessary to protect Company assets, preserve Company operations, address management disputes, and safeguard the interests of the Companies and their stakeholders, in the State Lawsuit involving these same assets and substantially similar allegations. Without the TRO, assets will likely be misappropriated further, thus tipping the balance of harm in favor of Neiswenter. The requested TRO simply returns the Companies to and preserves the *status quo* and prevents Zurich from unilaterally transferring assets, concealing information, or diverting further Company funds. As set forth in his Answer/Counterclaims, Neiswenter believes that Kennedy of James Bates Brannan Groover LLP possesses substantial experience in commercial real-estate matters, financial administration, business disputes, receiverships, and court-supervised fiduciary appointments and is well qualified to serve as receiver. In any event, a narrowly tailored injunction, coupled with the oversight of a well-qualified Federal Receiver like Kennedy, would not substantially injure Zurich, the Law Office, or TICZ.

***TRO/Injunction Factor 4: A TRO/Preliminary Injunction will Further the Public Interest:*** Finally, entry of the TRO and injunction will not be adverse to the public interest. Neiswenter has shown a substantial likelihood of success on the merits of claims for breach of fiduciary duties, breach of the operating agreements, conversion, and has alleged other meritorious tort based claims, including State and Federal RICO. Enjoining such unlawful conduct, protecting member interests under applicable state law and operating agreements, and preserving the *status quo* to ensure Company funds are not diverted and concealed serve the public interest.

## IV. **CONCLUSION**

For the foregoing reasons, Defendant, Counterclaim-Plaintiff David Neiswenter respectfully requests that this Court grant his Emergency Motion for Appointment of a Receiver and Entry of a Temporary Restraining Order and Preliminary Injunction and enter an Order:

1. Appointing a Federal Receiver over the Jointly Owned Companies and their assets, accounts, records, operations, and real and personal property, with such powers and authority as the Court deems just and appropriate;
2. Temporarily and preliminarily enjoining Zurich, the Law Office, TICZ, and all persons acting in concert with them from transferring, concealing, dissipating, encumbering, investing, commingling, or otherwise disposing of any funds or assets of the Jointly Owned Companies except as authorized by the Court or the Receiver;
3. Requiring the immediate disclosure of all accounts, including any trust accounts, Treasury Direct accounts, investment accounts, and any other accounts into which Jointly Owned Company funds have been transferred, together with all records necessary to identify the location, ownership, administration, and disposition of such funds;
4. Requiring Zurich and the Zurich Parties to provide the Receiver and Neiswenter with complete access to all Company books, records, banking information, accounting records, electronic platforms, and financial information;
5. Prohibiting Zurich and the Zurich Parties from engaging in unilateral management decisions affecting Company assets, leasing activities, refinancing efforts, distributions, lender communications, tenant relations, or other material Company operations absent Receiver authorization or further Order of the Court;

6. Preserving the status quo pending final adjudication of the parties' claims and defenses; and
7. Granting such other and further relief as the Court deems just, proper, and equitable under the circumstances.

The undisputed evidence demonstrates a continuing dispute and alleged deadlock between equal owners, the unilateral transfer and concealment of approximately $3.9 million in Company funds, the ongoing risk of additional unauthorized transfers and dissipation of assets, and the inadequacy of less drastic remedies. Under these extraordinary circumstances, immediate equitable intervention is necessary to protect the Jointly Owned Companies, preserve their assets and operations, and prevent further irreparable harm pending resolution of this action. Accordingly, the requested receivership, temporary restraining order, and preliminary injunction should be granted in their entirety.

Respectfully submitted this 23rd day of October, 2026.

BUCHALTER LLP

/s/ Brian S. Goldberg
Brian S. Goldberg
Georgia Bar No. 128007
3475 Piedmont Road NE
Suite 1100
Atlanta, Georgia 30305
Telephone: (404) 832-7667
Email: bgoldberg@buchalter.com

*Counsel for Defendant, Counterclaim-Plaintiff David Neiswenter*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of October, 2026, I electronically filed the foregoing BRIEF IN SUPPORT OF DAVID NEISWENTER'S EMERGENCY MOTION FOR APPOINTMENT OF A RECEIVER AND ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system, which will automatically send notice of such filing to all counsel of record.

Respectfully submitted,

BUCHALTER LLP
/s/ Brian S. Goldberg
Brian S. Goldberg
Georgia Bar No. 128007
3475 Piedmont Road NE
Suite 1100
Atlanta, Georgia 30305
Telephone: (404) 832-7667
Email: bgoldberg@buchalter.com

*Counsel for Defendant, Counterclaim-Plaintiff, and Third-Party Plaintiff David Neiswenter*