IN THE SUPERIOR COURT OF BIBB COUNTY
STATE OF GEORGIA

ZACHARY ZURICH, : CASE NUMBER: 26-CV-85533

-VS- :

DAVID NEISWENTER,
NEIS ACQUISITIONS 5192, LLC, :
NEIS ACQUISITIONS GA, LLC,
2364 TICZ, LLC, :
NEIS ACQUISITIONS AUXGA, LLC,
and NEIS ACQUISITIONS POPGA, LLC,:

DEFENDANT. :

---

MONDAY, AUGUST 31, 2026
TRANSCRIPT OF PROCEEDING
BEFORE THE HONORABLE KEN SMITH
SUPERIOR COURT JUDGE
BIBB COUNTY COURTHOUSE
MACON, GEORGIA

---

APPEARANCES:

FOR THE PLAINTIFF: MR. ZACHARY ZURICH (Pro Se)
1113 TOWLSTON ROAD
MCLEAN, VA 22102

FOR THE DEFENDANT: MR. BRIAN GOLDBERG
3475 PIEDMONT ROAD NE
SUITE 100
ATLANTA, GEORGIA 30305

SUZANNE K. PIERI, CCR
OFFICIAL COURT REPORTER
310 BIBB COUNTY COURTHOUSE
MACON, GEORGIA 31201

THE COURT: Okay. Appreciate y'all being here. Looking forward to hearing some arguments. We have a request for an injunction and request for a receiver to begin with. I'm going to go a little out of turn for one quick request, and then I'm gonna come back to the plaintiff. I see an exhibit list here. Got the full book. What I usually do is leave it on the bench and then if something's admitted or otherwise proper then I'll turn to it at that point in time. But I'll leave it closed. So I appreciate you having it ready. I just wanted you to know why I'm not opening it and just reading through it right now. There is a response to the request for receiver. It seems to not object in spirit, but maybe in terms to a receiver. Is that a fair --

MR. GOLDBERG: Yes, Your Honor, that's exactly correct.

THE COURT: -- summary? And the reason I mention that, and the reason I go a little out of turn, Mr. Zurich, I don't mean any disrespect to you and your position at all is if we all agree that a receiver could be a good thing, well, then I'll do a receiver. Question is, is what terms and who's paying for it is always a question, does it come out of the business, is it the moving party or the non-moving party? It just depends. Have y'all had any discussions about what particular receiver we might use? I see Mr. Kennedy in here. I know Mr. Kennedy. Mr. Nichols is there

with him. They serve regularly in receivership actions. Have y'all had a chance to consider, and Mr. Zurich, I'm coming to you first because you're the plaintiff. Have you had a chance to consider Mr. Kennedy and his firm as a potential receiver in this action?

MR. ZURICH: So Your Honor, defense counsel did submit Mr. Kennedy. I asked several questions specifically regarding --

THE COURT: Do me a favor. That microphone -- my ears are older than I look.

MR. ZURICH: Sorry, Your Honor. So yes, defense counsel did reach out to me and suggest Mr. Kennedy. I asked him several questions regarding Mr. Kennedy, specifically what properties he managed in the area, and his experience, how he -- what led him to refer Mr. Kennedy, how they were connected. Those questions have not been substantively answered, Your Honor. And I do have, as you'll see in my presentation, a receiver that I think is supremely qualified to handle this property and to handle the receivership.

THE COURT: Who's the receiver that you would propose, and maybe I'm putting the cart in front of the horse, but seems like we knock out one of the main concerns here is getting somebody input.

MR. ZURICH: Your Honor, the receiver that I propose is

GlassRatner, and they're out of Atlanta. They handle receiverships nationwide and have a tremendous amount of experience, over a billion dollars of assets, more than 50 receiverships inside and outside of Georgia. And I have in my presentation all of their experience and qualifications as well as a proposal that they've submitted to act as receiver.

THE COURT: Okay. All right. Well, certainly we can take a look at that when the appropriate time comes. How do y'all wish to proceed today?

MR. ZURICH: So Your Honor, I'd like to present to you the argument, the cases, and the evidence that I have. And I think you'll see that the law gives the Court broad discretion in not just appointing the receiver, but in deciding if the receiver should be limited in any capacity. And in order for Your Honor to be in the best position to consider who the receiver is and to what extent you may or may not limit their authority, I think it's important for the Court to understand the evidence and the allegations and the nature of this case and the nature of the assets which I'm prepared to present.

THE COURT: And I've read through some of the complaint. I've read through the complaint. Let me change that. And I know it's a -- we have notice pleadings in the State of Georgia, so not everything is in there. It seems

like everybody agrees that there's a deadlock on decision-making at this point in time that is stymieing the business. I know everybody has a different side as to why that is, and that's certainly something we hash out along the way. I don't know that I need a ton of convincing that we need a receiver, okay? And so I'm just kinda trying to focus the scope of what it is that we're doing here today. There are some substantial assets. I think your complaint said between 23 and 28 million; is that correct?

MR. ZURICH: That's correct, Your Honor.

THE COURT: So we're not talking about a small pole barn out in the middle of the woods. I mean, these are legitimate assets that we're dealing with. And the complexity, certainly it sounds like there is the revenue or asset base from the business to fund that receivership; is that correct? Does everybody agree to that?

MR. ZURICH: Yes, Your Honor.

MR. GOLDBERG: Yes.

THE COURT: All right. I'm gonna turn it over to you, Mr. Zurich, and give me some information, and we can kinda go through. I may sculpt it and kinda guide where we go along the way.

MR. ZURICH: Sure. Thank you, Your Honor, I appreciate that. I'm happy to move faster at any point.

THE COURT: Good deal.

MR. ZURICH: So good afternoon, and I thank the Court for granting us the emergency hearing. I apologize to the Court previously if my tone or demeanor to Lisa Bell was over-zealous. I have tried to tone it down substantially and stay focused on the issues.

THE COURT: I appreciate that. The written word's always more harsh than it's intended. It's just the way it sounds. All's well.

MR. ZURICH: So Your Honor, a receiver in some context or injunction in some context can be an extraordinary remedy. But in where we're traveling here, it's a 50/50 partnership dissolution. It's a partition. Receivers are regularly appointed and that's both traveling under two separate statutes that we'll get to. And the courts have very broad discretion to point a receiver to manage the property.

THE COURT: I'm with you on all that, and I think that's part of what I'm gonna curtail just a little bit.

MR. ZURICH: Okay.

THE COURT: Oddly enough, I have done a little receivership work back in the day when I wasn't handling my criminal docket, and so one of them may have included Mr. Kennedy, as a matter of fact, at least in the beginning of it. I think we settled that case, but you don't have to convince me that I can do it is what I'm trying to say.

MR. ZURICH: So one of the things that the defendant’s counsel is objecting to is the power which you give the receiver, and they would like to curtail that power of the receiver. Among other things, to not sell the asset. And some of the evidence you’re gonna see and some of the case law that I’m gonna discuss specifically talks about situations similar to the one that we’re in where there’s a balloon mortgage coming due on substantial debt that impacts a significant portion of the property. I'm going to show you evidence that there is a balloon mortgage coming due for approximately eight and a half million dollars next coming due in December of this year. There's also a balloon mortgage coming due on another property that has an approximate balance of 700,000, and that's coming due in January of ‘27. And I will show you that there is case law that says that when you have a balloon mortgage coming due, it's appropriate incident to an action for dissolution or incident for an appointment to receiver for the receiver to have the power not just to manage the property leading up to the sale but to take actions to sell the property so that secured creditors can be paid. And Your Honor, just giving you a little backstop before I get into the evidence, Mr. Neiswenter has taken a position so far in 2026 that at first seemed very bizarre to me. And he was refusing to sign leases for new incoming tenants, refusing to renew leases,

refusing to permit tenants to expand, refusing to make repairs on the property. And at the same time he indicated that he was going to go down the path of selling the property prior to the debt coming due. There were multiple national brokerage firms engaged who provided opinions of value, all of which I have here the Court to consider. And there will be emails that show when the brokers determined the value. Instead of being happy, Mr. Neiswenter was upset. And he was upset because the values exceeded what he thought they would be. And it took me a little while understand why. And the reason why, as the evidence will show, is that Mr. Neiswenter wants to buy the property for himself. He wants to force a sale to buy me out at a substantial discount below its fair market value. And that will explain why he's refusing to sign leases which would increase the income, which would increase the sale price, refusing to do repairs, refusing to take any action that would ordinarily be in the best interest of the company. The consequences of Mr. Neiswenter’s actions are extreme. They will impact the sale price millions of dollars. The fact that the property is not already listed for sale puts the company into a position that is running against the deadline to pay off debt that can go to a default interest rate. Banks have already issued default notices for debt service coverage violations as a result of the lack of

leasing on the property. And I think with that, I'll start with my first exhibit. I have tendered to opposing counsel the same binder that I've tendered to the Court so they can long follow along here.

