IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **Zachary Zurich**,<br><br>Plaintiff and<br>Counterclaim-Defendant<br><br>v.<br><br>**David Neiswenter**, individually, and David Neiswenter as member of all named nominal defendants.<br><br>Defendant and<br>Counterclaim-Plaintiff<br><br>**NEIS Acquisitions 5192, LLC**, a Georgia limited liability company<br><br>**NEIS Acquisitions AUXGA, LLC**, a Georgia limited liability company<br><br>Nominal Defendants,<br><br>**NEIS Acquisitions GA, LLC**, a Georgia limited liability company,<br><br>**NEIS Acquisitions PopGA1, LLC**, a Georgia limited liability company,<br><br>**NEIS Acquisitions 5192, LLC**, a Tennessee limited liability company,<br><br>**NEIS Acquisitions 5192, LLC**, an Illinois limited liability company,<br><br>**NEIS Acquisitions 6433 KY, LLC**, a Kentucky limited liability company, | ) | Civil Action File No.<br>5:26-cv-00388-MTT |

**NEIS Acquisitions 6471, LLC**, a Kentucky limited liability company, )

**NEIS Acquisitions 28232 PA, LLC**, a Pennsylvania limited liability company, )

**NEIS Acquisitions 28382 PA, LLC**, a Pennsylvania limited liability company, )

**NEIS Acquisitions 3502 IN, LLC**, an Illinois limited liability company, )

**NEIS Acquisitions 22298, LLC**, a Texas limited liability company, )

**NEIS Acquisitions 4651 SC, LLC**, a South Carolina limited liability company, )

**FDSTLMO 26945, LLC**, a Missouri limited liability company, and )

**National Property Management Services, LLC**, a Georgia limited liability company. )

Additional Nominal Defendants Joined Pursuant to Rules 13(h), 19, and 20, )

**The Law Office of Zachary Zurich, P.A.**, a Florida Professional Association and )

**2364 TICZ, LLC**, a Georgia limited liability company )

Additional Counterclaim )
Defendants Joined Pursuant to )
Rules 13(h) and 20.

## DAVID NEISWENTER'S AMENDED COUNTERCLAIMS[1]

These Amended Counterclaims amend only Counterclaim-Plaintiff's previously asserted counterclaims. Counterclaim-Plaintiff does not amend or withdraw his previously filed Answer or Affirmative Defenses, which remain operative and are incorporated herein by reference.

Counterclaim-Plaintiff David Neiswenter ("Neiswenter") asserts these Amended Counterclaims against Counterclaim-Defendants Zachary Zurich ("Zurich"), The Law Office of Zachary Zurich, P.A. (the "Law Office"), and 2364 TICZ, LLC, arising from the unilateral control and transfer of Company funds, the exclusion of Neiswenter from Company accounts and financial information, the use of trust and other accounts outside the Companies' ordinary operating structure, interference with Company governance, and related breaches of fiduciary, contractual, statutory, and equitable obligations.

[1] These Amended Counterclaims omit the claim previously asserted under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. The federal RICO claim is omitted voluntarily and without any adjudication on the merits or concession concerning its factual or legal basis. Except for conforming revisions resulting from that omission, the remaining counterclaims are unchanged.

Each Counterclaim Defendant is referred to individually by name and collectively, where appropriate, as the "Counterclaim Defendants." The claims against each Counterclaim Defendant are asserted only to the extent supported by the allegations applicable to that Counterclaim Defendant.

## General Factual Allegations

### I. Parties

1. At all times relevant hereto, David Neiswenter ("Neiswenter") and Zachary Zurich ("Zurich") were equal owners of multiple limited liability companies and affiliated entities holding interests in commercial real estate, banking relationships, operating accounts, and related assets (collectively, the "Jointly Owned Companies").

2. The Jointly Owned Companies include:

(a) NEIS Acquisitions 5192, LLC, a Georgia limited liability company;

(b) NEIS Acquisitions AUXGA, LLC, a Georgia limited liability company;

(c) NEIS Acquisitions PopGA1, LLC, a Georgia limited liability company;

(d) NEIS Acquisitions 5192, LLC, a Tennessee limited liability company;

(e) NEIS Acquisitions 5192, LLC, an Illinois limited liability company;

(f) NEIS Acquisitions 6433 KY, LLC, a Kentucky limited liability company;

(g) NEIS Acquisitions 6471, LLC, a Kentucky limited liability company;

(h) NEIS Acquisitions 28232 PA, LLC, a Pennsylvania limited liability company;

(i) NEIS Acquisitions 28382 PA, LLC, a Pennsylvania limited liability company;

(j) NEIS Acquisitions 3502 IN, LLC, an Illinois limited liability company;

(k) NEIS Acquisitions 22298, LLC, a Texas limited liability company;

(l) NEIS Acquisitions 4651 SC, LLC, a South Carolina limited liability company;

(m) FDSTLMO 26945, LLC, a Missouri limited liability company; and

(n) National Property Management Services, LLC, a Georgia limited liability company.

3. Separate from the Jointly Owned Companies, NEIS Acquisitions GA, LLC is owned solely by Neiswenter and holds an ownership interest in portions of the real property that is the subject of this action. Additionally, separately from the Jointly Owned Companies, 2364 TICZ, LLC is owned solely by Zurich and likewise holds an ownership interest in portions of the real property that is the subject of this action. (hereinafter NEIS Acquisitions GA , LLC and 2364 TICZ, LLC may be referred to as the "Separately Owned Affiliate Entities" herein).

4. Unless otherwise specifically identified, references herein to the "Company" or "Companies" shall mean the Jointly Owned Companies collectively,

together with their assets, bank accounts, money-market accounts, reserve accounts, treasury accounts, financial records, business operations, and property interests.

5. Additional Counterclaim Defendant The Law Office of Zachary Zurich, P.A. is, upon information and belief, a professional association organized under the laws of Florida.

6. At all relevant times, Zurich acted as an owner, officer, shareholder, employee, agent, or representative of the Law Office.

7. Upon information and belief, the Law Office maintained or administered one or more bank, trust, escrow, business, or financial accounts through which Company funds were received, held, transferred, administered, or retained, including an account ending in 642187.

8. To date, Counterclaim-Plaintiff has not been provided sufficient information to determine conclusively the legal title, precise account classification, authorized signatories, or complete account history for account ending in 642187. Zurich nevertheless described the account in writing as "my trust account," and available banking records reflect transfers of Company funds into and out of that account.

## II. <u>Jurisdiction and Joinder</u>

9. This Court does not possess subject-matter jurisdiction over the claims asserted by Plaintiff pursuant to 28 U.S.C. § 1332.

10. The Amended Counterclaims do not assert any claim arising under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, and do not provide an independent basis for original federal-question jurisdiction under 28 U.S.C. § 1331.

11. If this Court were to find subject-matter jurisdiction is proper, venue is proper in this Court because a substantial portion of the events, transactions, property, conduct, and disputes giving rise to the claims and counterclaims occurred in Bibb County, Georgia, and because the real property that forms a substantial portion of the controversy is situated within this District.

12. Pursuant to Federal Rule of Civil Procedure 13(h), Counterclaim-Plaintiff joins additional parties necessary for the adjudication of the counterclaims asserted herein. Rules 19 and 20 govern such joinder.

13. Pursuant to Rule 19(a), the entities identified in the caption as Additional Nominal Defendants claim interests relating to the funds, bank accounts, reserve accounts, distributions, investments, accounting records, intercompany transfers, real property interests, and governance matters that are the subject of the claims asserted herein, and complete relief cannot be accorded among the existing parties in their absence.