THE COURT: All right.

MR. ZURICH: The first exhibit, which I would mark Plaintiff’s 1 for identification. And Your Honor, I guess it’s a little bit unusual, but I’m appearing on behalf of myself, but also going to be giving support for the document. So I will tender to the Court that these documents are contained in our company’s Google Drive where we keep all of our documents in the ordinary course of business. This is a promissory note that was signed on a portion of the property that’s at issue here. I recognize this promissory note and based on that, I would move that this exhibit, Plaintiff’s Exhibit 1 be entered into evidence.

THE COURT: Is this the 8.5 or the 700,000?

MR. ZURICH: This is what I’ll refer to as the 8.5, which was originally 8,967,000 and has been paid down a little bit over the last few years.

THE COURT: Okay. Do y’all have any objections to these documents?

MR. GOLDBERG: I mean, Judge, the first time I have seen some of these is right now.

THE COURT: I understand.

MR. GOLDBERG: And so --

THE COURT: And I'm not telling you you can't have an objection by what I'm saying, just a request. Is there any dispute that there's eight and a half roughly due on a balloon note in December?

MR. GOLDBERG: No. There's no objection to that.

THE COURT: How about that there's roughly 700,000 due in January of '27?

MR. NEISWENTER: That's inaccurate. It's about $569,000.

THE COURT: Let's let -- oddly enough, you have an attorney, so I'm gonna have to let you talk through your lawyer. We agree that -- it sounds like there's roughly eight and a half to nine million dollars, somewhere around there due.

MR. ZURICH: Very good, Your Honor. And just to be clear that the maturity date as indicated on page 1 of the promissory note is December 17th, 2026, which is in a few months.

THE COURT: Correct. Understood.

MR. ZURICH: Okay.

MR. GOLDBERG: But there's no objection to the promissory note, but our --

THE COURT: Because I don't even have him under oath.

I mean, we're not -- this is a little -- I'm being a little loosie-goosy with procedure here today.

MR. GOLDBERG: It is. It's a little interesting.

THE COURT: As it sits, I don't know that I need these documents if we all agree that there needs to be a receiver. That's what I'm trying to say, so what I need to know is why that there would be either no limitations on the receiver or lesser, as you would ask for, or more from them. And then I need to know which receiver, either Mr. Kennedy or the one that you have proposed.

MR. ZURICH: Your Honor, I'll try to move faster if you'd like, but --

THE COURT: I think that's where my head's at. I think we are dealing with issues as to why a receiver should be important, and everybody agrees one is.

MR. ZURICH: So I'll try to get there and zone in faster.

THE COURT: Fair enough. Thank you.

MR. ZURICH: Skipping number 2, going to number 3. Number 3 is a default notice from the bank that has the approximately eight million dollar mortgage, which was sent June 5th notifying the borrower that they do not have adequate debt service, and therefore they are in violation. Any objection to 3 moving into evidence?

THE COURT: Well, you're not under oath. Like we're

not in an --

MR. ZURICH: Okay, I'll move on.

MR. GOLDBERG: I would --

THE COURT: It's an argument at this point.

MR. GOLDBERG: I would object to the characterization of that document. It's actually, says it's a reservation of rights letter.

THE COURT: Yeah. I get it.

MR. GOLDBERG: But I don't object to that being the document to the extent -- however he wants to characterize it.

THE COURT: There's a ton of money at stake. I wanna be clear. I'm not trying to have anybody whose assets are not being properly attended in this one way or the other, however we go. But let's start with what I need to understand the breadth that a receiver should have under his powers. And I'm gonna -- if you're gonna give me evidence, I'm gonna swear you in. That's the only way to do this.

MR. ZURICH: Okay, sure.

THE COURT: So I'll get you to raise your right hand.

(WHEREUPON PLAINTIFF WAS SWORN IN BY THE COURT)

THE COURT: Is also what you've already told me the truth, the whole truth and nothing but the truth so help you God?

MR. ZURICH: It is.

THE COURT: All right. You can put your hand down. Thank you. So why is it important from a financial standpoint to the entities that a receiver have the right to sell a property? Is it to satisfy those two notes?

MR. ZURICH: Well, it's important that the receiver have the right to sell the property because there are secured creditors with notes coming due, and I can -- I can -- there's plenty of cases that say that that's ample justification in and of itself to sell the property. But you also have incident to a dissolution the -- in a 50/50 partnership, the partner moving for dissolution has the right to have the property sold. And the reason why the property needs to be sold is that there's deadlock, there's allegations of breach of fiduciary and self-dealing. The property's not being properly managed and there's debt coming due. But there's more, Your Honor. The current debt on the property was placed years ago when interest rates were very low. The current debt on the property is approximately three and a half percent. The company has never borrowed money at interest rates where they are today. The debt today, interest rates would be twice what the property had originally had to carry, and in addition to that, Your Honor, income-producing property's value is heavily dependent upon the income that they generate. Typically they trade at a multiple.

THE COURT: I'm aware.

MR. ZURICH: And Your Honor, when the interest rates rise, then cap rates rise because investors have to compete against different asset types. So the higher the risk-free rate is on the treasuries, the higher yield they want to invest in the asset. A 100 basis point change in interest rates typically has about a ten percent reduction in the value of the property. The properties that we're talking about here primarily that I think should be sold right away, we have broker opinions of value between 23 and 27 million dollars. We actually have offers on the table from qualified buyers to transact at that price, one of whom is sitting in this courtroom who represents a group who owns over eight million square feet nationwide and who typically transacts in the range of about half a billion dollars of property per year. So there are qualified buyers who will pay a fair market price. In addition to that property, there's other property that can be sold that's separately parceled. So the total value of all the property we're talking about may even exceed 30 million dollars. The damage that might occur if the property is not sold and interest rates go up in itself can be north of three million dollars. The default rate that would apply if loans are not paid off on time could be the maximum that's allowable. On eight or nine million dollars of debt, that's millions of

dollars per year. And there is significant risk of injury if it's not done. Now, Mr. Neiswenter's position is, well, the company should just go out and borrow money, but that's not possible. And the reason it's not possible is it would require a guarantee of the members which I'm not willing to do and risk, and even in the context of a non-recourse loan, there are carve-outs for waste, for fraud that need to be signed by a suitable guarantor to stand behind those carve-outs, which I'm not willing to do. So, and to force one member to borrow money at twice the interest rate and bear the risk, I don't think that that's equitable. I think that the receiver should have the power to look at the situation, see the debt coming due, execute on leases that are on the table, engage with a buyer, or hire one of the three national firms that have already submitted requests and proposals with full details to mark up a property, sell the property at a market rate, and then allow those proceeds to be held while this case goes on and the issues of the breach of fiduciary and the damage that were caused to the company by Mr. Neiswenter's actions can be mitigated. If Mr. Neiswenter at the end of the day has any entitlement to those proceeds and he wants to go invest elsewhere, he can. But a partner has the right to ask for dissolution under the -- under various statutes. So once a company's dissolved, then the statute provides that the operations should be

wound up and the assets sold. It would make no sense to have to endure the risk of potential market fluctuations or long-term keep the assets when the company's not gonna continue to exist anymore, and the partners are deadlocked.

THE COURT: Where are the properties located?

MR. ZURICH: So there are several properties, all of which except one, is in Macon, Georgia and is primarily in the vicinity of what's referred to as the Eisenhower Crossing Shopping Center. There is one property that's in Vienna, Georgia that is currently leased to a company that's operating it as a Popeye's.

THE COURT: Okay. I'm looking through the complaint. I don't have that information. That's why I asked that. I don't think that we've pled jurisdiction venue in the complaint. Have you filed an amended complaint?

MR. ZURICH: There was an amended complaint filed, and that's on today's motion to be approved, and as far as I'm aware defense counsel is not objecting to that as there's been no responsive pleading filed.

MR. GOLDBERG: Our position is we don't have to -- under Georgia law, you don't -- we don't need to approve it.

THE COURT: I agree. And I don't -- at this early stage, you can just amend as you see fit.

MR. ZURICH: Okay.