14. In the absence of the Additional Nominal Defendants, the Court may be unable to determine the ownership, source, destination, allocation, administration,

accounting treatment, or disposition of Company funds and assets and may be unable to grant complete declaratory, accounting, injunctive, receivership, or equitable relief concerning the entities and property interests at issue.

15. In addition, the claims asserted in these Counterclaims concern numerous transfers, allocations, distributions, reimbursements, investments, reserve accounts, operating accounts, and other financial transactions involving the Jointly Owned Companies and affiliated entities.

16. The Additional Nominal Defendants are therefore joined pursuant to Rules 13(h) and 19 because they possess interests that may be impaired or affected by the adjudication of the claims asserted herein and because their presence is necessary to avoid inconsistent obligations and duplicative litigation.

17. Upon information and belief, the ownership, source, destination, allocation, accounting treatment, and present status of Company funds cannot be determined without adjudicating the rights and obligations of the Additional Nominal Defendants and affiliated entities.

18. Pursuant to Federal Rules of Civil Procedure 13(h) and 20(a)(2), Counterclaim-Plaintiff joins The Law Office of Zachary Zurich, P.A. and 2364 TICZ, LLC as Additional Counterclaim Defendants because the claims asserted against them arise out of the same transactions, occurrences, conduct, transfers, accounts, property interests, and course of conduct that form the basis of the claims

asserted against Zachary Zurich, and common questions of law and fact will arise in the action.

19. The claims against the Law Office concern the same approximately $1,941,000 transfer, account ending in 642187, subsequent transfers through Company operating accounts, Treasury Direct transactions, demands for disclosure and return, and disputed control of Company funds alleged against Zurich.

20. Upon information and belief, the Law Office received, administered, maintained, retained, controlled, supervised, or otherwise exercised authority over Company funds, trust-account funds, transfer proceeds, and related assets that form a substantial portion of the controversy described herein.

21. Upon information and belief, 2364 TICZ, LLC possesses ownership interests in property, funds, accounts, distributions, transfers, allocations, reimbursements, reserves, and related assets that are directly implicated by the claims and counterclaims asserted herein.

22. Joinder of the Additional Counterclaim Defendants promotes judicial economy, prevents inconsistent judgments, avoids duplicative litigation, and permits complete adjudication of the ownership, control, administration, accounting, and disposition of Company assets and funds.

23. Counterclaim-Plaintiff reserves the right to seek joinder of additional persons or entities if discovery reveals additional parties possessing interests in the

funds, accounts, transfers, assets, liabilities, distributions, reserves, investments, reimbursements, or property that are the subject of this action.

## III. Georgia Property and Ownership Structure

### A. *Eisenhower Crossing Tenant-in Common Property*

24. At all times relevant hereto, the parties held ownership interests in multiple Georgia limited liability companies and Georgia real estate assets.

25. One such asset consists of the commercial shopping-center property commonly known as 4628 and 4640 Presidential Parkway, Macon, Georgia 31206, consisting of approximately 99,963 square feet and commonly referred to by the parties as a grocery-anchored shopping center and located in the Eisenhower Crossing shopping area (the "Tenant-in-Common Property").

26. The Tenant-in-Common Property consists of Bibb County tax parcels L0840167 and L0840168.

27. Title to the Tenant-in-Common Property is held through a tenancy-in-common ownership structure as follows:

i. NEIS Acquisitions 5192, LLC, a Georgia limited liability company jointly owned by Neiswenter and Zurich, owns a 60.75 percent tenancy-in-common interest in the Tenant-in-Common Property.

ii. Neis Acquisitions GA, LLC, a Georgia limited liability company wholly owned by Neiswenter, owns a 19.625 percent tenancy-in-common interest in the Tenant-in-Common Property.

iii. 2364 TICZ, LLC, a Georgia limited liability company wholly owned by Zurich, owns a 19.625 percent tenancy-in-common interest in the Tenant-in-Common Property.

28. As a result of the foregoing ownership structure, Neiswenter possesses, directly and indirectly, an aggregate fifty-percent ownership interest in the Tenant-in-Common Property and Zurich likewise possesses, directly and indirectly, an aggregate fifty-percent ownership interest in the Tenant-in-Common Property.

29. The Tenant-in-Common Property is improved with income-producing commercial real estate and is operated through a combination of the tenancy-in-common ownership structure and the Jointly Owned Companies described herein.

30. The Tenant-in-Common Property constitutes the only Georgia real property pledged as collateral securing the City National Bank of Florida loan maturing on December 17, 2026. A true and correct copy of the Deed to Secure Debt, Assignment of Rents and Security Agreement, dated December 16, 2021 and recorded on January 21, 2022 in the real-property records of the Superior Court of

Bibb County, Georgia, at Deed Book 11126, Pages 348–377, is attached hereto as **Exhibit "A"** and incorporated herein by reference.

31. Only parcels L0840167 and L0840168 are encumbered by the deed to secure debt associated with the City National Bank financing relationship. *See* Ex. A.

32. No other Georgia property described herein is pledged as collateral for that loan.

### B. **<u>Eisenhower Crossing Property Owned by NEIS Acquisitions AUXGA, LLC</u>**

33. The parties also jointly own NEIS Acquisitions AUXGA, LLC, a Georgia limited liability company, with each party holding a fifty-percent membership interest.

34. NEIS Acquisitions AUXGA, LLC owns the retail and commercial property commonly known as 4657, 4658, 4659, and 4696 Presidential Parkway, Macon, Georgia 31206 (the "AUXGA Property").

35. The AUXGA Property consists of approximately 320,153 square feet of retail, commercial, parking, access, and ancillary real estate and includes Bibb County tax parcels L0840163, L0840169, L0840170, L0840160, L0910033, L0910051, and M0830285.

36. A true and correct copy of the Eisenhower Crossing Tax Parcel Map, depicting the parcels comprising the Tenant-in-Common Property and the AUXGA Property is attached hereto as **Exhibit "B"** and incorporated herein by reference.

37. Parcel L0840169 forms part of the AUXGA Property and is not owned through the tenancy-in-common ownership structure applicable to parcels L0840167 and L0840168.

38. Unlike the Tenant-in-Common Property, the AUXGA Property is owned solely by NEIS Acquisitions AUXGA, LLC and is not owned through the tenancy-in-common ownership structure described above.

39. The AUXGA Property is not encumbered by the City National Bank of Florida loan secured by parcels L0840167 and L0840168.

### C. Additional Affiliated Entities and Intercompany Relationships

40. The parties also possess ownership interests in additional affiliated entities, including NEIS Acquisitions 5192, LLC (a Tennessee limited liability company) and NEIS Acquisitions PopGa1, LLC (a Georgia limited liability company).

41. Upon information and belief, revenues, reserves, distributions, tenant income, reimbursements, transfers, Treasury Direct investments, trust-account funds, and other monies associated with the Tenant-in-Common Property, the AUXGA Property, NEIS Acquisitions 5192, LLC, the Tennessee entity bearing the

same name, NEIS Acquisitions PopGa1, LLC, and other affiliated entities have been transferred among accounts controlled or administered by Zurich.

42. Upon information and belief, Company funds have been transferred among multiple affiliated entities and accounts without adequate disclosure and without a complete accounting concerning the ownership, source, destination, allocation, administration, and disposition of those funds.

43. The ownership, allocation, source, destination, accounting treatment, and present status of such funds cannot presently be determined without discovery, production of banking records, Treasury Direct records, trust-account records, accounting records, and a complete accounting.

44. The existence of multiple jointly and separately owned entities, multiple real-estate assets, multiple bank accounts, multiple investment accounts, and multiple intercompany transactions makes a complete accounting necessary to determine the ownership and disposition of Company funds and the rights and obligations among the affiliated entities.