THE COURT: So to the extent --

MR. ZURICH: It’s better elaborated in the amended complaint, Your Honor.

THE COURT: All right. Give me just a second with that. I’m sorry. All right. That gives me more of an idea what you’re talking about. All right. Good deal.

MR. ZURICH: Okay. So Your Honor in Black versus Graham, which is a Supreme Court of Georgia case from ’96, very similar. Equal shareholders and where there’s deadlock and potential damage to the company and disagreement on management, under these circumstances the appointment of receiver and dissolution was warranted. Let me jump to -- so if I go to Dixieland, which is Dixieland Iron and Metal Company versus Piedmont Iron and Metal Company --

THE COURT: All right.

MR. ZURICH: In that case, again, plaintiff and defendant are equal partners. Dispute had arisen that prevents their cooperation in conducting affairs and the Court determined that an orderly liquidation of the assets is necessary to meet maturing obligations held by secured creditors to prevent foreclosure. The appointment of a receiver is necessary for the protection of the litigant’s rights and interests, matters resting in the direction of the trial court. So again, that’s a very similar case with debt coming due.

THE COURT: Again, I don’t have any doubts that that’s

what we can do. I'm trying to narrow down to make sure that I understand why it is that you feel like the full breadth of the receiver's powers are appropriate. It seems like to address the -- in most ways to address kinda the looming change in interest rate and the balloon notes that are present. Is that a fair way to kinda summarize it? There may be other things. That's what I'm trying to get to. I'm not trying to limit you; I'm not trying -- I just want to understand what you know to be true.

MR. ZURICH: So Your Honor, there's another concern which is the overall vacancy of Eisenhower Crossing. So there's around 420,000 square feet and there's around 200,000 that's rented. There are major tenants who have expressed dissatisfaction with lack of leasing at the property. Both existing tenants like Ross, who's one of our anchor tenants, Kroger has a lease coming up for renewal, and has been unwilling to renew as well as potential tenants that are looking to come to the center, like dd's, like Five Below, and the problem is is that when you are teetering on a functioning occupied center or you go the other way towards a vacant center, when you go more towards a vacant center, you can have more crime, less tenants that wanna go, less people coming to the center, which impacts tenants' businesses. And no one has a crystal ball about what's gonna happen, but I can tell you right now this property can

be sold for 23 to 27 million dollars. That’s confirmed, and I have the evidence to present to the Court. Multiple national listing brokers have assessed the value currently at this price. There are ready, willing, able buyers who are qualified to transact at this price. And if the receiver’s power to sell is limited, and things don’t go the right way because of interest rates, because of the economy, because of factors that we can’t foresee, the property value may change substantially, and all of the equity that’s in this property could be lost. For me personally, that would be a really significant problem. And the problem that we have here is that Mr. Neiswenter is not in the same boat. So the boat that Mr. Neiswenter is in is that if the property’s sold, his best case, maybe he walks with six or seven million dollars, however that’s minus whatever the sale price has been reduced by the leases he didn’t do to try to force the value down, notwithstanding the coming debt, and it all -- he has another problem which is a federal tax problem, which I have evidence to show you in terms of liens which have been filed for a tax debt that’s probably almost two million dollars at this point. And so if Mr. Neiswenter has to pay for the damages that he caused to the property in the reduction of value, and then the IRS comes in and takes two or three million dollars, he’s got nothing left. So he has an incentive to gamble. He has an

incentive to try to shoot for the stars, try to buy the property cheap, try to wait to lease it up to get something of value. But in the meantime, what I've worked for for the past six years is at risk. And I don't wanna take that risk. And I don't see how it's unfair incident to a dissolution if then the company should be charged with winding down and selling the assets and there are substantial assets there. Why they can't be sold, the proceeds protected, and if Mr. Neiswenter proffers at the end of the day, he can take his fair equity that exists today based on the fair market value and do what he wishes with it. But not gamble with the company's money, not gamble with my money.

THE COURT: All right. So to add to the other would be potential waste is what you're concerned about.

MR. ZURICH: Yep, that's correct, Your Honor.

THE COURT: There we go.

MR. ZURICH: So I have Plaintiff's Exhibit 12 for identification. This is a tenant dd's, which is a national tenant owned by Ross, who's interested in leasing about 20,000, 25,000 square feet. They've issued a letter of intent which has been signed and agreed to by both defendant and dd's. Mr. Neiswenter has refused to move forward with the lease, notwithstanding dd's is still trying to move forward with the transaction. They sent an email which is

this exhibit asking him to consent to a very minor change in their elevations that they're proposing, and the signage that they put on the center. They asked please given the urgency, can you review or respond within the next three business days. Nothing from Mr. Neiswenter because -- who knows why. My speculation is he doesn't want that lease because that lease will generate another $150,000.00 of income and increase the occupancy. And you'll see that it's not just limited to there. It's a pattern of behavior. So Exhibit 13, we've got an amendment pending with Ross to redo the lease which would be a key ingredient in selling the center and maximizing the value. Ross is interested in renewing early for another five years, and this is an email dated July 31st, which after me multiple times asking Mr. Neiswenter to please respond, he says, and I quote, "I'm nearly done and I expect to have a fully vetted draft amendment covering the outstanding issues very soon." Well, that was July 31st. Nothing since then. Number 14 is an email between myself and Mr. Neiswenter regarding a tenant Rainbow, who is not doing well in sales, and who has proposed expanding to take space which has been vacant for years, ever since we acquired the center, so that they can sell more merchandise, but using the same staff and hopefully turn around the project. They and our company agreed to a letter of intent regarding their expansion and

their renewal and Mr. Neiswenter has also received -- refused to proceed forward, notwithstanding the fact that the second addendum to lease, which is attached as an exhibit was signed by myself and signed by the tenant. The tenant gave Mr. Neiswenter multiple deadlines telling him that they will not negotiate further. If he doesn't consent and move forward, they will not only not expand, but they will not renew when their lease come due. Again, Mr. Neiswenter refused to go forward. Try to skip through the most important -- so I mean, here's an example of that, would be Exhibit -- Plaintiff's 17 for identification where Rainbow says we tried. If you are unable to sign what we've sent, we are moving on, to which Mr. Neiswenter responded with a diatribe of paragraph after paragraph after paragraph of changes. I advised Mr. Neiswenter that they gave us a demand. Accept or we're withdrawing. And prior to him responding to that offer, because any response is a counter offer, we need to discuss this issue. If we don't agree, we need to get a receiver. I implored him. Do not respond unilaterally. The company does not agree. Your response is a counter offer. We may lose the right to have them move forward with the document they've signed and sent to us, and this is pretty substantial, because it not only impacts the cash flow at the center, which we're having a problem with, and the bank has already sent us a notice on, but the tenant

next door has a co-tenancy clause, Hibbett, where if Rainbow's not there, their rent would drop dramatically. Mr. Neiswenter went ahead and sent the email anyway, which I have, and it's attached as Exhibit 17. Even after I asked him to withdraw this email, that it was destructive and it wasn't authorized; it wasn't the company's position, I'm moving for a receiver, he refused. I have --

THE COURT: I think we're getting back into the need for a receiver at this point in time.

MR. ZURICH: Okay. Let me try to skip forward. So --

THE COURT: Well, let me do this. You've given me the information that you believe that gives the breadth of the receiver's powers; is that fair, or is there more on that? And I'm gonna ask them on that issue, and then I'll come back to you on which receiver?