45. Specifically, Neiswenter and Zurich each owned a fifty percent (50%) membership interest in NEIS Acquisitions AUXGA, LLC. Neiswenter and Zurich likewise each owned a fifty percent (50%) membership interest in NEIS Acquisitions 5192, LLC, an Illinois limited liability company, which serves as the sole member of NEIS Acquisitions 5192, LLC, a Georgia limited liability company.

46. As equal members of the Jointly Owned Companies, Zurich and Neiswenter each participated in the management and operation of the Companies and each owed fiduciary duties to the Companies and to one another. Those duties included duties of loyalty, honesty, fair dealing, full disclosure, proper accounting, preservation of Company assets, avoidance of self-dealing, and the obligation to act in a manner reasonably believed to be in the best interests of the Companies.

## IV. Neiswenter's Discovery of Undisclosed Company Bank Accounts and Denial of Access.

47. Around approximately the beginning of 2026, Neiswenter discovered that multiple Company bank accounts existed for entities in which he possessed ownership interests and management rights but to which he had not been granted access, signatory authority, viewing authority, administrative rights, or other account privileges.

48. Upon information and belief, Zurich exercised exclusive control over the administration of the Company's banking relationships and account-access rights and maintained multiple Company accounts without affording Neiswenter equal access to those accounts.

49. After discovering the existence of the accounts, Neiswenter contacted representatives of City National Bank of Florida and requested access to the Company accounts and recognition as an authorized signer and account representative.

50. On or about August 6, 2026, representatives of City National Bank of Florida advised the parties that updated signature cards would be circulated to add David (Andy) Neiswenter as an authorized signer on multiple Company accounts maintained by the Companies.

51. The bank communication identified Company accounts maintained in the names of:

a. NEIS Acquisitions 6471, LLC (account ending in 6633);
b. NEIS Acquisitions AUXGA, LLC (account ending in 5063);
c. NEIS Acquisitions 4651 SC, LLC (account ending in 1582);
d. NEIS Acquisitions 22298, LLC (account ending in 1078);
e. NEIS Acquisitions 3502 IN, LLC (account ending in 2041); and
f. National Property Management Services, LLC (account ending in 8734).

52. Prior to receiving the communication from City National Bank, and for unknown reasons, Neiswenter had not been provided access to those accounts and had not been granted signatory authority, administrative authority, viewing authority, online access, or other account privileges with respect to those accounts.

53. The existence of the accounts and the need for City National Bank to circulate updated signature cards demonstrated that Company banking relationships

existed for multiple entities without Neiswenter possessing the access ordinarily associated with an equal owner and manager.

54. Upon information and belief, Zurich had previously exercised unilateral authority concerning the administration of those accounts and the granting or withholding of account-access rights.

55. Shortly after City National Bank informed the parties that Neiswenter would be added as an authorized signer on the identified Company accounts, Zurich sent Neiswenter an email acknowledging Neiswenter's efforts to obtain access to the accounts and stating: "I see you intend to escalate."

56. In the same communication, Zurich advised Neiswenter: "I will not consent to your request to be added to the various company bank accounts you requested" and instructed Neiswenter to withdraw the request submitted to City National Bank.

57. Zurich further advised that if Neiswenter refused to withdraw the request by the end of the day, Zurich intended to dissolve the remaining entities and initiate litigation in multiple jurisdictions, stating that Neiswenter would be required to retain counsel in each state and that Company assets would be turned over to receivers for management and sale.

58. Upon information and belief, Zurich's refusal to permit equal access to Company accounts, coupled with his demand that Neiswenter abandon his efforts to

obtain access, and his threat to pursue dissolution and litigation if Neiswenter persisted, formed part of a broader effort to maintain exclusive control over Company funds, Company records, Company distributions, Company reserves, Company investments, and Company banking relationships.

59. Zurich's refusal to permit access to Company accounts and his opposition to Neiswenter being added as an authorized signer forms part of the conduct giving rise to the fiduciary-duty, contract, accounting, declaratory-relief, conversion, receivership, and Georgia RICO counter-claims asserted herein.

## V. Zurich's Pattern of Financial Control and Exclusion of Neiswenter from Management

60. At all times relevant hereto, Zachary Zurich and David Neiswenter participated in the management and operation of the Jointly Owned Companies and each owed fiduciary duties to the Companies and to one another.

61. Those duties included duties of loyalty, honesty, fair dealing, full disclosure, preservation of Company assets, proper accounting, avoidance of self-dealing, and the obligation to act in a manner reasonably believed to be in the best interests of the Companies.

62. Beginning no later than 2025 and continuing through the present, Zurich engaged in a pattern of conduct that interfered with the rights of Neiswenter and the Companies, including without limitation:

a. restricting access to Company bank accounts and financial information;

b. excluding Neiswenter from Company banking relationships and account administration;

c. denying Neiswenter signatory authority and account-access rights;

d. transferring Company funds without authorization;

e. commingling Company funds and accounts;

f. exercising unilateral authority over Company finances and investments;

g. interfering with Company governance; and

h. utilizing Company assets, personnel, and resources for purposes not jointly approved by the parties.

## VI. Unauthorized Treasury Direct and Trust-Account Transfers

63. One of the most significant disputes concerns Zurich's unilateral removal, transfer, administration, and retention of Company funds.

64. On or about May 12, 2026, approximately $1,994,384.44 was transferred from a Company account into a Treasury Direct account. Zurich unilaterally initiated the transaction, without authorization from Neiswenter.

65. Bank records subsequently reviewed by Neiswenter reflected a transaction identified as "TREASURY DIRECT TREAS DRCT" in the amount of $1,994,384.44. Upon information and belief, those funds were transferred into one or more Treasury Direct accounts under Zurich's control or administration.

66. Thereafter, on or about August 6, 2026, Zurich caused an additional $1,941,000.00 to be withdrawn from a Company money-market account ending in 547561.

67. The August 6, 2026 transaction was reflected in Company banking records as "WEBXFR TO COMM MMA 642187" in the amount of $1,941,000.00. The transfer reduced the available balance of the account to approximately $1,000.30.

68. The August 6, 2026 transfer was undertaken by Zurich without the knowledge, authorization, approval, or consent of Neiswenter.

69. As a result of the May 12, 2026 and August 6, 2026 transactions alone, at least $3,935,384.44 in Company funds had been removed from Company accounts through transactions initiated by Zurich without authorization from Neiswenter.

70. Immediately after discovering the August 6, 2026 withdrawal, Neiswenter contacted Zurich and advised him that: “You have withdrawn $1,941,000 from our Company Bank Account today, without my consent. You need

to send me evidence of where this money was moved to and the name of the Account Holder in which it is held, today."

71. Zurich responded by admitting that the transferred funds had been placed into a trust account under his control and stated: "The funds are in my trust account and they'll stay there until further order of the court."

72. At the time Zurich made that statement, no court order had authorized Zurich to remove the funds from the Company's account, place the funds into a trust account, exercise exclusive control over the funds, or to restrict Neiswenter's access to those funds.

73. Zurich further stated that he was in the process of filing litigation in multiple jurisdictions and intended to keep the funds in the trust account.

74. Following Zurich's admission that Company funds had been placed into a trust account, Neiswenter advised Zurich that the Law Office was not a party to the Company's governance disputes, objected to the unilateral transfer of Company funds into a law-firm trust account, demanded the immediate return of the funds, and advised Zurich that complaints would be submitted to applicable bar authorities if the funds were not returned.

75. Rather than returning the funds or providing the requested information, Zurich responded: "go for it."

76. Zurich did not return the funds.

77. Instead of returning the funds or providing the requested information, Zurich continues to maintain, administer, transfer, control, or direct control over the disputed funds notwithstanding Neiswenter's objections, demands for disclosure, requests for an accounting, and demands for return of the funds.