MR. ZURICH: So -- okay. There's a large portion of the property, like I said, that's vacant. And there's a large portion of the property that has roofs that are leaking, and that have HVAC units that are not functioning. There's not enough money in the company to fix all of this. You'd be talking about millions and millions of dollars. If the property is sold and put into the hands of an entity that has better capital resources and that can manage that, has better outreach, they can bring in tenants, they can fix the roofs. So what's the damage to wait, you say? Well,

when a roof gets wet and it's beyond the end of its useful life and it leaks, you destroy the iso under the roof. When you destroy the iso under the roof, your cost to replace that roof can double. If you do nothing after the iso's wet, you get mold. Then you gotta do mold remediation and you gotta replace iso and you gotta redo roofs. So if you don't sell the property now and you don't have the funds to do all this, then you're wasting the property. You could have millions of dollars in damage, and reduction in market value. That's another reason why the receiver's rights should not be limited. They should have the authority from the Court to do what is in the best interest of the company incident to a dissolution and winding down. Doesn't mean fire sale, but it does mean to recognize you have debt coming due, to recognize you have serious deferred maintenance issues that are getting worse, to recognize that you have limited capital available. There's -- I'll skip through that, that's not -- skip through that. Skip through that, 24. So let me just take you -- I'll try to take you quickly through -- so of the various national listing brokers who the receiver may want to engage, although the receiver can engage with buyers who are currently on the table willing to pay a fair price. One of them is Atlantic Capital Partners. They've done 1.4 billion in transactions. They are a broker that Mr. Neiswenter initially contacted to

have the property evaluated. They received information from Mr. Neiswenter to consider. They came up with a valuation of between 24 and 26 million dollars. And the important thing to note in this report -- there's really two. Number one, they're using the income from dd's, which Mr. Neiswenter is blocking, and number two, they have a time frame for what's required for sale. So in a complex large commercial transaction like this, closings do not take place from one day to the next. There's typically an inspection period that's required, which can be between 30 and 45 days and then there's a period for financing, and then there's a period for closing. In their presentation, they estimated -- and this is back in June -- that if they were engaged on June 10th, they would have the sale completed by November 11th, five months. They submitted a proposal to do this and move forward. Mr. Neiswenter broke off discussions with them. Five months to get this asset sold before the debt comes due and we risk a default rate Right now where we sit today, we're August 31st, so we have debt coming due September -- December 17th. We have September, October, November, and part of December. We have only three and a half months left if we move now to engage receivers to work with the current buyers or to sell the asset. I'm not gonna take you through the other two, but they're exhibits, and I'll submit them to the Court. Again, similar conclusions.

Property needs to be rented where we can, valuations in that range. Listing agreements tendered to Mr. Neiswenter two months ago that he's refusing to move forward with. Skip through to -- I mean, this is just -- this is an interesting email. This is Exhibit 27. This is from Franklin Street, one of the brokers to Mr. Neiswenter after he tried to convince them that it would not be in the company's interest to rent space, specifically dd's. They responded back to him and said, Andy, without the dd's lease, your NOI would be 1.7 million. With dd's lease, one million 846. And highlighted that if he continued to object to the dd's lease, the company would likely be damaged by two million dollars. But that didn't change Mr. Neiswenter's position. So this is Exhibit -- Plaintiff's Exhibit 31. This is an email from Mr. Neiswenter to myself May 30th. Mr. Neiswenter says, see attached first BOV. This was a -- BOV is a broker opinion value. This is from Matthews that's in the file, and I responded to him that the broker's opinion of value seemed fair, that we should proceed forward. It seems reasonable to me. Mr. Neiswenter's response to this email is, considering we don't yet have any leases to support this value, I don't know what to think of it. I responded to him and asked him what leases are you talking about, dd and Rainbow that we have on the table that we should move forward with? No response. Exhibit 33, these

are federal tax liens that are in the public record.

THE COURT: And all that certainly may come along with your concern for waste, but --

MR. ZURICH: Okay, so we'll skip that. So --

THE COURT: Unless there's something materially different, I'm gonna turn to them on the first issue at this time.

MR. ZURICH: Can I have 30 seconds, Your Honor?

THE COURT: Go ahead.

MR. ZURICH: Exhibits 40 and 41 are offers that buyers made on the property that asked for timely response. Mr. Neiswenter refused to respond.

THE COURT: Well, and I've got that. I know that's your position.

MR. ZURICH: Okay.

THE COURT: That he's kind of not responding and not otherwise protecting the company as of right now.

MR. ZURICH: Okay. So okay. So let's jump down to Glass Ratner. So --

THE COURT: Before you get to Glass Ratner --

MR. ZURICH: Okay.

THE COURT: I'm gonna turn to them on the scope of receivership powers, and then we'll come back to which receiver. All right?

MR. ZURICH: So --

THE COURT: I’m gonna go ahead and swap over at this point --

MR. ZURICH: Okay.

THE COURT: -- and then we’ll come back on the other issue.

MR. GOLDBERG: Thank you, Your Honor.

THE COURT: Yes, sir.

MR. GOLDBERG: And good afternoon. I think as Your Honor aptly pointed out, the parties agree on a receivership, and really the remaining issue on that is the scope and the scale as to what authority the receiver has. We agree that a neutral receiver is appropriate, and actually for all the reasons that Mr. Zurich says is that there’s disagreements among the parties and, you know, we simply do not agree that a receiver should be empowered at the outset. We haven’t even -- I think procedurally where we are at in the case. We were served only recently. Actually we waived service. We filed a waiver with the Court. And we -- our answer period has not even come -- or expired yet. We have not even filed an answer. We anticipate filing counterclaims and we anticipate potentially bringing in third parties that are not even parties to this case at this moment. So what Mr. Zurich is asking at this point is all we’re saying is it’s premature, that at this stage of the litigation, we do not believe

that, as a matter of course at the very outset before we have even -- for Georgia civil procedure, filed or had an opportunity to file our answer and counterclaims to automatically set up a receiver that is empowered to dissolve the company without really full due process of being able to present a full evidentiary record. But we're not opposing the receiver itself. We're only opposing jumping to the conclusion to the end of the case. And our position is that that is what Mr. Zurich is attempting to do. Until the merits of the case have been fully pled out, and have been -- and a full evidentiary record has been established, we don't believe that there should be an immediate authority given to a receiver to dissolve and to liquidate all of the company's assets simply because Mr. Zurich says that they should. We think that should all be given -- the power to determine those things should be given to a receiver and then the parties can develop the evidentiary record through Georgia civil procedure through discovery, through our procedural rights to do so, and then establish whether or not the receiver should actually do that. The relevant statute, I think Mr. Zurich cited some of the business statutes that relate to, you know, directly to corporations, but these are all LLCs, so I think the relevant statute here is 14.11.603, which is the judicial and administrative dissolution statute, particularly section

A, and Your Honor, I have a copy of that if you would like --

THE COURT: I've got it pulled up. Thank you, though.

MR. GOLDBERG: And it says on application by or for a member of the Court may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of incorporation or written operating agreement. Mr. Zurich, it seems, is trying to jump to the end of the case and where it has specifically stated in the statute that the Court needs to determine whether something is reasonable practicable is a question for a fact-finder. And after Georgia civil procedure has played out through discovery and the evidentiary record is fully developed, can a Court actually determine whether or not a company should be dissolved. And we're simply not even at the stage of discovery yet. We haven't even filed an answer. We do believe that the receiver is in the interest of everyone, that it's in the interest of the court, the interest of the owners, the lenders, tenants, companies themselves, and that the companies, as Mr. Zurich has pointed out, there are disagreements among the parties. There's disputed control issues. There's disputed financial information, distributions, leasing decisions, banking authority, and those are all reasons why the receiver should be in place

and why we agree to that. There are some serious unresolved issues that haven't been brought up yet that we would like the receiver in its powers to investigate and fully develop and that's concerning transfer of money that we believe Mr. Zurich has done unilaterally. It's around 3.9 million dollars in company's funds that have essentially evaporated from the company and into Mr. Zurich's, as far as we know, his law firm trust account, which we think there's serious problems with that. Those were company accounts. The funds were -- there were also funds that were placed into treasury direct accounts without our client's consent. There's an email where Mr. Zurich had admitted, and I think he'll -- as he stands here today, he'll admit that those funds were placed in his trust account, his law firm trust account without my client's permission. And the whole reason that this all came about was Mr. Neiswenter had been denied meaningful access to bank accounts. So we think that's all important as to why the receiver should be put into place to control those accounts and make their own independent accounting. The receiver should be empowered to secure records, gain access to all bank accounts, determine where funds actually are, conduct an accounting, and then they could report that back to the Court, and in my conversations with Mr. Nichols back and Mr. Kennedy, that that's exactly the type of thing that they could do, and they have

expressed their capability to do so, and I'm convinced that they would be a perfect receiver for this job. They, I think, have the qualifications, and having talked to them --

THE COURT: Well, let's stick with issue one --

MR. GOLDBERG: Yes. Sorry, Your Honor.

THE COURT: -- and then I am going to go back to him.

MR. GOLDBERG: Getting ahead of myself. So with respect to the dissolution, under the Georgia statutes it's the Court that makes the decision about dissolution, and the receiver is there to -- while the litigation is pending to preserve the value of companies, preserve the value of all the assets while the litigation plays out, and this litigation is in its infancy. And again, we plan on filing counterclaims, third party claims, sensitive financial discovery, investigating company funds, accounting issues. Right now, no accounting has occurred, no discovery's occurred. It's all Mr. Zurich's word right now to this Court. No merits base determination has occurred at this point. So granting authority now to liquidate, that could irreversibly alter the parties rights before all of those claims are litigated. So we do support the preservation, the authority to preserve, we do support operational authority, accounting authority, lender communications, leasing authority, reporting authority, but we do not support automatically dissolution, automatically

liquidation, asset sales outside of the ordinary course for distribution of liquidated proceeds because those matters should be determined by the Court first.