78. Upon information and belief, all or substantial portions of the funds were thereafter placed into one or more trust accounts, Treasury Direct accounts, investment accounts, or other accounts outside the Companies' ordinary operating structure.

79. On or about August 11, 2026, approximately $997,168.89 was transferred from the trust account through the operating account of NEIS Acquisitions 5192, LLC (Tennessee) and thereafter transferred into one or more Treasury Direct accounts.

80. Upon further review of City National Bank records and online banking activity, Neiswenter discovered additional transactions occurring on or about August 18, 2026 involving the same group of funds previously transferred from Company accounts.

81. Bank records reflected that approximately $963,276.42 was transferred from Zurich's trust account into the operating account of NEIS Acquisitions 5192, LLC, a Tennessee limited liability company, account ending in 420508.

82. Upon information and belief, substantially all of those funds were immediately transferred out of the operating account and into one or more Treasury Direct accounts or Treasury investments.

83. Bank records further reflected that approximately $19,445.31 was transferred from the operating account of NEIS Acquisitions 5192, LLC, account ending in 420508, back into the trust account maintained by the Law Office, account ending in 642187.

84. Upon information and belief, the foregoing transactions constituted additional transfers of Company funds through the Law Office’s trust account and through Company operating accounts without the authorization, approval, or consent of Neiswenter.

85. Upon information and belief, these transactions were undertaken as part of a continuing course of conduct through which Zurich exercised exclusive control over Company funds, restricted Neiswenter's access to those funds contrary to Neiswenter’s requests otherwise, and moved Company assets among trust accounts, operating accounts, Treasury Direct accounts, and other financial accounts outside the Companies' ordinary operating structure.

86. As a result of the transfers occurring on May 12, 2026, August 6, 2026, August 11, 2026, August 18, 2026, and related transactions, approximately $4 million in Company funds were removed from ordinary Company accounts and

placed into accounts controlled or administered by Zurich, including trust accounts and Treasury Direct accounts.

87. Upon information and belief, the transfers rendered substantial Company funds unavailable for ordinary Company operations, distributions, management decisions, investment decisions, and other Company purposes absent Zurich's unilateral approval.

88. Zurich's conduct deprived, and is depriving, Neiswenter of equal access to, oversight of, and participation in the management of significant Company assets and forms a substantial portion of the conduct giving rise to the claims asserted herein.

89. As a direct and proximate result of Zurich's actions, Neiswenter and the Companies have sustained damages in an amount to be proven at trial.

## COUNT I: BREACH OF FIDUCIARY DUTY

(Against Zurich)

90. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

91. Zurich breached the fiduciary duties he owed to the Jointly Owned Companiesand to Neiswenter in numerous respects.

92. Among other things, Zurich unilaterally transferred Company funds without authorization and outside the ordinary course of business.

93. Zurich also restricted and, in some instances, denied Neiswenter access to Company bank accounts, financial records, administrative platforms, and other financial information necessary for Neiswenter to exercise his rights as a fifty-percent owner.

94. Upon information and belief, Zurich caused or permitted Company funds to be transferred into accounts outside the Companies' ordinary operating accounts, including trust accounts, Treasury Direct accounts, investment accounts, and other accounts over which Neiswenter lacked visibility and control.

95. Zurich further failed to provide a complete accounting concerning the location, ownership, disposition, and current status of those funds and failed to provide transparency concerning the movement of Company assets among accounts under his control.

96. Zurich further breached his duties by causing Company assets and Company funds to be commingled with funds belonging to affiliates, related entities, and third parties, thereby impairing transparency and making it more difficult to determine the ownership, source, and disposition of Company funds.

97. In addition, Zurich utilized or permitted the utilization of Company-paid personnel, contractors, and resources for the benefit of entities and assets that were not jointly owned by the parties and from which Neiswenter derived no corresponding benefit.

98. Zurich likewise permitted individuals possessing no ownership interest in the Companies, including third parties and family members, to possess administrative authority, management authority, access rights, or control over Company banking relationships and Company financial accounts while simultaneously restricting Neiswenter's access to those same accounts.

99. Zurich also repeatedly acted unilaterally concerning Company operations, financial relationships, leasing matters, banking relationships, and management decisions despite the parties' equal ownership interests and despite governing documents requiring joint decision-making.

100. Zurich's conduct was designed to consolidate control over Company assets, restrict Neiswenter's participation in management, and interfere with the ordinary governance of the Companies.

101. Zurich further utilized litigation and receivership proceedings as leverage concerning jointly owned assets and entities.

102. Despite repeatedly representing to a court that emergency judicial intervention was required and that a receiver was necessary to protect Company assets, Zurich later abandoned those proceedings after obtaining a ruling appointing a receiver and immediately recommenced substantially similar litigation in another forum: this case presently before the Court.

103. Discovery will be commencing, and Counterclaim-Plaintiff expects additional breaches of fiduciary duty to be revealed through discovery, including additional unauthorized transfers, undisclosed transactions, account administration issues, intercompany transactions, and acts of self-dealing.

104. As a direct and proximate result of Zurich's conduct, Neiswenter has suffered damages and the Companies have suffered injury in an amount to be determined at trial.

## COUNT II: BREACH OF OPERATING AGREEMENTS
(Against Zurich)

105. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

106. The Companies are governed by written Operating Agreements that constitute valid and enforceable contracts governing the rights, obligations, authority, management, governance, operations, finances, and affairs of the Companies and their members.

107. At all times relevant hereto, Zurich and Neiswenter were parties to, bound by, and entitled to enforce the Operating Agreements.

108. The Operating Agreements require compliance with the governance structure, approval procedures, member rights, information rights, management requirements, and financial-administration obligations established therein.

109. At all times relevant hereto, Counterclaim-Plaintiff performed his obligations under the Operating Agreements or was excused from further performance by Zurich's conduct.

110. Zurich breached the Operating Agreements in numerous respects.

111. Among other things, Zurich transferred Company funds without obtaining the approvals required by the governance structure established under the Operating Agreements.

112. Zurich further transferred Company funds into Treasury Direct accounts, trust accounts, investment accounts, and other accounts outside the Companies' ordinary operating accounts without authorization and without providing complete information concerning the ownership, control, location, administration, and disposition of those funds.

113. Zurich further restricted or denied Counterclaim-Plaintiff access to Company bank accounts, Company financial records, account-administration information, transfer records, and other Company information to which Counterclaim-Plaintiff was entitled under the Operating Agreements.

114. Zurich further exercised unilateral authority concerning Company finances, Company operations, Company banking relationships, Company accounts, account administration, financial transfers, financial reporting, and other Company

matters despite the equal ownership structure of the Companies and despite governance requirements contained in the Operating Agreements.

115. Zurich further granted or permitted third parties to possess administrative authority, account authority, access authority, management authority, financial authority, signatory authority, or other control over Company affairs without the approvals required by the Operating Agreements.

116. Zurich further failed to administer the affairs of the Companies in a manner consistent with the contractual governance structure established by the Operating Agreements and instead exercised unilateral authority over Company finances, Company records, Company accounts, and Company operations despite the parties' equal ownership interests and management rights.

117. Zurich further failed to provide information, records, account documentation, transfer documentation, financial information, and other Company records necessary for Counterclaim-Plaintiff to exercise his contractual rights under the Operating Agreements.

118. Zurich's conduct materially deprived Counterclaim-Plaintiff of the benefits of the Operating Agreements, including his rights to participate in Company management, monitor Company finances, access Company information, protect Company assets, oversee Company operations, and exercise the rights of an equal owner.