THE COURT: All right. Thank you, sir.

MR. GOLDBERG: And I'll leave it there, Your Honor.

MR. ZURICH: Your Honor, if I can respond.

THE COURT: Go ahead.

MR. ZURICH: So the Court, as you're aware, has really broad power. Both under 14.2.430 (sic) to dissolve whenever there's danger and deadlock. And the plaintiff is moving here both under the statute that provides for dissol --

THE COURT: Mr. Zurich, I'm not dissolving today. That's not gonna happen.

MR. ZURICH: Okay.

THE COURT: We're nowhere near that.

MR. ZURICH: So --

THE COURT: So this is solely receivership and preservation and trying to decide how to proceed from there.

MR. ZURICH: So under Lankford versus Milhollin, a Supreme Court case in Georgia, there the Court directed that the properties be sold and that the funds be held pending trial. So we can certainly have a trial to go through the various allegations. The question is, should the Court limit the receiver's power in the context where there's deadlock, where there's debt coming due, where there's

allegations of waste and fraud, or should the receiver be allowed to do what the receiver thinks is in the best interest of the company. And I think the Court has broad power at any stage in the case to do that. In addition, Your Honor, the defense counsel raised a number of issues relevant to asset transfers, and I know that that's not the purpose of the hearing today. But the allegations -- so I'm gonna limit it to -- very short, but the allegations that were contained in the brief, and the allegations that defense counsel made to this Court are frankly shocking to me. And I will tell you why. The company, as I said before, maintains a cloud drive that Mr. Neiswenter has full access to, that contains all of the bank statements and copies of everything that's been done. So I'm not sure if Mr. Neiswenter didn't provide this information to his lawyer or he did and they proceeded anyway, but I can tell this Court that there's no 3.9 million dollars that moved and they know that. The amount of money that moved was approximately 1.8 million dollars, and that moved essentially from checkings to savings. Now the reason it went through my trust account is because after I filed the motion for receiver, I got a phone call from the bank saying that Mr. Neiswenter was going in trying to access the accounts. Now in the entire time I've done business with Mr. Neiswenter, he's never had access to the accounts. He's

never moved money. He's never ordered a check, done an ACH, done a wire transfer, done a distribution, never. The only person in the company that manages the money is myself, and we can get into reasons why later. That's not relevant, and I have consistently managed the money. And what I found out that he was trying to access and add his name to the accounts, I took the step to move liquid funds into my trust account until they could be properly deposited with the treasury. The treasury holds weekly auctions for T-bills, which is where we keep our money. And in the next two successive treasury auctions, those funds were placed into the treasury account. They were moved into my account for safekeeping. I am an officer of the company. I did what I thought was in the best interest of the company. And I have --

THE COURT: So where's the money now?

MR. ZURICH: The money is with the treasury.

THE COURT: Okay.

MR. ZURICH: In the company account at the treasury.

THE COURT: How much money is in that account?

MR. ZURICH: So that account contains money not just for the companies that are in Georgia, but for companies that Mr. Neiswenter and I have even outside the State of Georgia. It has been our business practice from day one to hold excess funds in a Tennessee entity that we both own

50/50 because there's better State tax treatment in Tennessee than in Georgia. That's what we've always done, right or wrong. Money has always moved between entities. Money has always been put into savings, and Mr. Neiswenter's never objected to it. Your Honor, --

THE COURT: I'm not saying anybody's done anything right or wrong. I just wanna know what the dollar figure is. How much money's in that account that is related to these entities.

MR. ZURICH: About 1.8 million dollars, Your Honor.

THE COURT: Okay. There wasn't any pre-existing money in there as related to these entities before?

MR. ZURICH: There were funds that were in that account before, yes. The funds got transferred by me back from treasury to the bank because the bank said if we increased our balances they would lower our fees and they were charging some pretty substantial fees. Since that time, the bank's been paying us less in interest and the treasury's are yielding more. I'm a person that manages money and makes those decisions, and so the funds were moved back. That's not really at issue. What I have an issue with --

THE COURT: Well, it is for me in this moment, so stick with me.

MR. ZURICH: Fair enough.

THE COURT: 1.8 sitting somewhere, right?

MR. ZURICH: It's sitting with the United States Treasure, that's correct.

THE COURT: Is there any other money that you've moved out of there that has gone into your trust account or any other account that you maintain that is the property of the entities?

MR. ZURICH: There's no money in my trust account or in any account other than company accounts for company funds.

THE COURT: Okay. What's your proposal when the receiver comes in as to access to that treasury money?

MR. ZURICH: Full access.

THE COURT: Okay.

MR. ZURICH: Now, but Your Honor, if I can, because -- Ms. Bell didn't get back to us as to whether or not we could have witnesses appear remote or not --

THE COURT: I don't think --

MR. ZURICH: -- I have an affidavit, Your Honor, but

THE COURT: -- I don't think we need witnesses on all that. We are solely as to the extent of the powers at this point in time.

MR. ZURICH: So the purpose here, Your Honor, is to address my concern that Mr. Neiswenter has had full access to the company accounts by virtue of our Google drive system. His lawyer has represented with the Court that he doesn't have access. His lawyer has represented to the

Court that 3.9 million dollars moved when it's not the case. And they have the evidence to show it. Beyond that, Mr. Neiswenter had a conversation with our bookkeeper who handles reconciliations and account statements and has worked with us for about five years. Her name is Christine Perez, and she can't be here, but she submitted an affidavit because she's shocked by the allegations that Mr. Neiswenter's attorney represented to this Court. And she's read his brief, and I can just quote some of what she has to say, but she says that --

THE COURT: I don't know that that helps me on the breadth of the issues as to power or which receiver.

MR. ZURICH: Fair enough, Your Honor.

THE COURT: All of that goes to his position's wrong and he's not told you the truth, and that goes into credibility, impeachment, all the above down the road. We're not there today.

MR. ZURICH: Fair enough.

THE COURT: So as far as it sits, let's transition into the second issue of the who, and then I'll tell you guys where my head's at. You've got -- what was the name of that entity again?

MR. ZURICH: So GlassRatner, Your Honor.

THE COURT: GlassRatner. That's right.

MR. ZURICH: So I can tell you that GlassRatner, and

I've submitted the evidence into the Court. They've handled billions of dollars in debt and properties. The specific receiver, Adam Brown, has been a receiver in 50 cases all across the country including a substantial amount in Georgia. He's routinely testified as an expert witness in damage calculations. It's a large firm that has accounting and legal and property related experience. I've also submitted multiple other courts that have approved them to act as a receiver, and that's including cases for Comerica Bank out of Atlanta. That's including cases involving Federal and National Mortgage Association, FNMA, quasi-government entity, has them working as a receiver. I've spoke to them. They're extremely knowledgeable. Generally, in a receivership proceeding, a receiver will charge an hourly fee and a disposition fee. Now in our particular case, just in the state of Florida when we have 20 or 30 million dollars of property to sell, but there's also receivership actions that I've filed in numerous states, six so far. And this receiver has the capacity to work nationwide to act as the receiver for all of these actions. And they have agreed to waive the disposition charge that they normally would otherwise charge. So it's a very well respected firm. They've done billions of dollars worth of receivership. They've got the support personnel to be able to work on this case. They've got the economy's scale and

efficiency to act as the receiver nationwide with the other actions that are filed and awaiting on service which has been a little bit of an issue, and I think it makes sense especially considered that oftentimes money has moved from one company to another for various reasons.  So to have one receiver that is then empowered to handle and report to the courts I think adds a layer of efficiency, just like we had the situation with the treasury where they're gonna need to have access to an entity that's not a Georgia entity and then decide whether they wanna have those funds held; do they need to have them apportioned, so they have the qualifications, they have the experience and the moving party, and there's also -- it's a good engagement letter, and there's efficiency involved.

THE COURT:  All right.  Thank you, sir.  The issue two.