119. Zurich's breaches have caused damage to Counterclaim-Plaintiff and the Companies, including but not limited to costs associated with investigating disputed transfers, tracing Company funds, obtaining access to Company information, protecting Company assets, restoring transparency to Company finances, resolving governance disputes, and such further damages as may be established through discovery and at trial.

120. Zurich's breaches are continuing in nature unless restrained by this Court.

121. As a direct and proximate result of Zurich's breaches of the Operating Agreements, Counterclaim-Plaintiff and the Companies have sustained damages in an amount to be proven at trial.

**COUNT III: ACCOUNTING**
(Against all Counterclaim-Defendants)

122. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

123. Zurich has exercised substantial control over Company finances, Company banking relationships, Company records, Company distributions, and Company accounting functions, and upon information and belief, the Law Office has received, maintained, administered, transferred, retained, or exercised authority over Company funds and records relating thereto.

124. A substantial dispute exists concerning the receipt, transfer, investment, administration, allocation, ownership, and disposition of Company funds, including, without limitation:

a. Company distributions;

b. Company reserves;

c. Treasury Direct investments and accounts;

d. trust accounts and escrow accounts;

e. bank accounts and investment accounts;

f. administrative control of Company accounts;

g. intercompany transfers;

h. co-tenant allocations;

i. management-fee allocations;

j. reimbursements and expense allocations;

k. partner-debt balances;

l. transfers involving affiliated entities;

m. transfers involving accounts controlled by Zurich or persons acting at Zurich's direction;

n. account signatories, administrators, and persons possessing transfer authority;

o. account balances and historical account activity; and

p. other financial transactions relating to the Jointly Owned Companies.

125. Upon information and belief, Zurich possesses or controls financial information, banking records, accounting records, transfer documentation, communications, administrator records, and other information necessary to determine the nature, source, destination, ownership, and present status of Company funds.

126. Upon information and belief, the Law Office possesses or controls records concerning the receipt, custody, administration, transfer, investment, retention, and disposition of Company funds transferred into or through account ending in 642187, including account records, trust-account records, wire information, transfer instructions, communications, and records identifying account signatories and authorized users.

127. Zurich and the Law Office have failed or refused to provide a complete accounting concerning the nature, ownership, location, transfer, investment, and disposition of Company funds transferred into or through account ending in 642187.

128. Zurich has failed or refused to provide complete information concerning numerous disputed transactions and account relationships, including transactions involving Treasury Direct investments, transfers among affiliated entities, account administration, and the location and disposition of Company funds.

129. Zurich has further failed to provide complete transparency concerning the identity of persons possessing administrative authority, transfer authority, signatory authority, approval authority, or other control over Company financial accounts.

130. Because Zurich and Neiswenter are equal owners of Jointly Owned Companies and because Zurich exercised substantial control over significant portions of the Companies' financial affairs, ordinary legal remedies are inadequate to determine the full extent of the transactions at issue.

131. A full accounting is necessary to determine: the location and ownership of Company funds; the propriety of transfers involving Company assets; the amount of any distributions, allocations, reimbursements, or payments owed; the existence and extent of any commingling of Company funds; the identity of persons exercising authority over Company accounts; the amount of damages suffered by Neiswenter and the Companies; and such other matters as may be revealed through the accounting process.

132. Neiswenter has no adequate remedy at law to obtain the information necessary to fully determine these issues without an equitable accounting.

133. Equity therefore requires a complete accounting of all Company funds, financial records, account activity, transfers, allocations, reimbursements, account administration, investment activity, and related transactions.

## COUNT IV: DECLARATORY JUDGMENT

(Against All Counterclaim Defendants)

134. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

135. An actual, present, and justiciable controversy exists between Counterclaim-Plaintiff and Counterclaim-Defendants concerning their respective rights, obligations, authority, and duties relating to the Jointly Owned Companies and the assets owned by those entities.

136. The parties dispute, among other things:

a. the scope of each member's management authority;

b. access to Company bank accounts, financial records, and administrative platforms;

c. the authority to distribute Company funds;

d. the ownership, control, location, and disposition of Company funds;

e. the propriety of prior transfers involving Company funds;

f. the authority to transfer Company funds into Treasury Direct accounts, trust accounts, investment accounts, or other financial accounts;

g. the authority to engage in leasing activity on behalf of the Companies;

h. the authority to negotiate, approve, reject, execute, amend, renew, or terminate leases;

i. the authority to market Company-owned property for sale;

j. the authority to negotiate, approve, reject, or execute purchase and sale transactions involving Company assets;

k. the authority to obtain financing, refinancing, or loan modifications;

l. the authority to grant account access, signatory authority, transfer authority, administrative authority, or viewing authority to third parties;

m. the identity of persons who are properly authorized to access or administer Company accounts;

n. the proper use of Company personnel, contractors, and other Company resources;

o. the parties' respective fiduciary obligations; and

p. the parties' respective rights and obligations under the governing operating agreements.

q. whether The Law Office of Zachary Zurich, P.A. possessed authority to receive, hold, administer, transfer, invest, or retain Company funds through account ending in 642187;

r. whether Company funds maintained in or through account ending in 642187 must be disclosed, accounted for, preserved, and returned.

137. Zurich has repeatedly asserted unilateral authority concerning Company funds, Company operations, leasing activity, banking relationships, account administration, and other Company matters. Neiswenter disputes those

assertions and contends that Zurich lacks the authority to take such actions unilaterally.

138. Zurich has further asserted positions concerning the operation of the Companies that are inconsistent with Neiswenter's interpretation of the governing agreements, the ownership structure of the entities, and the parties' historical course of conduct.

139. Unless the Court determines the parties' respective rights and obligations, uncertainty will continue concerning the operation, management, and governance of the Companies.

140. Neiswenter is entitled to a declaration defining the parties' respective rights, authority, duties, obligations, and limitations under the governing agreements and applicable law.

**COUNT V: INJUNCTIVE RELIEF**
(Against All Counterclaim Defendants)

141. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

142. Zurich and the Law Office have engaged in, and upon information and belief continues to engage in, unilateral conduct affecting the Jointly Owned Companies, including their finances, banking relationships, leasing activities, governance, records, personnel, and confidential business information.

143. Specifically, Zurich has exercised unilateral control over Company funds, restricted Neiswenter's access to Company accounts and financial information, caused or permitted Company funds to be transferred into accounts outside the ordinary operating accounts of the Companies, utilized the Law Office trust accounts, Treasury Direct accounts, and other investment accounts without authorization, and failed to provide complete transparency concerning the location, ownership, and disposition of Company funds.

144. Zurich has also acted unilaterally concerning leasing opportunities, tenant negotiations, broker communications, prospective sale opportunities, and related business activities despite the parties' equal ownership interests and despite governing agreements requiring joint participation and approval in connection with significant Company decisions.

145. Upon information and belief, Zurich has further utilized Company-paid personnel, contractors, and resources for entities, properties, and business activities not jointly owned by the parties while simultaneously restricting Neiswenter's participation in Company operations and management.

146. Zurich's conduct has created a substantial risk of continuing and irreparable harm to the Companies and to Neiswenter, including the loss of Company opportunities, interference with Company governance, impairment of transparency,

loss of access to financial information, diminution of Company value, and potential dissipation or concealment of Company assets.

147. Upon information and belief, the Law Office has received, maintained, transferred, retained, administered, possessed, or exercised authority over Company funds or records relating thereto. Unless restrained by this Court, Zurich and the Law Office may continue transferring, investing, retaining, dissipating, concealing, or otherwise impairing the traceability and availability of Company funds.

148. Monetary damages alone are insufficient to protect Neiswenter and the Companies from the continuing effects of Zurich's conduct.