MR. GOLDBERG:  Yes, Judge.  I actually know that firm. I think they are a well-respected company.  I think our firm has worked with them before.  I think for these -- for this particular property and having spoken with colleagues back here at James Bates, they're more than capable of handling this.  It's my understanding that Mr. Kennedy, he's worked on matters on the national scale.  I believe there was a bank that he's worked as receivership for in many different states, so I don't think that that's an issue at all for them.  I think that one of the most important things about

having them as a receiver in this case is that they also have a local presence here. That if they are able -- if something comes up or they need to go and investigate the property, look at the property, they're able to have somebody boots on the ground. They're here in Macon, and I think that that's an important aspect. We're all for having a -- if Mr. Zurich wants to have a nationwide receiver where everything goes through one receiver, I think their firm is capable of doing that. If he wants to agree to that, we're more than capable, or more than happy to agree. Actually, that would make things a lot more efficient if Mr. Zurich would agree to have everything kinda wrapped up into one because he has filed actions in many, many different states, and I think if Mr. Zurich consents to that and agrees, then I think that that's something that we would be fine with, and would make things a lot more efficient for everybody. That seems to be what he's implicating by saying that GlassRatner can handle things on a national scale, so we're -- we've actually discussed that previously, had not come to an agreement, but we would absolutely be for that to make it easier.

THE COURT: Well, and we've got some issues I think we can all realize, that there are other judges in other jurisdictions that may not necessarily go the same way, and I don't know that we can plan for something that is still

very, very fluid in other jurisdictions. I'm not limiting it, whoever I pick, but as far as their ability to serve in other areas, but I'm not necessarily gonna issue any sort of order that appoints whomever it is, be it, you know, Senator Kennedy and his firm or GlassRatner in other states, in other matters that don't exist right now. So I'm gonna leave that up to those judges, either adopting what I do here, or going in a different direction. Hate to say it, but I'm gonna put that ball in their hands as to the following decisions, not the initial decision. I see the economies of scale, and I do think it's important. All right. Y'all wanna make any final comments before I make a decision here?

MR. ZURICH: Your Honor, part of my frustration is that the defendant continues to try to exert control, and I think an impartial receiver properly empowered is the right course of action. I have not had a chance to ask, or been provided information on what properties this receiver is involved with in the county. They may be involved with competing properties. You know, it's the receiver's jobs to make decisions. They can engage management; they can engage leasing; they can engage sales. The receiver's job is to be responsible and strategic. And it doesn't need to be a local firm. It needs to be an impartial firm that has the scope and capability to handle this company. Keep in mind

this company is not just property. This company in one of the exhibits I didn't get to is about litigation. This company is involved with almost a dozen active cases. Some of them involve claims for millions of dollars in damage including Target Corporation, which is being -- which is headed for trial in first quarter of next year. There's slip and fall cases; there's (unintelligible) cases. The entity has to have the capacity to make choices and make decisions on a whole host of litigation, running the property, selling the property, reporting to the Court, managing money. I have not had, nor have I been provided any information on this receiver's qualifications, but on GlassRatner, I have. They are more than qualified; they are impartial. I have no connection with them. We have an engagement letter that I have in the file that can be signed. I have a proposed order appointing them, and given that I'm the moving party, and given that there's been all kinds of allegations of breach of fiduciary, to allow the non-moving party to pick the receiver at the same time while they're trying to control and object to what the receiver does would make me very concerned. Thank you, Your Honor.

THE COURT: Well, I appreciate that. Certainly I'll be the one picking, not them. I mean, you're both making recommendations, and then I have to make a choice, either one of these two or a third. All right, your final comment.

Do you have anything?

MR. GOLDBERG: Your Honor, I think just to briefly address some of the points. I know that James Bates is a well-respected firm in Macon area, and that -- to the extent there's a question of whether they can handle litigation, I think that that is not an issue. I know that firm regularly handles litigation. I do not have any sort of personal connection to them. I was recommended them by a colleague and I've reached out to them, and I actually invited Mr. Zurich in the process to reach out to them and speak to them as well. I did respond to his emails about some of the questions he asked which I thought were fair questions. And I mean, they're here right now if he wants to ask them any questions. They're sitting back there.

THE COURT: Senator Kennedy, you available?

MR. KENNEDY: Yes, sir.

THE COURT: Would you like me to put him under oath and bring him up? I mean, I don't know how formal we need to make that.

MR. ZURICH: So I guess, Your Honor, if you're willing to appoint GlassRatner, there's no need. If you're inclined to appoint them, then yeah, I'd like to ask him some questions before that happens.

THE COURT: I've got a -- this is a -- come on up, Senator. This is a local -- well, let's just say Macon-Bibb

County has a lot at stake in the success of y'all's project out there in the Eisenhower corridor, and Presidential Parkway was a huge change from the indoor mall that we all call the old mall back in the day over there not too far from where y'all's property was built. We were all glad to see it, and things like Best Buy and big entities to come in. So we're -- we want to see success whatever that means, whether that means that goes to another entity, as you're asking for, sir, and dissolution, or whether that means continuation. I don't know yet. Senator Kennedy, I'll get you to raise your right hand if you don't mind.

(WHEREUPON MR. KENNEDY IS SWORN IN BY THE COURT)

THE COURT: Go ahead, counselor.

CROSS EXAMINATION

BY MR. ZURICH:

Q So to what extent in this county have you acted as a receiver for a property like Eisenhower Crossing, and when I say a property like Eisenhower Crossing, I'm talking about something that's about a half a million square feet on about 50 acres.

A So Mr. Zurich, right?

Q That's correct.

A So you limited your question to Bibb County, and so I would -- and to give you the fullness of an answer, my receivership work and experience really goes back over 25 years now all around the state, federal, and superior court actions

here in Georgia. If you limit it just to Bibb County, I've had a hotel that I was the receiver of, and I'm trying to remember, sir, other properties just in Bibb County, but I think you're looking for understandable experience levels, and so if you look at my experience, which is included being the receiver of a mortgage company that ultimately wound up having hundreds of properties across the southeast that I then was in charge of liquidating, commercial and residential property that took a number of years. I'm currently serving as a federal receiver in a matter that was a company that had 76 locations around the country from the west coast, northeast, all the way to Florida. Most of those were leasehold interests rather than actually owned, but had the responsibility of a tenant in a wind down operated the company for a short period of time and then wound that down. Currently serving as a court-appointed receiver for the Superior Court of Fulton County, which is Atlanta, in which they were -- of a trust which has two primary assets if the receivership is not expanded further. One was a 170,000 square foot commercial building, I think four or five stories in Connecticut and some coastal property and largely an island off the coast of Florida. We managed, operated the property in Connecticut and liquidated that. That's actually been during the course of this past -- in the past eight or ten months that we liquidated that. We had the property in Florida currently being marketed. And then the other experience over the course of the

last 25 plus years has included everything from management of cemeteries around the State for a Texas-based company to shareholder deadlock cases to --

MR. ZURICH: Your Honor, I need to object here. The question I asked was not for the witness's entire history. The question I asked was has the witness managed --

THE COURT: No. I heard the question. The spirit of what you're trying to ask is why are you the appropriate person though? I mean, and that's what I want to know is whether or not this firm is the appropriate person.

MR. ZURICH: So what I've heard is that the witness managed a hotel. It's not an apartment building; it's not an office building; it's not a commercial shopping center. So --

THE COURT: I think you stopped listening after that. I specifically wrote down that he managed 170,000 square foot commercial building that was approximate four to five stories in Connecticut, and that's in one trust.

MR. ZURICH: Again, Your Honor, we are not talking about a multi-story, 100,000 square foot building. We are talking about a power commercial --

THE COURT: Okay. That's argument as to why he's --

MR. ZURICH: -- shopping center that's half a million square feet.

THE COURT: Mr. Zurich, you've talked over me a number

of times. I'm gonna stop you from that. That's argument as to why this isn't the right guy, okay?

MR. ZURICH: Okay.

THE COURT: Do you have any other questions as to -- that you'd like to ask him that --

MR. ZURICH: Yes.

THE COURT: Okay. Go ahead and do it.

Q MR. ZURICH: So if you're empowered as a receiver and given discretion from the Court to take actions in the best interest of the company, knowing there's mortgages coming due, walk me through how you'd evaluate whether or not you'd recommend that the property be continued to operate or be sold. And if continued to operate, explain to me what you would do with the coming debt maturities.