149. Unless restrained by this Court, Zurich and The Law Office of Zachary Zurich, P.A. are likely to continue engaging in unilateral actions affecting Company finances, Company operations, Company records, leasing opportunities, tenant relations, and Company assets.

150. Counterclaim-Plaintiff has no adequate remedy at law to prevent such continuing harm.

**COUNT VI: CONVERSION**
(Against Zurich and Law Office)

151. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

152. At all relevant times, the jointly owned Companies owned and possessed funds, cash equivalents, bank-account balances, money-market balances,

Treasury Direct investments, investment-account balances, reserves, rents, and other monetary assets.

153. As a fifty-percent owner of the jointly owned Companies, Counterclaim-Plaintiff possessed ownership rights and legally protected interests in Company funds and Company assets.

154. Zurich exercised custody, possession, management authority, signatory authority, access authority, administrative authority, and control over Company funds and Company financial accounts.

155. Beginning no later than May 2026, Zurich transferred, controlled, redirected, invested, administered, retained, and exercised dominion over substantial sums of Company money without authorization and outside the ordinary course of Company business.

156. Those transfers included, without limitation:

a. the transfer of approximately $1,994,384.44 into a Treasury Direct account;

b. the transfer of approximately $1,941,000.00 from a Company money-market account into account ending in 642187;

c. the subsequent transfer of approximately $997,168.89 into Treasury Direct accounts;

d. the subsequent transfer of approximately $963,276.42 into Treasury Direct accounts; and

e. additional transfers and related transactions that will be identified through discovery and a complete accounting.

157. Zurich further exercised dominion and control over Company funds by:

a. restricting Neiswenter's access to Company bank accounts and financial information;

b. refusing to provide complete information regarding the location and disposition of Company funds;

c. failing to provide complete account records and transfer documentation;

d. transferring Company funds into accounts outside the Companies' ordinary operating accounts;

e. transferring Company funds into trust accounts, Treasury Direct accounts, investment accounts, and other accounts under his control; and

f. retaining possession, custody, or control over Company funds after demand for disclosure, accounting, and return.

158. Upon information and belief, Zurich's conduct deprived Counterclaim-Plaintiff and the Companies of possession, control, use, access, transparency, and administration of Company funds.

159. Counterclaim-Plaintiff demanded return of Company funds, disclosure concerning the location of Company assets, identification of receiving accounts, account records, and restoration of access to Company financial information.

160. Zurich failed and refused to return the funds, provide the requested information, or restore access to Company accounts.

161. Zurich exercised dominion and control over Company funds in a manner inconsistent with the rights of Counterclaim-Plaintiff and the Companies by asserting exclusive authority over the disposition, investment, administration, location, and return of Company funds and by refusing to restore such funds and information after demand.

162. Upon information and belief, the Law Office knowingly received, possessed, administered, retained, transferred, controlled, or otherwise exercised dominion over Company funds transferred into or through account ending in 642187.

163. Upon information and belief, the Law Office exercised dominion and control over Company funds after receiving notice that ownership and control of

those funds were disputed and after demands were made for disclosure, tracing, accounting, and return.

164. Upon information and belief, the Law Office lacked authorization from the Companies, Counterclaim-Plaintiff, any Company resolution, escrow arrangement, trust agreement, governing document, or court order authorizing continued possession, administration, retention, or transfer of Company funds.

165. Upon information and belief, the Law Office retained possession, custody, administration, or control of Company funds after receiving notice that ownership and control of the funds were disputed and after demands were made for disclosure, tracing, accounting, preservation, and return.

166. Upon information and belief, the Law Office received and retained the disputed funds despite knowing that the funds originated from Company accounts and despite being informed that Counterclaim-Plaintiff disputed Zurich's authority to transfer, retain, or exclusively control those funds.

167. As a direct and proximate result of the conduct of Zurich and the Law Office including the unauthorized transfer, receipt, retention, administration, and control of Company funds, Counterclaim-Plaintiff and the Companies have sustained damages in an amount to be determined at trial.

168. The conduct of Zurich and, upon information and belief, the Law Office, constituted an unauthorized assumption and exercise of ownership,

dominion, possession, and control over Company property inconsistent with the rights of Counterclaim-Plaintiff and the jointly owned Companies.

169. The conduct of Zurich and, upon information and belief, the Law Office, was intentional, willful, and undertaken in conscious disregard of the rights of Counterclaim-Plaintiff and the Companies.

170. Zurich and, upon information and belief, the Law Office, remain in possession of information, records, accounts, proceeds, investments, funds, or other property necessary to identify the full extent of the converted property.

**COUNT VII: APPOINTMENT OF RECEIVER**
(Against All Counterclaim Defendants)[2]

171. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

172. The Jointly Owned Companies own, operate, manage, and lease substantial commercial real property and maintain significant financial accounts, investment accounts, banking relationships, tenant relationships, and other assets requiring ongoing management and oversight.

---

[2] Counterclaim-Plaintiff David Neiswenter is the sole member and 100% owner of NEIS Acquisitions GA, LLC, which owns a 19.625% tenancy-in-common interest in the Tenant-in-Common Property. In his capacity as the sole member authorized to act for NEIS Acquisitions GA, LLC, Neiswenter has authorized and consents on its behalf to the appointment of the requested receiver and to the receiver's management, preservation, leasing, operation, maintenance, refinancing, marketing, and administration of the Tenant-in-Common Property, subject to further order of the Court.

173. The parties each possess a fifty-percent ownership interest in the Companies and possess equal management rights under the governing agreements.

174. A substantial dispute exists concerning the management and operation of the Companies, including disputes concerning:

a. Company bank accounts;

b. Company distributions;

c. control of Company funds;

d. Treasury Direct investments and accounts;

e. trust-account transfers;

f. leasing decisions;

g. tenant negotiations;

h. refinancing efforts;

i. Company records;

j. account administration;

k. signatory authority;

l. management authority; and

m. the overall governance and operation of the Companies.

175. Zurich has exercised unilateral control over substantial Company funds and has transferred Company funds into Treasury Direct accounts, trust accounts,

investment accounts, and other financial arrangements outside the Companies' ordinary operating accounts.

176. Zurich has further restricted or impaired Neiswenter's ability to exercise equal oversight concerning Company finances, account administration, and Company operations.

177. The parties' disputes have reached a point where continued management of the Companies through ordinary cooperation is no longer reasonably achievable.

178. As first raised by Zurich’s prior lawsuit and pursuant to Mr. Zurich's own sworn testimony and representations to the court in prior litigation, the Companies are presently facing significant financial and operational issues, including the maturity of the City National Bank loan scheduled for December 17, 2026, ongoing leasing issues affecting property performance, disputes concerning Company reserves and financial management, and the need for coordinated lender communications and refinancing efforts.

179. Resolution of lender issues, refinancing efforts, leasing opportunities, tenant negotiations, preservation of Company assets, administration of Company funds, and operation of the Companies require neutral oversight.

180. The need for receivership is further demonstrated by the parties' disputes concerning the transfer, administration, investment, location, and control of

millions of dollars in Company funds, including disputed transfers involving Treasury Direct accounts, trust accounts, and other financial accounts outside the Companies' ordinary operating structure.

181. Less restrictive remedies are presently inadequate because substantial disputes exist concerning control of Company funds, disputed transfers, account administration, leasing authority, refinancing authority, access to Company records, and day-to-day management of the Companies. The parties' equal ownership interests and inability to resolve these disputes have materially impaired the Companies' ability to operate efficiently and address upcoming lender, leasing, and operational issues.

182. Zurich has previously initiated legal proceedings wherein he requested a receiver and asserted under oath and to the court that the appointment of a receiver was necessary to protect Company assets, preserve Company operations, address management disputes, and safeguard the interests of the Companies and their stakeholders, and obtained the appointment of a receiver in prior litigation involving these same assets and substantially similar allegations.