A Well, the first thing, Mr. Zurich that I have to do that any responsible receiver would do would come in and triage the situation and ask questions of the owners. I would meet -- hopefully individually in person with each of you and determine what the circumstances are surrounding the property. You triage the property by learning are there immediate threats. Number one, how about the property taxes. Number two, is the insurance paid. Number three, are there any potential environmental concerns with the property. Number four, is there any pending litigation. Number five, is there any threatened litigation; and go down my normal checklist of things that I triage from the very

beginning to determine are there threats to the value and equity to the property.  Number two, is there anything that might impair the continued operations of the property, and specifically when you're dealing with tenants, reach out to the tenants, let them know that a receiver has been appointed and find out what their concerns are so that those are addressed.  Those are the things that you do on an immediate basis to learn what the immediate threats are.  The next phase -- your question was about sale, whether or not to sell the proper --

Q     My question was given there's significant mortgage debt coming due in three and a half months, what would your firm -- how would you analyze, and what actions -- walk me through the process of what you would do to deal with the maturing debt that's coming due in three and a half months on a major commercial shopping center?

A     We would engage all the lenders to determine all the details of the facilities that were put in place.  What I've heard today are largely two.  One for eight and a half million, and one that's 700,000, or I think I heard --

Q     So when you say engage the lender -- I'm trying to understand maybe more specifically, so these are --

A     It's the same thing that I've -- excuse me.

Q     These are loans that have personal recourse.  So I'm wondering what you would propose to do with a full recourse loan with a guarantor who's unwilling to make any modifications to

that debt. Is it your testimony that somehow you would get the bank without the consent of the guarantor to enter into a loan modification; is that correct?

A Mr. Zurich, any responsible receiver would engage, as I said, would engage with a lender, learn all the details of the facilities as they were originally contemplated, find out what the status is, learn about what the bank's attitude is, then engaging with and learning from the owners what the preferences are, and making through the best business practices and business judgment, make a determination of what can be done going forward. Can I, or anyone that would serve as a receive tell you exactly what the loan modification or renewal, non-renewal, events of default, dealing with those defaults would look like, no. I don't have a crystal ball. What I do have, though, is the experience of having dealt with banks, both representing banks as a lawyer, both arguing for and against the appointment of a receiver, and as serving as a receiver and dealing with debt facilities on numerous basis over the many years. I think what you're -- if I can say this, I think what you're saying is that you are wanting me to address how is one going to reach a landing spot with a debt that's coming due in December that I think, I gather that there must be some personal guarantees involved that you are not willing to do at this point on a renewal. That will have to be negotiated.

Q So again, I really have two specific questions. One,

everything you just said in dealing with the bank and trying to get the lay of the land, about how much time in your experience does that typically take?

A It depends on the circumstances. What I usually do is go in, and most of my experience, Mr. Zurich, has been going in on an emergent basis, and so we will engage with and find out as much as we can about the lay of the land as quickly as the banks will engage with us.

Q So are you aware -- strike that. So I'll give you a hypothetical which applies to this case. So in the event the receiver's appointed, that's a default under the loan documents. The bank can take the loan, all eight million dollars and change to a default interest rate, not three, maybe 23, so your first step would be to contact the bank, let them know you're a receiver and essentially admit that the loan is in default, then you would propose after that to take the limited window that we have left to try to sell the property and negotiate, try to negotiate something with the bank? And after that --

THE COURT: I think you're presuming that I'm gonna give the receiver the power to sell the property. I haven't said that.

MR. ZURICH: So if Your Honor does not grant the receiver to sell the property, and Mr. Neiswenter refuses to sell the property, and the company is damaged because the value drops or the loan goes to a default interest rate,

then Mr. Neiswenter has to be responsible for his choices and whether or not they were in the best interest of the company.

THE COURT: As do you.

MR. ZURICH: As do I.

THE COURT: So we've got that. But my point is is you're asking questions about hypotheticals when I haven't even ruled on the extent of the powers that a receiver, much less this receiver might have.

MR. ZURICH: So in order for me to question the receiver better on the receiver's experience and qualifications, it might be beneficial for me to understand that. But if Your Honor's not in a position to make a ruling today, and I just have to question the receiver, then I have to take into account that the Court might empower him to do that, and part of my concern is that this particular receiver doesn't seem to know in a normal course in a recourse loan that filing a receiver is in the event of default. My problem with this receiver is that no bank with a full recourse loan is going to make any modification without the consent of the guarantor because they care about the guarantor. That's why the bank did an out-of-state loan. Only because the guarantor was behind the loan. So without the guarantor's consent, bank's not gonna do anything, and I don't think the receiver can get other debt.

Certainly the receiver hasn't given me any testimony that he's able to obtain debt on the property without either a guarantor or without someone to sign (unintelligible) on a non-recourse loan.

THE COURT: Okay.

MR. ZURICH: And if the receiver has no plan to get that --

THE COURT: All that's argument.

MR. ZURICH: -- that does not seem --

THE COURT: This is the second time I've had to tell you to stop talking over me. All that's argument. I won't tell you not to talk over me a third time. I'm gonna go straight to contempt. Do you understand?

MR. ZURICH: Yes, Your Honor.

THE COURT: Thank you for that. Now, as it sits right now, the questions that we have here as to his experience in general and receivership, not hypotheticals, but under -- not what his plan is, because you haven't brought GlassRatner for me to be able to do that, so to the extent that we have that, do you want to take any -- ask him any other questions about his general qualifications to serve as a receiver dealing with a property of this type?

MR. ZURICH: No, Your Honor, but I'd ask that if you -- if you're going to appoint the receiver then we have a subsequent hearing where I can bring a representative of

GlassRatner in so that you can hear properly from the receiver that the moving party is requesting be hired, which is an extremely reputable firm. They were not able to be here on short notice, and opposing counsel asked Ms. Bell if you would permit witnesses to appear by phone or by Zoom. There was no response. And I certainly could have them come down, and so you could consider them properly for the appointment. But we were not provided the opportunity today.

THE COURT: Well, that's not entirely fair to the Court. You've been provided an emergency hearing at your continued insistence for it. You tried to have it contrary to Georgia law prior to service and notice to the other side. And it was only after I gave you notice of a case that specifically says doing so is error that you decided that it was okay to have them served and bring them in. Secondly, as it sits here today, you've been afforded every opportunity to have people here. Certainly opposing counsel has brought in Senator Kennedy and Mr. Nichols to the extent that they're here. You tell me that you had -- that GlassRatner was unavailable for today, and I don't have any information that you were looking for other days for the purposes of rescheduling this, and time seems to be of the essence for the purposes of moving forward here today.

MR. ZURICH: So actually --

THE COURT: We can't have it both ways.

MR. ZURICH: Can I -- can I -- so actually, Your Honor, I had proposed multiple dates when I could have witnesses in person available. Every date I proposed was objected to by defense counsel. The only date that I had after I waited over three weeks for an emergency hearing was this date. My witnesses were not available on this date. We requested if they --

THE COURT: Waited over three weeks for an emergency hearing. One more time, what you proposed was illegal. It was contrary to Georgia law, and any action that was taken on that day without notice to the other side would have been set aside from a case that arose out of this Court. Not this judge, but this Court.

MR. ZURICH: Your Honor, I --

THE COURT: It could not have happened.

MR. ZURICH: I appreciate your pointing that out to me. What I'm objecting to is the fact that I could get a hearing date that opposing counsel would agree to where I could have witnesses appear. And that when we requested witnesses appear telephonically or by video, we got no answer.

THE COURT: When was that?

MR. ZURICH: Defense counsel is the one who wrote the email, cc'd me, and they probably remember better than I do. It'd been the last few days.

MR. GOLDBERG: And Your Honor, this is exactly why the reason I think this receiver is the perfect receiver to be here because they're close by and they're here. And they're available to -- whenever we need them.

THE COURT: All right. Any final points for this witness? Do you have any cross?

MR. GOLDBERG: No, Your Honor.

THE COURT: Direct? I don't know. I mean, at this point in time, we're just going through it. I'm trying to give y'all as much leeway as I can.

MR. GOLDBERG: I have one.

THE COURT: All right.

DIRECT EXAMINATION

BY MR. GOLDBERG:

Q Thank you, Mr. Kennedy, Senator Kennedy.

A Yes, sir.

Q I have one I think simple question, and that is based on what you've heard today on the facts as you know them, the property at issue, the issues in general that have been discussed, do you feel like in your experience that you would be able to serve in a capacity as receiver and make the best business judgments neutrally as a receiver, and really the best interest of the company and the parties as they sit here today?