183. Counterclaim-Plaintiff believes that John F. Kennedy of James Bates Brannan Groover LLP possesses substantial experience in commercial real-estate matters, financial administration, business disputes, receiverships, and court-supervised fiduciary appointments and is well qualified to serve as receiver.

184. Counterclaim-Plaintiff requests that the receiver be vested with all powers necessary to:

a. preserve and protect Company assets;

b. receive, collect, hold, and administer Company funds;

c. obtain and maintain access to all Company accounts, financial records, and financial information;

d. supervise leasing activity and tenant communications;

e. supervise refinancing efforts and lender communications;

f. preserve Company records and electronically stored information;

g. investigate disputed transfers of Company funds;

h. provide accountings and reports to the Court and the parties; and

i. take such other actions as may be necessary to preserve and administer the Companies pending final resolution of this action.

185. Appointment of a receiver is in the best interests of the Companies, their owners, their creditors, and other stakeholders.

**COUNT VIII: GEORGIA RICO VIOLATIONS**
O.C.G.A. § 16-14-1, *et seq*
(Against Zurich and the Law Office)

186. Counterclaim-Plaintiff incorporates by reference the preceding paragraphs 1 through 89 as though fully set forth herein.

187. The Georgia RICO Act prohibits any person, through a pattern of racketeering activity or proceeds derived therefrom, from directly or indirectly acquiring or maintaining any interest in or control of an enterprise or property of any nature, including money. O.C.G.A. § 16-14-4(a). The Act further prohibits a person employed by or associated with an enterprise from directly or indirectly conducting or participating in the enterprise through a pattern of racketeering activity. O.C.G.A. § 16-14-4(b).

188. At all relevant times, the Jointly Owned Companies were legal entities and therefore constituted one or more "enterprises" within the meaning of O.C.G.A. § 16-14-3(3).

189. Counterclaim-Defendant Zurich was associated with and participated in the affairs of the Companies through his ownership interests, participation in management, access to Company funds, control of Company banking relationships, and administration of Company financial accounts.

190. As a member, manager, fiduciary, and person entrusted with access to Company funds, Zurich initially obtained possession of and authority over Company funds subject to the operating agreements, his fiduciary obligations, the rights of his equal co-owner, and the obligation to use, apply, administer, and preserve those funds solely for authorized Company purposes.

191. Upon information and belief, the Law Office was associated with and participated in the affairs of the enterprise through its banking, trust-account, financial-administration, transfer, and custodial activities relating to Company funds.

192. Upon information and belief, Company funds were transferred into, through, or from accounts maintained by or associated with the Law Office, including account ending in 642187.

193. Upon information and belief, the Law Office knowingly participated in or facilitated the receipt, transfer, retention, administration, investment, or control of Company funds after receiving notice that ownership and control of those funds were disputed.

194. Beginning no later than May 2026, Zurich engaged in multiple related acts involving the unauthorized transfer, appropriation, retention, concealment, investment, and control of Company funds.

**The Predicate Acts**

195. On or about May 12, 2026, Zurich transferred or caused the transfer of approximately $1,994,384.44 in Company funds from a Company account into a Treasury Direct account without Counterclaim-Plaintiff's knowledge, consent, or approval and without producing any Company resolution or other authorization supporting that transfer.

196. On or about August 6, 2026, Zurich transferred or caused the transfer of approximately $1,941,000 in Company funds from the Neis Acquisitions 5192, LLC money-market account ending in 547561 to an account ending in 642187. When asked to identify where the funds had been placed, Zurich stated: “The funds are in my trust account and they’ll stay there until further order of the court.”

197. No court order authorized Zurich to remove the funds from the Company account, place the funds in an account identified as his trust account, or exercise exclusive control over the timing and conditions of their return.

198. On or about August 11, 2026, Zurich transferred or caused the transfer of approximately $997,168.89 from the account ending in 642187, through a Company operating account, and into one or more Treasury Direct accounts.

199. On or about August 18, 2026, Zurich transferred or caused the transfer of approximately $963,276.42 from the account ending in 642187, through a Company operating account, and into one or more Treasury Direct accounts.

200. Additional transactions involving the account ending in 642187 included a transaction of approximately $19,445.31 and may include other transactions to be identified through discovery and a complete accounting.

201. Each transfer constituted a separate exercise of dominion and control over Company property and a separate appropriation or disposition of Company funds.

202. The foregoing transfers were undertaken without Counterclaim-Plaintiff's knowledge or consent, outside the Companies' ordinary operating accounts, and without the joint authorization required by the Companies' equal ownership and governance structure.

203. After the transfers occurred, Neiswenter demanded, return of the funds, a complete tracing and accounting, identification of the receiving accounts and their owners, disclosure of all signatories and authorized users, restoration of financial access, and cessation of further unilateral financial activity, among other things. Neiswenter further demanded that the funds remain intact, segregated, and traceable pending their return.

204. Zurich failed and refused to provide the demanded authorization, accounting, tracing information, account documentation, and return of the disputed funds.

**Theft-Based Racketeering Activity**

205. O.C.G.A. § 16-14-3 includes theft offenses under Article 1 of Chapter 8 among the criminal offenses capable of constituting racketeering activity.

206. Under O.C.G.A. § 16-8-2, theft by taking includes not only the initial unlawful taking of another's property, but also the unlawful appropriation of property by a person who initially possessed the property lawfully, when undertaken with the intent to deprive another of that property.

207. Under O.C.G.A. § 16-8-4, theft by conversion occurs when a person lawfully obtains funds or other property of another subject to an agreement or other known legal obligation requiring a specified application or disposition and knowingly converts the funds or property to that person's own use in violation of the agreement or legal obligation.

208. Zurich initially obtained access to the Company funds through his position as a member, manager, fiduciary, and person entrusted with administration of Company financial accounts.

209. Zurich was subject to and bound by known legal, fiduciary, contractual, and governance obligations requiring him to administer Company funds for authorized Company purposes, preserve the property and rights of the Companies and their members, provide an accounting of Company assets, refrain from misappropriating Company property, and refrain from exercising unauthorized exclusive control over jointly owned Company funds.

210. Zurich's obligation to administer Company funds arose from the Operating Agreements, his status as an equal member and manager, his fiduciary duties owed to the Companies and to Neiswenter, and the parties' longstanding course of dealing. Zurich therefore possessed Company funds pursuant to known legal obligations concerning their administration, use, preservation, and disposition.

211. By transferring Company funds into Treasury Direct accounts, the disputed account ending in 642187, and an account he described as "my trust account," and by retaining control of those funds without joint authorization and after demand for return and accounting, Zurich knowingly appropriated and converted Company property in violation of those obligations.

212. Upon information and belief, each transfer alleged above constitutes a separate predicate act of theft by taking, theft by conversion, or both, within the meaning of O.C.G.A. § 16-14-3.

**Wire-Fraud Based Racketeering Activity**

213. Upon information and belief, Zurich utilized interstate wire communications, including electronic banking systems, internet-based financial platforms, online banking portals, Treasury Direct systems, electronic communications, emails, and other interstate wire transmissions to effectuate, conceal, and further the scheme described herein.

214. Upon information and belief, Zurich knowingly transmitted, or caused to be transmitted, electronic instructions, authorizations, communications, records, representations, and other wire communications relating to the transfer, administration, control, custody, disposition, and investment of Company funds.

215. Upon information and belief, such wire communications were transmitted for the purpose of executing and furthering a scheme to obtain, retain,

exercise control over, conceal, administer, and dispose of Company funds through materially false, misleading, incomplete, or fraudulent representations and omissions concerning the ownership, administration, authorization, location, custody, and disposition of Company funds.