A Yes, sir. I do. And based on my years of experience, the breadth of experience, not just serving as a receiver, but

also the work that I do in commercial litigation, in representing clients, understanding what those needs are, what those demands are, I do as you've sort of alluded to, our firm between my law partner, Jack Nichols, and others that we have, I have a number of lawyers that have significant experience in the receivership realm, either being part of my receivership team. I also have CPAs that I regularly use that are typically make themselves immediately available to me to come in with me on day one to start doing -- sometimes it's a forensic analysis, sometimes it's an operational ongoing analysis, depending on what the circumstances are. And maybe I'll offer one other thing, too, for Mr. Zurich, and I think you may have alluded to this, but there was a question of my relationship with you or your firm. And I met you when I came in today. I don't think we've ever spoken. I assume that's your client, I'd never met him, and I don't know anyone in your law firm either.

MR. KENNEDY: So to the extent there's a question there, Your Honor, I have no association with the lawyer or the parties asking for me to appear in front of you for consideration of appointment.

THE COURT: All right. Thank you, sir.

MR. KENNEDY: Yes, sir.

THE COURT: All right. You can step down, sir. Please be careful as you come down. I wanna take a look over the evening as to the -- particularly the breadth of the powers

that are afforded. I share some concerns on both sides as to the need for a receiver to come in to be certainly immediately proactive. We've got some major deadlines that are looming. I understand Mr. Zurich's position is is that those deadlines certainly something that need to be addressed, and I share that concern. The question is how we share it. There is a little bit of the cart before the horse in asking me to effectively out the gate rule on dissolution or otherwise rule for immediate sale of a piece of property, but before I say one way or the other, I wanna do some thinking on that. Along with that, I'll do some thinking on what I've heard today, particularly as to the merits of Glass-Ratner. And I believe you said his name is Adam Brown; is that correct?

MR. ZURICH: That's correct, Your Honor. In your booklet if you want, there's his bio from history, engagement letter, everything regarding the firm.

THE COURT: Any objection to me reading the -- what exhibit is that in the book?

MR. ZURICH: So I believe that's 44 -- 44a, b, c, and d.

THE COURT: Okay.

MR. ZURICH: And maybe e. It's got information on Adam Brown who's the senior managing director. It's got information on all the court cases that they're involved

with, the billions of dollars of real estate that they handle, and worked out. It’s also got copies of proposed orders giving them authority to take actions and preventing interference which I’ve modeled my order on. That’s also in the list of exhibits.

THE COURT: Gotcha. Any objection to me looking at 44 over the evening?

MR. GOLDBERG: I have no objection, Your Honor. And also, I was provided a proposed order by James Bates as well, I have a proposed order that I can present to you as well and --

THE COURT: And your order was which exhibit?

MR. ZURICH: So there is a Table of Contents in the beginning, but it is 44d -- no, I’m sorry.

THE COURT: Let me do it this way. Do both of y’all mind emailing me your proposed orders?

MR. ZURICH: I do, Your Honor.

THE COURT: That’ll be the easiest thing. That way I’d have it in Word.

MR. ZURICH: I can give that to you. If I can say one thing briefly in closing.

THE COURT: Okay, go ahead.

MR. ZURICH: I’d ask the Court to consider if you limit the receiver’s power. The Court’s not set up to handle a series of emergency requests or injunctions, and given the

severity of the state that the property's in, and the amount of choices that have to get made, if this Court properly empowers a receiver to do what they think is in the best interest of the company, we can focus the balance of the litigation on the issues of breach of fiduciary, get the money sold, get the property into the hands of somebody who has the capital to take care of it. Like you said before, it's important to the community.

THE COURT: It is.

MR. ZURICH: Get somebody who has outreach to national tenants who can get the center rented and take care of it, fix the deferred maintenance. If Your Honor limits the power of the receiver and then we have debt going to a default that can't be cured, imagine how the Court is gonna have to get involved on an expedited basis in trying to sort through all those issues, which really is not generally in the Court's province, or the Court has time for, which is why giving the power to the receiver, whoever the receiver is to make the choices to manage the property and dispose of the asset if they feel it's in the best interest of the company removes the Court from that responsibility. Thank you, Your Honor.

THE COURT: Is there something you'd like to add?

MR. KENNEDY: Yes, sir. May I? Judge, if I may, just very briefly -- take the stand?

THE COURT: No. Just grab a microphone if you will and then certainly there may be some follow-up comments by the others.

MR. KENNEDY: Thank you, Your Honor. Judge, I thought I would offer this from my experience that might assist in the order that you draft for whomever and it also may provide some -- little bit of solace to the parties. In my experience over the years, even when the order of appointment authorizes in the cases where I've been a receiver, or my client that's been appointed has been the received, has been authorized to sell real estate, it has been my practice, I think without exception, to always file either a petition for direction or a motion to sell property and bring that before the Court. That does two things. One, it makes sure that the Court is aware of what the receiver wants to do, which obviously every receiver serves at the pleasure of the Court. When you're talking about the transfer of title to dirt and real estate it's a big deal, and when I have served as a receiver before selling real estate, I've always filed a petition for direction so that it does two things. It lets the Court know and have an opportunity to weigh in, but it also let's the parties object to, if they don't like the sale or they don't like the terms of the sale, it gives a chance for those parties to bring those concerns to the Court so ultimately you as

the Judge are involved. Selfishly, and it also protects my rear end as a receiver, because I have then brought that issue before the Court, and I don't have to worry about a party later challenging the authority, even though granted in the order of appointment, somehow there was some limitation or concern that the receiver didn't actually have the authority to do that, and when you're dealing with that issue and real estate prospectively, it can be a big problem. So that may, Your Honor, if the Court were to follow that, or if I were the receiver, that would functionally provide the receiver with the authority and an eye to award sale or potential sale, but nonetheless those details would be brought to the Court ahead of time and either party would have the right to be fully aware and object to the terms of a sale.

THE COURT: All right. Fair enough.

MR. ZURICH: Can I ask the witness a question?

THE COURT: I think I'm past that point now. I appreciate it. All right. Any final comments?

MR. GOLDBERG: No, Your Honor, I think, really just a final statement, just that I think we have made clear our position that we believe that the claim should play out, we should have our opportunity to file our counterclaims, to not be too hasty in awarding all this authority to the receiver for selling the property, dissolving the company.

I think you've already made clear that's not happening, or may not happen, and I think a reasonable approach that Mr. Kennedy is that it would essentially be put up to the parties by motion or petition. I don't think we're necessarily opposed to that as long as everybody has an opportunity to weigh in on each of those, like a major decision like that. So that's how we'd leave it.

THE COURT: All right. Y'all have given me a lot to think about. Thank y'all for the input. Thank you, Senator Kennedy and Mr. Nichols for being here. I'm going to do a little thinking tonight. Oddly enough, some hybrid solution is why I want to look at the powers for receivers, something where both of your concerns are addressed, whether it's the ultimate power, if there is an emergency situation where a receiver wouldn't have to come back for a lengthy hearing or something like that, but also give some protection for notice and if there is a problem that is emerging. We're in an imperfect situation. And we know that, right? That's why you're here. And so I'm gonna do my best to craft a solution that is as fair as I possibly can to all involved and get y'all some guidance in the next 24 hours, okay?

MR. ZURICH: Your Honor, I have my proposed order, but I also have the proposed order granting the motion to amend. Are you saying that that doesn't need to be signed by the Court? It may just need filed.

THE COURT: Your amended complaint's filed.

MR. ZURICH: Okay.

THE COURT: Yeah, that's -- for our purposes, I know you practice elsewhere, but as long as there has not been a pretrial order, and as long as it's not abusive, I mean there certainly could be a scenario, not you, but where somebody could just be continuing to shifting the target. I wouldn't do anything to prohibit that.

MR. ZURICH: Thank you.

THE COURT: I think you're well within your rights to do so. All right. Thank, y'all. If y'all will email those orders. Appreciate you.

MR. GOLDBERG: Thank you, Your Honor.

MR. ZURICH: Thank you, Your Honor.

(Hearing concluded)

CERTIFICATE OF REPORTER

GEORGIA, BIBB COUNTY:

I, Suzanne K. Pieri, CCR, B-2409, CERTIFY that acting in such capacity on August 31, 2026, I reported the proceedings in the above referenced matter, and on the foregoing pages, numbered 2 through 64, both inclusive, have transcribed a true and accurate transcript of the same.

I FURTHER CERTIFY that I am not counsel for nor related to any of the parties; nor am I interested in the event or the outcome thereof.

WITNESS my hand and official seal this 5th day of October, 2026.

Suzanne K. Pieri, CCR

Certificate Number B-2409

CERTIFIED COURT REPORTER
STATE OF GEORGIA
1776
B-2409