216. Upon information and belief, Zurich represented, directly or indirectly, that he possessed authority to transfer, administer, invest, retain, restrict access to, and control Company funds when, in fact, such authority was disputed, limited, subject to the governing Operating Agreements, subject to Counterclaim-Plaintiff's equal ownership and management rights, and otherwise not authorized in the manner represented.

217. Upon information and belief, each electronic transfer authorization, electronic banking instruction, electronic communication, online transaction, and related interstate wire communication transmitted in furtherance of the scheme constitutes a separate predicate act of wire fraud under 18 U.S.C. § 1343 and O.C.G.A. § 16-14-3.

**<u>Pattern of Racketeering Activity</u>**

218. The alleged predicate acts occurred within four years of one another and were not isolated incidents.

219. The predicate acts described herein, including theft by taking, theft by conversion, wire fraud, and related racketeering activity, shared the same or similar intent, purpose, result, victim, participant, property, and method of commission.

220. Each predicate act involved Zurich's use of financial-account access and Company banking relationships to acquire or maintain disproportionate or exclusive control over Company money without Counterclaim-Plaintiff's knowledge or consent.

221. The predicate acts were interrelated and undertaken in furtherance of a common scheme to consolidate control of Company funds, restrict Counterclaim-Plaintiff's access to those funds, and prevent Counterclaim-Plaintiff from exercising equal management and oversight rights.

222. The alleged predicate acts therefore constitute a "pattern of racketeering activity" under O.C.G.A. § 16-14-3(4).

**Violations of O.C.G.A. § 16-14-4**

223. Through the pattern of racketeering activity described above, Zurich directly or indirectly acquired or maintained an interest in or control over Company money, Company investments, Company financial accounts, and other Company property in violation of O.C.G.A. § 16-14-4(a).

224. Through the same pattern of racketeering activity, Zurich, while associated with the Companies, conducted or participated directly or indirectly in the affairs of the Companies in violation of O.C.G.A. § 16-14-4(b).

225. The pattern of racketeering activity enabled Zurich to remove substantial funds from accounts subject to ordinary Company oversight, transfer them through an account outside Counterclaim-Plaintiff's control, place them into investments and accounts lacking equal access and transparency, and maintain control over the funds notwithstanding Counterclaim-Plaintiff's objections and demands.

**Direct and Proximate Injury**

226. The injuries alleged in this Count flow directly from the alleged theft-based predicate acts. Civil Georgia RICO requires a direct connection between at least one predicate act and the claimed injury, rather than an attenuated or merely consequential relationship.

227. As the direct and proximate result of the transfers and conversions, Counterclaim-Plaintiff was deprived of access to and oversight of Company funds, deprived of the ability to participate equally in their administration and disposition, and forced to incur expenses to trace, protect, recover, and obtain an accounting of the funds.

228. The Companies were likewise deprived of possession and control of funds held in their ordinary operating accounts and incurred losses, expenses, administrative burdens, and risks associated with the unauthorized transfers, disputed custody, and lack of transparency.

229. Counterclaim-Plaintiff has therefore suffered injury to business and property by reason of the violations of O.C.G.A. § 16-14-4.

230. Under O.C.G.A. § 16-14-6(c), a person injured by a violation of O.C.G.A. § 16-14-4 may recover three times the actual damages sustained, appropriate punitive damages, attorney's fees in the trial and appellate courts, and reasonably incurred costs of investigation and litigation.

## PRAYER FOR RELIEF

WHEREFORE, Defendant and Counterclaim-Plaintiff David Neiswenter, individually and derivatively on behalf of the Jointly Owned Companies to the extent applicable, respectfully requests that the Court enter judgment in his favor and against the appropriate Counterclaim Defendants and grant the following relief:

A. Award compensatory damages in an amount to be determined at trial;

B. Award consequential damages, special damages, and all other damages recoverable under applicable law;

C. Award treble damages pursuant to the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-6(c);

D. Award punitive damages to the extent authorized by Georgia law and otherwise permitted by law;

E. Award all attorney's fees, litigation expenses, expert fees, investigative costs, accounting expenses, forensic expenses, and other recoverable costs authorized by contract, statute, equity, or common law, including but not limited to O.C.G.A. § 16-14-6(c);

F. Order a full accounting, tracing, and identification of all Company funds, reserves, investments, Treasury Direct accounts, trust accounts, bank accounts, transfers, distributions, reimbursements, allocations, revenues, and other Company assets;

G. Enter appropriate declaratory relief defining and adjudicating the parties' respective rights, duties, authority, management rights, account-access rights, ownership interests, fiduciary obligations, and governance authority;

H. Enter preliminary, interlocutory, and permanent injunctive relief as necessary to preserve Company assets, prevent further unauthorized transfers, maintain the status quo, compel disclosure of financial information, and protect the rights of Counterclaim-Plaintiff and the Companies;

I. Appoint a receiver with the powers requested in Count VII, including authority over Company assets, Company finances, lender communications, leasing

activity, records, and operations, together with such additional authority as the Court deems appropriate;

J. Impose a constructive trust upon all Company funds, accounts, investments, Treasury Direct accounts, trust accounts, proceeds, and assets traceable to the transfers and conduct alleged in these Counterclaims;

K. Impose an equitable lien upon all assets, accounts, investments, proceeds, funds, or property traceable to the Company monies transferred, administered, retained, invested, or controlled by Counterclaim Defendants;

L. Award prejudgment interest and post-judgment interest as authorized by law;

M. Award taxable costs of court;

N. Award such derivative relief as may be necessary to restore Company assets and property to the affected Companies;

O. Grant such other, further, legal, equitable, and just relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

Defendant and Counterclaim-Plaintiff David Neiswenter hereby demands a trial by jury on all claims, counterclaims, defenses, and issues so triable.

Respectfully submitted this 17th day of November, 2026.

BUCHALTER LLP

/s/ Brian S. Goldberg
Brian S. Goldberg
Georgia Bar No. 128007

3475 Piedmont Road NE
Suite 1100
Atlanta, Georgia 30305
Telephone: (404) 832-7667
Email: bgoldberg@buchalter.com
*Counsel for Defendant, Counterclaim-Plaintiff David Neiswenter*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of November, 2026, I electronically filed the foregoing David Neiswenter's Amended Counterclaims with the Clerk of Court using the CM/ECF system, which will automatically send notice of such filing to all counsel of record.

Respectfully submitted,

BUCHALTER LLP

/s/ Brian S. Goldberg

Brian S. Goldberg
Georgia Bar No. 128007

3475 Piedmont Road NE
Suite 1100
Atlanta, Georgia 30305
Telephone: (404) 832-7667
Email: bgoldberg@buchalter.com
*Counsel for Defendant, Counterclaim-Plaintiff David Neiswenter*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| **Zachary Zurich**,<br><br>Plaintiff and<br>Counterclaim-Defendant<br><br>v.<br><br>**David Neiswenter**, et al.<br><br>Defendant and<br>Counterclaim-Plaintiff | ) | Civil Action File No.<br>5:26-cv-00388-MTT |

**VERIFICATION OF DAVID NEISWENTER**

I, David Neiswenter, declare as follows:

1. I am the Defendant and Counterclaim-Plaintiff in the above-captioned action, and I have read the foregoing Answer, Affirmative Defenses, and Counterclaims.

2. I have personal knowledge of the facts set forth therein.

3. As to those matters stated upon information and belief, I believe them to be true and correct.

4. The factual allegations contained in the foregoing Answer, Affirmative Defenses, and Counterclaims are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2026.

_______________________
David Neiswenter